ACCEPTED
02-18-00178-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
5/24/2018 2:13 PM
DEBRA SPISAK
CLERK

NO. 02-18-00178-CV

IN THE COURT OF APPEALS
FOR THE SECOND DISTRICT OF TEXAS
FORT WORTH, TEXAS

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
5/24/2018 2:13:01 PM
DEBRA SPISAK
Clerk

ENERQUEST OIL & GAS, L.L.C.,
*Appellant,*

v.

ANTERO RESOURCES CORPORATION,
*Appellee.*

On Appeal from the 141st Judicial District
of Tarrant County, Texas
Trial Court Cause No. 141-290089-17

## ANTERO'S RESPONSE TO
## ENERQUEST'S EMERGENCY MOTION FOR TEMPORARY RELIEF

Jason R. Grill
State Bar No. 24002185
jason.grill@steptoe-johnson.com
STEPTOE & JOHNSON P.L.L.C.
10001 Woodloch Forest Drive, Suite 300
The Woodlands, Texas 77380
Telephone: (281) 203-5700
Facsimile: (281) 203-5701

Phillip B. Dye, Jr.
State Bar No. 06311500
pdye@velaw.com
Jason M. Powers
State Bar No. 24007867
jpowers@velaw.com
Caroline C. Stewart
State Bar No. 24098477
cstewart@velaw.com
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Telephone: (713) 758-2048
Facsimile: (713) 615-5766

*Attorneys for Appellee*
*Antero Resources Corporation*

TO THE HONORABLE COURT OF APPEALS:

Appellee Antero Resources Corporation ("Antero") responds to Appellant EnerQuest Oil & Gas, L.L.C.'s ("EnerQuest's") Emergency Motion for Temporary Relief as follows.

Because EnerQuest concedes it will be participating in discovery in this case through a Texas-based entity it purports to manage, and therefore will actually incur the discovery expense it claims should be avoided, there is no reason to stay discovery—especially because the emerging facts are already showing additional jurisdictional contacts that EnerQuest sought to avoid revealing below. The only effect of the stay EnerQuest seeks would be to facilitate gamesmanship with respect to EnerQuest's admitted obligation to continue responding to merits discovery on behalf of Braxton Minerals III, the Texas-based entity it manages.

## Procedural Background

In pertinent part, this case concerns the theft of trade secrets belonging to Antero. Antero alleges that certain defendants below participated in a scheme to acquire confidential information about Antero's oil-and-gas well-drilling activities from at least two individuals associated with a Fort Worth-based company providing landman and other title-related services to Antero.

On March 9, 2018, Antero filed an amended petition in this case adding multiple defendants, including EnerQuest and Braxton Minerals III, LLC.

1

EnerQuest, an Oklahoma-based company, owns 75% of the membership interest in Braxton Minerals III, a limited liability company with its principal place of business in Fort Worth. Braxton Minerals III holds oil and gas properties that appear to have been targeted for acquisition on the basis of Antero's non-public information. Braxton Minerals III's acquisition of these properties was funded by EnerQuest, who in 2015 had reached out to Texas to enter into a business relationship with the other member of Braxton Minerals III—a Fort Worth-based entity called Braxton Minerals-Appalachia ("BMA")—and the two Fort Worth residents who were principals of BMA, all of whom are also defendants below. EnerQuest contends that it is the managing member of Braxton Minerals III.[1]

On April 18, 2018, EnerQuest filed a special appearance denying that it was subject to personal jurisdiction in Texas. In that special appearance, EnerQuest admitted that it had searched its files and found confidential Antero documents received from one of BMA's principals, a resident of Fort Worth. *See* Ex. A at 6-7. These documents had been requested by EnerQuest in emails sent to Texas, as explained in Antero's answer to the special appearance. *See* Ex. B.

On April 25, 2018, Antero served jurisdictional discovery on EnerQuest seeking to establish the scope of EnerQuest's relevant contacts with Texas for

---

[1] A defendant below has called into question whether the formation of Braxton Minerals III was fraudulent. Antero takes no position on that issue at this time, but assumes for purposes of this motion that EnerQuest is, as it claims to be, the managing member of Braxton Minerals III.

purposes of responding to EnerQuest's special appearance. *See* Ex. B-4. The day after receiving these discovery requests, EnerQuest gave notice that the District Court would hear its special appearance on May 9, 2018. *See* Ex. C.

On April 30, 2018, Braxton Minerals III filed an answer and generally appeared. *See* Ex. D. As expected, given that EnerQuest had already admitted in its special appearance that it had "removed Braxton Minerals-Appalachia as Manager of Braxton Minerals III and *appointed itself as Manager* of that company," *see* Ex. A at 6, Braxton Minerals III's answer was filed by EnerQuest's counsel, *see* Ex. D.

On May 1-2, 2018, Antero requested that EnerQuest agree to a continuance of the special appearance hearing to allow for limited jurisdictional discovery to proceed before the special appearance was decided. EnerQuest refused the request. Therefore, on May 2, 2018, Antero filed its response identifying those Texas contacts of which Antero was already aware, along with an alternative motion for continuance to obtain answers to the outstanding jurisdictional discovery requests and conduct further jurisdictional discovery as needed. *See* Ex. B.

On May 11, 2018, the District Court denied EnerQuest's special appearance, evidently concluding that specific personal jurisdiction over EnerQuest was already established without the need for further discovery. *See* Ex. E.

## ARGUMENT

EnerQuest argues for a stay of discovery to avoid expense and avoid deciding claims that may not be subject to personal jurisdiction. But as EnerQuest concedes, it will bear the expense of discovery in any event; and Texas law already prevents any risk that claims will be decided while EnerQuest's appeal pends. In this Court, EnerQuest is merely doing what it did below: trying to avoid any inquiry whatsoever into jurisdictional facts.

**I.    Because EnerQuest will remain in this litigation under another name, it faces no additional expense or inconvenience from continuing in discovery.**

EnerQuest's primary argument is that it will suffer "substantial expense and inconvenience" from participating in discovery in Fort Worth. Motion at 4. But EnerQuest does not explain what expense or inconvenience it will suffer. Indeed, it does not explain why it will suffer *any* expense or inconvenience from participating in discovery in the name of EnerQuest, since it intends to participate in discovery in the name of Braxton Minerals III, the Texas-based entity it owns and on whose behalf it answered without contesting jurisdiction at all. Given that EnerQuest contends it is the sole manager of Braxton Minerals III, EnerQuest's position is that it is the only entity capable of producing Braxton Minerals III's documents, answering interrogatories on its behalf, or designating corporate representatives for its testimony.

4

Indeed, EnerQuest has conceded that it will continue to participate in discovery. Just two days ago, counsel for EnerQuest asked that Antero consent to stay discovery as to EnerQuest, explaining that EnerQuest would continue to participate in discovery as the manager of Braxton Minerals III:

> We intend to answer the discovery for BMIII and ***continue to participate in the discovery of the case, as well as produce any documents EnerQuest has*** in relation to BMIII, Bauer and Ashburn through BMIII.

*See* Ex. F.

EnerQuest cites no authority for the proposition that discovery should be stayed during the appeal of a special appearance when that discovery imposes no meaningful additional costs on the defendant. As reflected in each case EnerQuest cites, courts stay discovery during the appeal of a special appearance only when the requested discovery would impose a significant burden and expense on the specially appearing party. In *Oryx Capital International, Inc. v. Sage Apartments, L.L.C.*, the appellate court granted a stay so that Oryx could avoid "the expense and inconvenience of discovery pending the resolution of this appeal." 167 S.W.3d 432, 437 (Tex. App.—San Antonio 2005, no pet.). Again, in *Lattin v. Barrett*, the court "expressed concern for an appellant challenging the denial of a special appearance having to incur the expense and inconvenience of discovery pending resolution of the appeal of a special appearance." 127 S.W.3d 276, 277 (Tex. App.—Waco 2003, no pet.). And finally, in *Lacefield v. Elec. Fin. Grp., Inc.*, the court stayed discovery

5

on the *sole* basis of burden and expenses, stating: "Lacefield should not be required to submit to 'the expense and inconvenience' of discovery pending resolution of his appeal." 21 S.W.3d 799, 800 (Tex. App.—Waco 2000, no pet.).

Although burden and expense may be a valid basis on which to stay discovery in some cases, this issue has no weight here, where EnerQuest will be participating in discovery on behalf of Braxton Minerals III. EnerQuest has not explained how responding on behalf of itself would impose any measurable additional burden that would support a stay of discovery.

Moreover, EnerQuest faces no special burden from participating in discovery in Texas. Based in Oklahoma City, EnerQuest has convenient access to Fort Worth, and because EnerQuest operates oil and gas wells in Texas, is registered to do business in Texas, and has an agent for service of process in Texas (*see* Ex. A at 4), it has already demonstrated that it has no serious objection to litigating in Texas.

II.     **The automatic trial stay obviates any risk of a merits disposition that would affect EnerQuest's substantial rights pending appeal.**

EnerQuest next contends that "the parties risk litigating claims … that must be dismissed" if it prevails on its jurisdictional appeal. Motion at 4. Not so. First, Texas statute is clear that an interlocutory appeal of an order denying a special appearance stays "the commencement of a trial" during the appeal. TEX. CIV. PRAC. & REM. CODE § 51.014(b). As such, the District Court will not decide the outcome of the case while the appeal pends. But otherwise, the District Court retains

6

jurisdiction over the case during the interlocutory appeal and may proceed with all other matters. "Section 51.014(a)(7) provides that an interlocutory appeal may be brought after the denial of a special appearance, but the statute does not provide a stay of anything but the trial pending resolution of the appeal," in contrast to appeals under Subsection (a)(3), (5), (8), or (12). *Buswell v. The GWSPI Co., LLC*, 511 S.W.3d 256, 257 (Tex. App.—San Antonio 2015, no pet.) (citing § 51.014(a)(7), (b)). An appellant therefore bears the burden of showing why Section 51.014(a) should be extended to discovery when they appeal under Section 51.014(a)(7). EnerQuest has not carried its burden.

Second, even in the unlikely event EnerQuest were to prevail on its appeal, it is far from clear this case would be dismissed. Because EnerQuest demanded a hearing on its special appearance before any jurisdictional discovery, even a reversal of the District Court's decision could merely result in a remand to the District Court to allow jurisdictional discovery exploring the EnerQuest contacts with the other Texas defendants that the evidence has already revealed in part.

## III.  EnerQuest is attempting to take strategic advantage of its refusal to participate in jurisdictional discovery in the district court.

EnerQuest fought ordinary jurisdictional discovery below, and its current motion appears designed to prevent the development of facts that could quickly resolve the jurisdictional issues on remand if necessary. As explained in the proceedings below, the District Court had discretion to permit discovery on a special

7

appearance. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Barron v. Vanier*, 190 S.W.3d 841, 847 (Tex. App—Fort Worth 2006, no pet.). Such commonplace discovery could easily have been allowed if it were necessary. But after EnerQuest insisted it had no relevant Texas contacts, Antero submitted clear evidence to the District Court that EnerQuest had reached out to Texas to obtain confidential information. In addition, since the time of the special appearance hearing, one of the BMA principals has testified in deposition that EnerQuest's president and another EnerQuest employee actually *came to Texas for an October 2015 meeting* with the two BMA principals to discuss investing in Braxton's mineral acquisition program, right before Braxton Minerals III was formed in November 2015 and acquired the allegedly tainted properties.[2]

In the court below, EnerQuest sought to avoid answering discovery that would have revealed that Texas contact, and EnerQuest's motion in this Court appears intended to continue the strategy of seeking a decision on the special appearance without allowing the development of *any* fact record regarding its Texas contacts. This Court need not facilitate EnerQuest's strategic approach. Allowing ordinary discovery to continue may reveal facts that will further solidify personal jurisdiction over EnerQuest and possibly lead EnerQuest to abandon its appeal.

---

[2]   *See* Ex. G (excerpt from deposition of Robert Scott Bauer) at 121-22. Because the Bauer deposition took place less than ten days ago, a final transcript has not been completed. Therefore, an excerpt of the "rough" draft transcript received from the reporter is attached.

Indeed, the strategic value of this stay to EnerQuest is likely its only real value. Given that EnerQuest will be participating in discovery under the name of Braxton Minerals III, the only practical impact of a stay of discovery would be to give EnerQuest a fig-leaf reason to selectively respond to discovery, *i.e.*, a license to refuse to answer discovery requests and deposition questions about its activities in Texas. This selective responsiveness would be wasteful, as it makes no sense for an EnerQuest witness giving a deposition as a Braxton corporate representative to refuse to answer questions about EnerQuest's visits to Texas. More troublingly still, EnerQuest could use the discovery stay to delay or limit the inquiry into the merits of the case against Braxton Minerals III, by choosing to disclose whatever facts it is comfortable disclosing, and then asserting that any inconvenient questions encroach on the subject of EnerQuest's contacts with Texas—contacts which may well prove central to the manner in which Antero's confidential information was solicited, disclosed, and used by multiple individuals and entities. Because the discovery stay would do nothing to avoid any expense or burden, there is no reason to risk entering a stay that could potentially be misused and abused.

## **PRAYER**

Appellee Antero Resources Corporation respectfully requests that this Court deny EnerQuest's Motion for Temporary Relief. Antero further requests the Court grant it such additional and further relief to which it may show itself entitled.

9

Respectfully submitted,

STEPTOE & JOHNSON P.L.L.C.

By:     /s/Jason R. Grill
        Jason R. Grill
        State Bar No. 24002185
        jason.grill@steptoe-johnson.com
        W. Henry Lawrence
        WV State Bar No. 2156
        10001 Woodloch Forest Drive, Suite 300
        The Woodlands, Texas 77380
        281.203.5700
        281.203.5701 (facsimile)

VINSON & ELKINS L.L.P.

By:     /s/Jason M. Powers
        Phillip B. Dye, Jr.
        State Bar No. 06311500
        pdye@velaw.com
        Jason M. Powers
        State Bar No. 24007867
        jpowers@velaw.com
        Caroline C. Stewart
        State Bar No. 24098477
        cstewart@velaw.com
        1001 Fannin Street, Suite 2500
        Houston, TX  77002-6760
        713.758.2222
        713.758.2346 (facsimile)

**Attorneys for Appellee**
**Antero Resources Corporation**

10

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all parties listed below via E-service and/or via facsimile, on this the 24th day of May, 2018:

*Via E-Service:*
*ghamm@hammfirm.com*
Gene A. Hamm, II
The Hamm Firm
1333 W. McDermott, Suite 200
Allen, Texas  75013
*Attorney for Plaintiff, Penn Investment Funds, LLC and New Defendants Venture Strong II, LLC and Joe F. Penn Jr.*

*Via E-Service:*
*apennington@phblaw.com*
H. Allen Pennington, Jr.
Matthew D. Germany
Pennington Hill, LLP
Tindall Square – Warehouse No. 3
509 Pecan Street, Suite 101
Fort Worth, Texas
*Attorneys for Defendants John Bradley Ashburn and New Defendant Post Oak Appalachia, LLC*

*Via E-Service:*
*mhassett@tarrantbusinesslaw.com*
Michael Hassett
Jones Hassett, PC
440 North Center
Arlington, Texas 76011
*Attorney for Defendants Michael Fisher, Maegan Fisher and M&M Consulting*

*Via E-Service:*
*awoodward@hrepc.com*
C. Andrew Woodward
Holman Robertson Eldridge
8226 Douglas Ave., Suite 550
Dallas, Texas 75225
*Attorney for Kelly O'Connor*

*Via E-Service:*
*Scott@braxtonenergy.com*
R. Scott Bauer
8851 Camp Bowie Boulevard W
Suite 200
Fort Worth, Texas  76116
*Attorney for Braxton Acquisitions, LLC; Braxton Energy, LLC; Braxton Minerals II, LLC; and R. Scott Bauer*

*Via E-Service:*
*brad@postoakroyalty.com*
Brad Ashburn
100 N. Forest Park Blvd., Suite 201
Fort Worth, Texas 76102
*Attorney for Braxton Minerals-Appalachia, LLC*

*Via E-Service:*
*rolandjohnson@hfblaw.com*
Roland K. Johnson
Harris, Finley & Bogle, PC
777 Main Street, Suite 1800
Fort Worth, Texas 76102
*Attorney for Energy Corporation of*
*America*

*Via E-Service:*
*joe.cox@bracewell.com*
Joseph M. Cox and Andrea D. Broyles
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Spencer F. Smith
McAfee & Taft
211 N. Robinson Ave.
Oklahoma City, Oklahoma 73102.
*Attorneys for EnerQuest Oil & Gas,*
*L.L.C. and Braxton Minerals III, LLC*

*Via E-Service:*
*jnt@turnerandallen.com*
Jess N. Turner, III
Turner & Allen, P.C.
P.O. Box 930
Graham, Texas 76450
*Attorney for Turn 2 Energy, LLC*

*Via E-Service: cd@peebleslaw.com*
C.D. Peebles
The Peebles Law Firm
1604 Devon Court
Southlake, TX 76092
*Attorney for Austin Fox*

*/s/ Caroline C. Stewart*_____
CAROLINE C. STEWART

**EXHIBITS**

Ex. A       Special Appearance of Defendant EnerQuest Oil & Gas, L.L.C. to Object to Personal Jurisdiction

Ex. B       Intervenor Antero Resources Corporation's Response to EnerQuest Oil & Gas L.L.C.'s Special Appearance and Motion to Continue

Ex. C       Notice of Hearing on EnerQuest Oil & Gas, L.L.C.'s Special Appearance to Object to Personal Jurisdiction

Ex. D       Defendant Braxton Minerals III, LLC's Special Exceptions and Original Answer

Ex. E       Order Overruling Objection to Jurisdiction

Ex. F       Cox Email re: Discovery Stay

Ex. G       Robert Scott Bauer Deposition Excerpts



**EXHIBIT A**

FILED
TARRANT COUNTY
4/18/2018 2:57 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | ) | IN THE DISTRICT COURT OF |
| *Plaintiff*, | ) | |
| | ) | |
| ANTERO RESOURCES CORPORATION, | ) | |
| *Intervenor*, | ) | TARRANT COUNTY, TEXAS |
| | ) | |
| vs. | ) | |
| | ) | |
| BRAXTON ENERGY, LLC, et al., | ) | |
| *Defendants*. | ) | 141ST JUDICIAL DISTRICT |

## SPECIAL APPEARANCE OF DEFENDANT ENERQUEST OIL & GAS, L.L.C. TO OBJECT TO PERSONAL JURISDICTION

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant EnerQuest Oil & Gas, L.L.C. ("EnerQuest") files this special appearance under Rule 120a of the Texas Rules of Civil Procedure for the sole purpose of objecting to the personal jurisdiction of this Court over EnerQuest. EnerQuest's special appearance is being made prior to the filing of a motion to transfer venue, answer, or any other plea, pleading or motion on EnerQuest's behalf. For the reasons that follow, the Court should dismiss the claims asserted against EnerQuest for lack of personal jurisdiction.

### I. Summary of the Argument

Defendant EnerQuest is not subject to personal jurisdiction in the State of Texas in this case. There are two types of personal jurisdiction: general and specific. Neither type of personal jurisdiction exists against EnerQuest under the circumstances here. EnerQuest is not subject to general or "all purpose" jurisdiction in the State of Texas because it is organized under the laws of and maintains its principal place of business in Oklahoma, not Texas. *See Daimler AG v. Bauman*, 571 U.S. 117, 134 S. Ct. 746, 760-61 (2014) (holding that foreign corporations only subject to general jurisdiction when "at home" in forum, such as when the forum is the defendant's state of

#5680198

incorporation or principal place of business). Additionally, EnerQuest is not subject to specific jurisdiction in the State of Texas in this case because none of Antero's actions asserted in this case arise out of any activity by EnerQuest that was intentionally or purposefully directed at the State of Texas. *See Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1780 (2017). Therefore, this Court lacks personal jurisdiction over EnerQuest and this case should be dismissed as to EnerQuest.

## II. Background

### A. Summary of Relevant Portions of Antero's Amended Petition in Intervention and Its Claim Against EnerQuest.[1]

This case concerns the alleged misappropriation by other Defendants of certain of Antero's alleged trade secrets. Antero contends that a "Critical Date Report," a "SWN June 2016 Acquisition Defects report," and certain "Title Opinions" that pertain to oil and gas minerals located in West Virginia are its confidential trade secrets. Am. Pet. Interv. ¶¶ 22-28. Antero alleges that at some point in 2015 and 2016, one or more of the "Original Defendants" and New Defendant Austin Fox unlawfully acquired these alleged trade secrets from non-party Texhoma Land Consultants I Inc. in Tarrant County, Texas.[2] *Id.* ¶¶ 22, 29. Antero also alleges the aforementioned

---

[1] Due to the pre-answer stage of this case vis-à-vis EnerQuest, the following summary assumes well-pleaded allegations in the amended petition are true unless such facts are specifically controverted by evidence below and attached hereto. Nothing contained herein should be construed as an admission or concession that Antero's allegations are in fact correct.

[2] The "Original Defendants" are Braxton Energy, LLC; Braxton Acquisitions, LLC; Braxton Minerals II, LLC; Robert Scott Bauer; John Bradley Ashburn; Michael and Maegen Fisher; M&M Consulting,; and Kelly O'Connor. Am. Pet. Interv. ¶¶ 3-9.

The "New Defendants" are Austin Fox; Joe F. Penn, Jr.; EnerQuest; Venture Strong II, LLC; Post Oak Appalachia, LLC; Turn 2 Energy, LLC; Braxton Minerals-Appalachia, LLC; Braxton Minerals III, LLC; and Global Oil and Gas Fields Oklahoma, LLC. *Id.* ¶¶ 10-18.

2

Defendants, Plaintiff Penn Investment Funds, LLC, and New Defendant Joe F. Penn, Jr. conspired to misappropriate Antero's trade secrets. *Id.* 29, 50-54.

Next, Antero contends that Original Defendant Braxton Minerals II, LLC used the allegedly misappropriated trade secrets to acquire oil and gas interests in West Virginia that were "adverse" to Antero's interests, and that Braxton Minerals II subsequently transferred its allegedly ill-gotten mineral interests to New Defendant Braxton Minerals III, LLC and certain other Defendants (but not EnerQuest). *Id.* ¶ 40. Antero further alleges that Braxton Minerals III is owned by EnerQuest and New Defendant Braxton Minerals-Appalachia, LLC, and that the latter entity is in turn owned by Original Defendants Robert Scott Bauer and John Bradley Ashburn, two of the alleged conspirators. *Id.* ¶ 42.

Other than its allegation that EnerQuest is one of the members of Braxton Minerals III, the only allegations in the amended petition directed at EnerQuest are that (i) EnerQuest claims to have removed and replaced Braxton Minerals-Appalachia as the manager of Braxton Minerals III, and (ii) as the manager of Braxton Minerals III, EnerQuest has offered West Virginia oil and gas properties owned by Braxton Minerals III for sale, certain of which properties Antero claims were acquired by other Defendants using the misappropriated trade secrets. *Id.* ¶ 44, 46. Antero's amended petition does not allege that EnerQuest played any part in misappropriating the alleged trade secrets. More importantly, the amended petition does not allege EnerQuest took any actions within or directed at the State of Texas. As will be shown below, Antero's claims do not arise out of any contact of EnerQuest within the State of Texas.

**B.    Summary of EnerQuest's Relevant Operations.**

EnerQuest is an oil and gas exploration and production company that is organized as a limited liability company under the laws of the State of Oklahoma, and it maintains its headquarters

3

at 12368 Market Drive, Oklahoma City, Oklahoma 73114. Affidavit of Gregory Olson, ¶ 3 (attached as Exhibit 1). EnerQuest operates oil and gas wells in Oklahoma, Texas, Louisiana, Utah, and Arkansas. *Id.* ¶ 4. In addition, EnerQuest owns non-operated oil and gas interests in Alabama, Arkansas, Florida, Georgia, Illinois Louisiana, Michigan, Mississippi, Nebraska, North Dakota, New Mexico, Oklahoma, Oregon, Pennsylvania, Texas, West Virginia, and Wyoming. *Id.* Although EnerQuest is registered to and does conduct business in the State of Texas, it maintains no offices or employees in Texas. *Id.* ¶ 3. Oklahoma is the only state in which EnerQuest maintains an office and employees. *Id.*

Relevant here, EnerQuest and Braxton Minerals-Appalachia formed Braxton Minerals III, a Delaware limited liability company, in November 2015. *Id.* ¶ 5. Braxton Minerals III was organized for the express purpose of acquiring, owning, holding, and maintaining certain types of oil and gas interests in the States of West Virginia, Pennsylvania, and Ohio. *See* Limited Liability Company Agreement of Braxton Minerals III, LLC §§ 1.3, 2.1(a) ("BMIII Agreement" attached as Exhibit 1A).

Generally, Braxton Minerals III was organized such that EnerQuest owns 75% of the equity interest in the company and Braxton Minerals-Appalachia owns 25% of the equity interest in the company. BMIII Agreement, § 3.6 & Exhibit A. Braxton Minerals-Appalachia was designated as the initial Manager of the company, *id.* § 6.1(b), was responsible for conducting its day-to-day operations, *id.* § 6.5(a), and was responsible for funding its day-to-day operations and expenses, *id.* § 4.1(c). EnerQuest, for its part, committed to contribute up to $10 million in capital to Braxton Minerals III in order to acquire certain oil and gas interests located in West Virginia, Pennsylvania, or Ohio that were identified by the Manager as meeting certain agreed-upon criteria. *See id.* §

4

4.1(a), (b), & Exhibit A. Prior to the Liquidity Event described below, EnerQuest did not exercise control over or participate in management activities of Braxton Minerals III.

The first mineral interests acquired by Braxton Minerals III were purchased from Original Defendant Braxton Minerals II contemporaneously with the formation of Braxton Minerals III in November 2015. *See id.* § 4.1(a). These "Previously Acquired Interests" were composed of 214.40 net mineral acres located in West Virginia. *See id.* § 4.1; Olson Affidavit, ¶ 6. Braxton Minerals-Appalachia represented to EnerQuest at the time Braxton Minerals III was formed that the Previously Acquired Interests had been fully paid for by Braxton Minerals-Appalachia or its affiliates, and that such interests met certain other characteristics that fit with the package of mineral interests to be purchased by Braxton Minerals III. *See* BMIII Agreement § 4.1(a)(i). EnerQuest did not have any involvement in the initial acquisition of the Previously Acquired Interests by Braxton Minerals II, Braxton Minerals-Appalachia, or any of their managers, owners, or affiliates. Olson Affidavit, ¶ 6.

Between November 2015 and April 2016, EnerQuest fully funded its $10 million capital commitment to Braxton Minerals III, which funds were used by Braxton Minerals III to purchase certain oil and gas interests in West Virginia and Pennsylvania. Olson Affidavit, ¶ 7. By letter dated March 10, 2016 from Brad Ashburn, Braxton Minerals-Appalachia notified EnerQuest pursuant to Section 4.5 of the BMIII Agreement that EnerQuest's remaining commitment amount was less than $1 million and requested that EnerQuest elect whether it would contribute additional capital. Olson Affidavit, ¶ 8; March 10, 2016 Ltr. (attached as Exhibit 1B). Under the BMIII Agreement, EnerQuest then had 30 days to decide whether to commit to contribute another $10 million in capital to Braxton Minerals III, or Braxton Minerals-Appalachia  was obligated to liquidate Braxton Minerals III. *See* BMIII Agreement, § 4.5. Ultimately, EnerQuest elected not to

5

increase its capital contribution commitment to Braxton Minerals III, which triggered a "Liquidity Event" under Section 10.1 of the BMIII Agreement. Olson Affidavit, ¶ 8; Email of April 8, 2016 (attached as Exhibit 1C).

As a result of the Liquidity Event, Braxton Minerals-Appalachia was supposed to select a liquidator, to be approved by EnerQuest, to wind up the affairs of Braxton Minerals III and distribute its assets to EnerQuest and Braxton Minerals-Appalachia as provided in the BMIII Agreement. *See* BMIII Agreement, § 10.2. However, Braxton Minerals-Appalachia failed or refused to do so. Olson Affidavit, ¶ 9. By letter dated August 9, 2017, EnerQuest notified Braxton Minerals-Appalachia that it was in breach of the BMIII Agreement by, among other things, failing to select a liquidator to wind the company up, and demanded that Braxton Minerals-Appalachia cure such breach before September 10, 2017. Olson Affidavit, ¶ 10; Aug. 9, 2017 Ltr. (attached as Exhibit 1D). Braxton Minerals-Appalachia failed and refused to cure its breach within the specified time period, so EnerQuest removed Braxton Minerals-Appalachia as Manager of Braxton Minerals III and appointed itself as Manager of that company on September 29, 2017, as allowed in the BMIII Agreement. Olson Affidavit, ¶¶ 10-11; Written Consent of Members of Braxton Minerals III, LLC dated Sept. 29, 2017 (attached as Exhibit 1E); Sept. 29, 2017 Ltr. (attached as Exhibit 1F).

Subsequently, in February 2018, Antero's counsel notified EnerQuest's counsel that it believed Original Defendants Robert Scott Bauer and John Bradley Ashburn had possession of certain of its alleged trade secret documents and inquired as to whether EnerQuest had possession of certain specified documents. Feb. 23, 2018 Ltr. (attached as Exhibit 2). In response, EnerQuest searched its files, determined that it had received certain information from Original Defendant Robert Scott Bauer that Antero alleges are its trade secret documents, and so notified Antero. Olson

6

Affidavit, ¶ 12; Email of March 5, 2018 from J. Black to H. Lawrence (attached as Exhibit 3). As EnerQuest's counsel previously explained to Antero's counsel (and were evidenced by the emails and text messages previously provided to Antero), such documents were disclosed to Greg Olson of EnerQuest by Bauer in February 2017 or later in the course of Bauer's effort to solicit EnerQuest to invest in another of Bauer's mineral acquisition programs. Olson Affidavit, ¶ 13; March 5, 2018 Email. EnerQuest did not know that Bauer allegedly acquired the subject information by unlawful means. Olson Affidavit, ¶ 13. In any event, the alleged trade secret information was received by Greg Olson of EnerQuest in Oklahoma. *Id.* EnerQuest has not disclosed the documents to anyone outside of its organization other than Original Defendants Bauer and Ashburn. *Id.*

### III. Argument and Authorities

"The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). If the plaintiff does so, the burden shifts to the defendant to negate the "bases for personal jurisdiction that exist in the plaintiff's pleadings." *Id.* The Texas legislature, through its long-arm statute, has authorized Texas courts to exercise personal jurisdiction over nonresidents to the limits allowed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See id.* (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W. 3d 569, 574 (Tex. 2007)). As a result, the question of whether Texas courts may exercise personal jurisdiction over a nonresident is coextensive with whether the exercise of that jurisdiction comports with due process. *See id.* Thus, the present inquiry is whether EnerQuest has sufficient minimum contacts with the State of Texas "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted).

7

There are two categories of personal jurisdiction: general and specific. General jurisdiction is "all-purpose jurisdiction" where the defendant can be sued in the forum state regardless of whether the plaintiff's cause of action relates to the defendant's contacts with the forum. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014). Specific jurisdiction, on the other hand, allows jurisdiction only over claims that arise out of or relate to a defendant's contacts with the forum state. *See id.* For the reasons discussed below, EnerQuest does not have sufficient minimum contacts with Texas to support either general or specific jurisdiction in this case. Therefore, the Court should dismiss EnerQuest from this case for lack of personal jurisdiction.

## A.     EnerQuest is not subject to general personal jurisdiction in Texas.

Until relatively recently, some courts had interpreted the United States Supreme Court's precedent as authorizing general personal jurisdiction in any forum with which the defendant had substantial, "continuous and systematic contacts." *Cf. Moki Mac River Expeditions*, 221 S.W.3d at 575 (suggesting that general jurisdiction is present merely when a "defendant has made continuous and systematic contacts with the forum."). Recently, however, the Supreme Court has rejected that view of general jurisdiction and held that it "is unacceptably grasping." *Daimler*, 134 S. Ct. at 761. Instead, the Supreme Court has emphasized "that only a limited set of affiliations with a forum will render a defendant amendable to all-purpose jurisdiction there." *Id.* at 760. For individuals, that place is the defendant's domicile. *Id.* For corporations, "the place of incorporation and place of business are [the] paradigm bases for general jurisdiction." *Id.* (quotation omitted).

In *Daimler*, the Supreme Court held that general jurisdiction comports with due process only when a "corporation's 'affiliations with the State are so continuous and systematic as to render it essentially *at home* in the forum State.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (emphasis added)). In explaining why a corporation's principal

8

place of business and state of incorporation are the paradigm examples of the "limited set of affiliations" that render a corporation at home, the Supreme Court analogized those locations to an individual's domicile and indicated they were the corporation's functional "equivalent" to an individual's domicile. To be sure, the Supreme Court in *Daimler* left open the possibility that in "an exceptional case" a corporation might be deemed to be at home in a state other than its state of incorporation or principal place of business. *Id.* at 761, n.19. However, the Court emphasized that the character of affiliations necessary to render a defendant at home in a state should be "unique" and "easily ascertainable," like an individual's domicile, or a corporation's principal place of business and state of incorporation. *See id.* at 760.

Underscoring the point that the place where a corporation is deemed to be at home should be "unique" and "easily ascertainable," the Court in *Daimler* rebuffed the dissent for suggesting that its holding would invite additional jurisdictional discovery as to the quantum of contacts necessary to establish general jurisdiction. *See id.* at 761, n.20 ("But it is hard to see why much in the way of discovery would be needed to determine where a corporation is at home."). Thus, it should come as no surprise that lower courts after *Daimler* have consistently rejected attempts to expand general jurisdiction over corporations to states other than the corporation's principal place of business or state of incorporation. *See, e.g., Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 223 (2d Cir. 2014) (per curiam) (stating "general jurisdiction extends beyond an entity's state of incorporation and principal place of business only in *the exceptional case* . . ." (emphasis added)); *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014) ("It is, therefore, *incredibly difficult* to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." (emphasis added)); *Wal-Mart Stores, Inc. v. LeMaire*, 395 P.3d 1116, 1122 (Ariz. Ct. App. 2017) (holding that an "exceptional case" where general jurisdiction

9

#5680198

would extend beyond the paradigm examples identified by the Supreme Court requires "*exigent circumstances* that render traditional jurisdictional limits unworkable." (emphasis added)).

EnerQuest is "at home" for purposes of general jurisdiction only in Oklahoma, not Texas. Oklahoma is where EnerQuest is organized. Oklahoma is where EnerQuest maintains its headquarters and its employees. Thus, Oklahoma is the place from where EnerQuest directs its business in multiple states. EnerQuest does not maintain an office or employees in any state other than Oklahoma. As a result, Oklahoma is the only "unique" and "easily ascertainable" place that is equivalent to EnerQuest's domicile. As a result, Oklahoma is the only state in which EnerQuest is subject to general, "all purpose" jurisdiction untethered to its contacts with the forum. While EnerQuest conducts business in the State of Texas, it also conducts business in other states. The Supreme Court has made clear that doing substantial business in a state is not enough to confer general jurisdiction because "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler AG*, 134 S. Ct. 761, n.20. Therefore, EnerQuest is at home and subject to personal jurisdiction in only Oklahoma, not in Texas.

**B.     EnerQuest is not subject to specific personal jurisdiction in Texas in this case.**

"In order for a state court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1780 (2017) (quotations and alterations omitted). This requires "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State." *Id.* at 1781 (quotation and alterations omitted). Moreover, to count as a "contact" giving rise to suit, the defendant's actions giving rise to the suit must have been "purposefully directed . . . at residents of the forum" state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). The Texas Supreme Court has

10

identified "three features" or guideposts for analyzing the relevancy a defendant's contacts with the forum in the context of specific personal jurisdiction: "(1) the relevant contacts are those of the defendant, and the unilateral activity of another person or a third party is not pertinent; (2) the contacts that establish 'purposeful availment' must be purposeful rather than random, fortuitous, isolated, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016).

In addition, "[s]pecific jurisdiction . . . does not exist where the defendant's contacts with the forum state are not substantially connected to the alleged operative facts of the case." *Id.* at 70. The Texas Supreme Court has explained that this "substantial connection" test requires consideration of "[1] what the [plaintiff's] claim is principally concerned with, [2] whether the [defendant's] contacts will be the focus of the trial and consume most if not all of the litigations' attention, and [3] whether the [defendant's] contacts are related to the operative facts of the [plaintiff's] claim." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 52-53 (Tex. 2016) (internal quotations and citations omitted). For purposes of specific personal jurisdiction, it does not matter how many contacts a defendant has with the forum state if the plaintiff's claim does not relate to those contacts. *See Bristol-Myers Squibb*, 137 S. Ct. 1781-82.

In this case, Antero's claims concern the alleged misappropriation by other Defendants of Antero's alleged trade secrets concerning oil and gas properties located in West Virginia. Although Antero alleges that the Original Defendants and New Defendant Austin Fox unlawfully acquired the alleged trade secrets from non-party Texhoma Land Consultants I Inc. in Tarrant County, Texas, *id.* ¶¶ 22, 29, Antero does not allege EnerQuest played any part in that alleged misappropriation. While EnerQuest did receive (in Oklahoma) certain of the allegedly trade secret information from Original Defendant Robert Scott Bauer in February 2017, Antero does not (and

11

cannot) allege EnerQuest has used or disclosed that information, let alone that it did so in Texas. Further, even if EnerQuest did disclose or use Antero's trade secret information (which it did not), any damages allegedly suffered by Antero from such disclosure or use would be realized in West Virginia, where the subject oil and gas properties are located, or in Colorado, where Antero alleges its corporate headquarters are located. *See* Am. Pet. Interv. ¶ 1.

Simply put, Antero's claims in this lawsuit have nothing to do with any contact between EnerQuest and the State of Texas. Therefore, this Court lacks specific personal jurisdiction over EnerQuest in this case.

## IV. Prayer

Wherefore, for the reasons explained above, EnerQuest respectfully requests the Court set this matter for hearing at the earliest time possible and that, upon hearing, this special appearance be sustained in all things and the claims and causes of action against Defendant EnerQuest Oil & Gas, L.L.C. be dismissed for lack of personal jurisdiction. EnerQuest also requests any other or further relief, at law or in equity, to which it may be justly entitled.

#5680198

Respectfully submitted,

BRACEWELL LLP

By: _/s/ Joseph M. Cox_
    Joseph M. Cox
    State Bar No. 04950200
    Joe.Cox@bracewell.com
    Andrea D. Broyles
    State Bar No. 24082744
    Andrea.Broyles@bracewell.com

1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Telephone: (214) 468-3800
Facsimile: (800) 404-3970

        - and -

Spencer F. Smith
State Bar No. 24008625
MCAFEE & TAFT A Professional Corporation
Tenth Floor, Two Leadership Square
211 N. Robinson Ave.
Oklahoma City, Oklahoma 73102-7103
spencer.smith@mcafeetaft.com

**Attorneys for Defendant EnerQuest Oil & Gas, L.L.C.**

### Certificate of Conference

This certifies that on April 4, 2018 and April 6, 2018, a telephone conference was held with Jason Grill, attorney for Intervenor Antero Resources Corporation, regarding the merits of this motion. A reasonable effort has been made to resolve the dispute without the necessity of court intervention and the effort failed. Therefore it is presented to the Court for determination.

_/s/ Joseph M. Cox_
Joseph M. Cox

13

## Certificate of Service

I hereby certify that on April 18, 2018, a true and correct copy of the foregoing document was served on the following counsel of record in accordance with the Texas Rules of Civil Procedure:

| | |
|---|---|
| Jason R. Grill<br>W. Henry Lawrence<br>Steptoe & Johnson PLLC<br>10001 Woodlock Forest Drive, Suite 300<br>The Woodlands, Texas 77380<br>jason.grill@steptoe-johnson.com<br>hank.lawrence@stptoe-johnson.com<br>**Attorneys for Intervenor Antero Resources Corporation** | Phillip B. Dye, Jr.<br>Caroline C. Stewart<br>Vinson & Elkins LLP<br>1001 Fannin Street, Suite 2500<br>Houston, Texas 77002-6760<br>pdye@velaw.com<br>cstewart@velaw.com<br>**Attorneys for Intervenor Antero Resources Corporation** |
| Gene A. Hamm, II<br>The Hamm Firm<br>1333 W. McDermott, Suite 200<br>Allen, Texas 75013<br>ghamm@hammfirm.com<br>**Attorney for Plaintiff Penn Investment Funds, LLC, Joe F. Penn Jr., and Venture Strong II, LLC** | H. Allen Pennington, Jr.<br>Matthew D. Germany<br>Pennington Hill, LLP<br>Tindall Square-Warehouse No. 3<br>509 Pecan Street, Suite 101<br>Fort Worth, Texas 76102<br>apennington@phblaw.com<br>**Attorneys for Defendant John Bradley Ashburn and Post Oak Appalachia, LLC** |
| Michael Hassett<br>Jones Hasset, PC<br>440 North Center<br>Arlington, Texas 76011<br>mhasset@tarrantbusinesslaw.com<br>**Attorney for Defendants Michael Fisher, Maegan Fisher, and M&M Consulting** | Avery McDaniel<br>Law Office of Avery McDaniel<br>1205 N. Main Street<br>Fort Worth, Texas 76164<br>avery@avrymcdaniel.com<br>**Attorney for Braxton Minerals II, LLC** |
| R. Scott Bauer<br>8851 Camp Bowie Boulevard W<br>Suite 200<br>Fort Worth, Texas<br>scott@braxtonenergy.com<br>**Attorney for Braxton Acquisitions, LLC, Braxton Energy LLC, and himself** | C. Andrew Woodward<br>Holman Robertson Eldridge<br>8226 Douglas Ave., Suite 550<br>Dallas, Texas 75225<br>awoodward@hrepc.com<br>**Attorney for Kelly O'Connor** |
| Roland K. Johnson<br>Harris, Finley & Bogle, P.C.<br>777 Main Street, Suite 1800<br>Fort Worth, Texas 76102<br>rolandjohnson@hfblaw.com<br>**Attorneys for Energy Corporation of America** | Charles W. Sartain<br>Gray Reed & McGraw<br>1601 Elm Street, Suite 4600<br>Dallas, Texas 75201<br>**Attorneys for Global Oil and Gas Fields** |

*/s/ Joseph M. Cox*
Joseph M. Cox

14

#5680198

Cause No. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | ) | In the District Court |
| *Plaintiff,* | ) | of Tarrant County, Texas |
| | ) | |
| ANTERO RESOURCES CORPORATION, | ) | |
| *Intervenor,* | ) | |
| | ) | |
| vs. | ) | 141st Judicial District |
| | ) | |
| BRAXTON ENERGY, LLC, et al., | ) | |
| *Defendants.* | ) | |

## Verification

| | |
|---|---|
| STATE OF OKLAHOMA | § |
| | § |
| COUNTY OF OKLAHOMA | § |

Before me, the undersigned notary public, on this day personally appeared Gregory W. Olson, who after being duly sworn, stated on his oath that he has read the foregoing Special Appearance to Object to Personal Jurisdiction and that the statements contained therein are true and correct based upon either his personal knowledge or information made available to him in in the course and scope of his employment for EnerQuest Oil & Gas, L.L.C.

_____
Gregory W. Olson
President Emeritus
EnerQuest Oil & Gas, L.L.C.

Subscribed and sworn to before me by Gregory W. Olson, this 17th day of April, 2018.

(Seal)

_____
Notary Public
My Commission Expires: 11/8/18

15

# EXHIBIT 1

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | ) | IN THE DISTRICT COURT OF |
| *Plaintiff,* | ) | |
| | ) | |
| ANTERO RESOURCES CORPORATION, | ) | |
| *Intervenor,* | ) | TARRANT COUNTY, TEXAS |
| | ) | |
| vs. | ) | |
| | ) | |
| BRAXTON ENERGY, LLC, et al., | ) | |
| *Defendants.* | ) | 141ST JUDICIAL DISTRICT |

## **AFFIDAVIT OF GREGORY W. OLSON**

| | |
|---|---|
| STATE OF OKLAHOMA | § |
| | § |
| COUNTY OF OKLAHOMA | § |

I, Gregory W. Olson, being duly sworn, depose and state the following upon my oath:

1. "I am over the age of 21. I have never been convicted of a felony. I am of sound mind, and I am fully competent to make this affidavit. This affidavit is being made in support of the Special Appearance of EnerQuest Oil & Gas, L.LC. ("EnerQuest") in the above-captioned case for the sole purpose of objecting to personal jurisdiction over EnerQuest.

2. "I am currently President Emeritus of EnerQuest, am semi-retired, and consult with EnerQuest on certain matters. From its creation in November of 1996 until December 31, 2017, I was the President of EnerQuest. At all times relevant to this affidavit, I have resided in Edmond, Oklahoma and worked out of EnerQuest's Oklahoma City office. Through my positions as President and President Emeritus, I have personal knowledge of the facts stated herein, which are true and correct.

3. "EnerQuest is an oil and gas exploration and production company. It is organized as a limited liability company under the laws of the State of Oklahoma, and it maintains its

headquarters at 12368 Market Drive, Oklahoma City, Oklahoma 73114. EnerQuest does not maintain any offices or employees in any state other than Oklahoma.

4.      "EnerQuest operates oil and gas wells in Oklahoma, Texas, Louisiana, Utah, and Arkansas. In addition, EnerQuest owns non-operated oil and gas interests in Alabama, Arkansas, Florida, Georgia, Illinois Louisiana, Michigan, Mississippi, Nebraska, North Dakota, New Mexico, Oklahoma, Oregon, Pennsylvania, Texas, West Virginia, and Wyoming.

5.      "In November 2015, EnerQuest and Braxton Minerals-Appalachia, LLC formed Braxton Minerals III, LLC, a limited liability company organized under Delaware law. A copy of the Limited Liability Company Agreement of Braxton Minerals III, LLC (the "BMIII Agreement") is attached hereto as Exhibit 1A. Exhibits B and C and Schedules 4.1(b)(i) and 7.1(b)(i) to the BMIII Agreement have been omitted to protect certain irrelevant and/or confidential information from unnecessary disclosure. The BMIII Agreement was executed by myself, as President of EnerQuest, and by Brad Ashburn, as President of Braxton-Minerals-Appalachia, LLC, dated as of November 10, 2015.

6.      "The "Previously Acquired Interests" referenced in Section 4.1 of the BMIII Agreement were composed of 214.40 net mineral acres located in West Virginia. EnerQuest was not involved in the initial acquisition of those interests by Braxton Minerals II, LLC, Braxton Minerals-Appalachia, LLC, or any of their managers, owners, or affiliates.

7.      "EnerQuest committed to contribute up to $10,000,000 in capital to Braxton Minerals III, LLC. The initial capital contribution of $975,860.17 was to fund BMIII's acquisition of the aforementioned Previously Acquired Interests. Subsequent capital contributions were to fund the purchase of oil and gas interests acquired after the formation of BMIII, as described in the BMIII Agreement. Between November 2015 and April 2016,

EnerQuest fully funded its capital commitment to Braxton Minerals III, LLC. Those funds were used to purchase certain oil and gas interests in West Virginia and Pennsylvania on behalf of Braxton Minerals III, LLC.

8. "In March 2016, I received a letter dated March 10, 2016 from Brad Ashburn on behalf Braxton Minerals-Appalachia, LLC. That letter is attached hereto as Exhibit 1B. The letter notified EnerQuest pursuant to Section 4.5 of the BMIII Agreement that EnerQuest's remaining commitment amount was less than $1,000,000 and requested that EnerQuest elect whether it would contribute additional capital. By email dated April 8, 2016 to Brad Ashburn, I notified Braxton Minerals-Appalachia, LLC that EnerQuest had elected not to contribute additional capital to Braxton Minerals III, LLC, according to the terms of the BMIII Agreement. A copy of my April 8, 2016 email is attached hereto as Exhibit 1C.

9. "This triggered a "Liquidity Event" under Section 10.1 of the BMIII Agreement. According to Section 10.2 of the BMIII Agreement, the above Liquidity Event required Braxton Minerals-Appalachia, as the initial Manager of Braxton Minerals III, LLC, to, among other things, propose a liquidator for EnerQuest's approval who would wind up the affairs of Braxton Minerals III, LLC and distribute its assets as provided in the BMIII Agreement. However, Braxton Minerals-Appalachia, LLC failed or refused to timely propose a liquidator as provided in the BMIII Agreement.

10. "On or about August 9, 2017, I, as President of EnerQuest, sent a letter to Braxton Minerals-Appalachia, LLC, attention to Brad Ashburn and Scott Bauer, demanding that Braxton Minerals-Appalachia comply with the provisions of the BMIII Agreement by, among other things, proposing a liquidator as required by Section 10.2 of that Agreement by September 10,

2017. A copy of that letter is attached as Exhibit 1D. Braxton Minerals-Appalachia, LLC failed or refused to comply with EnerQuest's demand within the specified time.

11. "On September 29, 2017, I, as President of EnerQuest, executed a Written Consent of Members of Braxton Minerals III, LLC that, pursuant to certain provisions of the BMIII Agreement, removed Braxton Minerals-Appalachia, LLC as Manager of Braxton Minerals III, LLC and subsequently elected EnerQuest to be the replacement Manager. A copy of the Written Consent is attached hereto as Exhibit 1E. On or about the same date, I sent a letter to Braxton-Minerals-Appalachia, LLC, attention to Brad Ashburn and Scott Bauer, advising it of EnerQuest's action. A copy of that letter is attached hereto as Exhibit 1F.

12. "In February 2018, I learned that Antero Resources Corporation ("Antero") suspected that Robert Scott Bauer and John Bradley Ashburn had shared certain documents that Antero alleged were confidential and proprietary business records and trade secrets. In response, I searched my files and caused EnerQuest to search its files for the documents identified by Antero. Certain documents matching the description provided by Antero were located, which documents were then provided to EnerQuest's counsel, Jeremy Black, to provide to Antero's counsel.

13. " The documents described by EnerQuest were disclosed to me in February 2017 or later by Scott Bauer via email and text messages received by me in Oklahoma. Bauer disclosed the subject documents to me in an effort to solicit EnerQuest to invest in another of Bauer's mineral acquisition programs. Until February 2018, I did not know that Scott Bauer had allegedly obtained the subject documents by unlawful means. I did not disclose the subject information to anyone outside of EnerQuest except for Scott Bauer and Brad Ashburn. To the

best of my knowledge, no one else with EnerQuest has disclosed the subject information to anyone outside of EnerQuest except for Scott Bauer and Brad Ashburn."

FURTHER AFFIANT SAYETH NOT.

Dated this 17TH day of April, 2018.

_____
Gregory W. Olson
President Emeritus
EnerQuest Oil & Gas, L.L.C.


SUBSCRIBED and SWORN TO before me on this 17th day of April, 2018, by Gregory W. Olson.

(Seal)



_____
Notary Public
My Commission Expires: 11/8/18

# EXHIBIT 1A

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## BRAXTON MINERALS III, LLC,

### a Delaware Limited Liability Company

### November 12, 2015

# TABLE OF CONTENTS

Page

ARTICLE I – ORGANIZATIONAL MATTERS ........................................................................... 1
    Section 1.1.    Formation............................................................................1
    Section 1.2.    Name...................................................................................1
    Section 1.3.    Purpose. ..............................................................................1
    Section 1.4.    Registered Office and Registered Agent; Principal Place of Business.......1
    Section 1.5.    Foreign Qualification...........................................................2
    Section 1.6.    Term....................................................................................2

ARTICLE II – DEFINITIONS AND REFERENCES ....................................................................... 2
    Section 2.1.    Definitions. .........................................................................2
    Section 2.2.    References and Construction. ..............................................11

ARTICLE III – MEMBERS AND UNITS......................................................................................... 11
    Section 3.1.    Members. .............................................................................11
    Section 3.2.    Additional Members. ..........................................................12
    Section 3.3.    Liability to Third Parties......................................................12
    Section 3.4.    Withdrawal. ........................................................................12
    Section 3.5.    Members Have No Agency Authority....................................12
    Section 3.6.    Units...................................................................................12
    Section 3.7.    Members Right to Act. ........................................................12

ARTICLE IV – CAPITALIZATION ................................................................................................ 13
    Section 4.1.    Capital Contributions of Members. .....................................13
    Section 4.2.    Non-Payment of Capital Contributions. ..............................16
    Section 4.3.    Interest on and Return of Capital Contributions....................17
    Section 4.4.    No Other Capital Contributions. .........................................17
    Section 4.5.    EnerQuest Commitment Amount. ........................................17

ARTICLE V – ALLOCATIONS AND DISTRIBUTIONS............................................................. 17
    Section 5.1.    Allocations for Purposes of Maintaining Capital Accounts. ...................17
    Section 5.2.    Allocations for Federal Income Tax Purposes.......................20
    Section 5.3.    Distributions. ......................................................................21

ARTICLE VI – MANAGEMENT AND GOVERNANCE PROVISIONS............................... 22
    Section 6.1.    Management by Manager. ....................................................22
    Section 6.2.    Removal of Manager. ..........................................................22
    Section 6.3.    Vacancies............................................................................22
    Section 6.4.    Compensation of Manager...................................................22
    Section 6.5.    Actions Requiring Manager and EnerQuest Approval............22
    Section 6.6.    Officers and other Appointments.........................................23

ARTICLE VII – ACCOUNTING AND BANKING MATTERS; CAPITAL ACCOUNTS;
TAX MATTERS................................................................................................................................ 24
    Section 7.1.    Books and Records; Reports.................................................24
    Section 7.2.    Fiscal Year. .........................................................................24

Section 7.3.    Bank Accounts.................................................................................24
Section 7.4.    Capital Accounts.............................................................................25
Section 7.5.    Tax Partnership..............................................................................25
Section 7.6.    Tax Elections.................................................................................25
Section 7.7.    Tax Matters Partner........................................................................26
Section 7.8.    Tax Returns..................................................................................26

ARTICLE VIII – INDEMNIFICATION..................................................................... 26
Section 8.1.    Power to Indemnify in Actions, Suits or Proceedings..........................26
Section 8.2.    Expenses Payable in Advance............................................................27
Section 8.3.    Survival of Indemnification and Advancement of Expenses....................27
Section 8.4.    Limitation on Indemnification............................................................27
Section 8.5.    No Obligation to Contribute Capital.....................................................27

ARTICLE IX – DISPOSITIONS OF MEMBERSHIP INTERESTS ........................... 28
Section 9.1.    Dispositions..................................................................................28
Section 9.2.    Substitution..................................................................................28

ARTICLE X – DISSOLUTION, LIQUIDATION, AND TERMINATION............................ 28
Section 10.1.   Dissolution...................................................................................28
Section 10.2.   Liquidation and Termination..............................................................29
Section 10.3.   Deficit Capital Accounts..................................................................30
Section 10.4.   Certificate of Cancellation................................................................30

ARTICLE XI – ADDITIONAL COVENANTS .............................................................. 30
Section 11.1.   Exclusive Dealings in the Buy Area......................................................30
Section 11.2.   Outside Activities of EnerQuest..........................................................31
Section 11.3.   Confidentiality...............................................................................31

ARTICLE XII – GENERAL PROVISIONS................................................................... 32
Section 12.1.   Notices.......................................................................................32
Section 12.2.   Amendment and Waivers..................................................................32
Section 12.3.   Entire Agreement...........................................................................33
Section 12.4.   Successors and Assigns...................................................................33
Section 12.5.   Governing Law..............................................................................33
Section 12.6.   Arbitration...................................................................................33
Section 12.7.   Venue and Consent of Jurisdiction; Waiver of Jury Trial.......................33
Section 12.8.   Directly or Indirectly......................................................................34
Section 12.9.   Severability..................................................................................34
Section 12.10.  Further Assurances........................................................................34
Section 12.11.  Title to Company Property................................................................34
Section 12.12.  No Third Party Beneficiaries.............................................................34
Section 12.13.  Expenses.....................................................................................34
Section 12.14.  Counterparts................................................................................34

-iii-

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## BRAXTON MINERALS III, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT, dated as of November 10, 2015 (the "**Effective Date**"), is made and entered into by and among the undersigned as the initial Members of Braxton Minerals III, LLC (the "**Company**") in connection with the formation of the Company. Capitalized terms used herein shall have the meanings set forth in **Article II** unless otherwise defined herein.

### ARTICLE I– ORGANIZATIONAL MATTERS

**Section 1.1.** **Formation.** The Company has been formed as a Delaware limited liability company by the filing on November 12, 2015, of the Certificate of Formation of the Company (the "**Certificate**") in the office of the Secretary of State of the State of Delaware under and pursuant to the Act. The Members agree that during the term of the Company, the rights and obligations of the Members with respect to the Company will be determined in accordance with the terms and provisions of this Agreement and, except where the Act provides that such rights and obligations specified in the Act shall apply "unless otherwise provided in a limited liability company agreement" or words of similar effect and such rights and obligations are set forth in this Agreement, the Act.

**Section 1.2.** **Name.** The name of the Company is "Braxton Minerals III, LLC". The business of the Company shall be conducted in the name of the Company. If the Applicable Law of a jurisdiction where the Company does business requires the Company to do business under a different name, the Manager shall, with the approval of the Members, choose another name to do business in such jurisdiction. In such a case, the business of the Company in such jurisdiction may be conducted under such other name.

**Section 1.3.** **Purpose.** The purposes for which the Company is organized are: (i) to acquire, own, hold, and maintain Oil and Gas Interests in the Buy Area and (ii) to engage in or perform any and all activities that are related to or incident to the foregoing and that may be lawfully conducted by a limited liability company under the Act. In carrying out the business and purposes of the Company, the Company may act directly or indirectly through one or more entities.

**Section 1.4.** **Registered Office and Registered Agent; Principal Place of Business.**

(a) The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the initial registered office named in the Certificate or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or persons as the Manager may designate from time to time.

(b)    The principal place of business of the Company shall be 3973 W. Vickery Boulevard, Suite 102, Fort Worth, Texas 76107, or such location as designated by the Manager with the consent of all Members.

Section 1.5.    **Foreign Qualification.**    Prior to the Company's conducting business in any jurisdiction other than Delaware, the Company shall comply with all requirements necessary to qualify the Company as a foreign limited liability company in such jurisdiction. At the request of the Manager, each Member agrees to execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

Section 1.6.    **Term.** The existence of the Company commenced on the date the Certificate was filed with the Secretary of State of Delaware and shall continue in existence until it is dissolved and terminated in accordance with the terms of this Agreement.

## ARTICLE II – DEFINITIONS AND REFERENCES

Section 2.1.    **Definitions.**

(a)    When used in this Agreement, the following terms have the respective meanings assigned to them in this Section 2.1(a):

"**Act**" means the Delaware Limited Liability Company Act or any successor statute, as amended from time to time.

"**Adjusted Capital Account**" means the capital account maintained for each Member as provided in Section 7.4, (i) increased by the amount such Member is obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or is deemed obligated to restore under the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5) as computed in accordance with the applicable Treasury Regulations, and (ii) decreased by the adjustments provided for in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4)-(6).   The foregoing definition of "Adjusted Capital Account" is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Affiliate**" means, when used with respect to any Person, any Person directly or indirectly controlling, controlled by, or under common control with such Person. For the purposes of this definition, the terms "**controlling, controlled by, or under common control**" mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. Without regard to the foregoing, any family member of an Affiliate of a Person, including without limitation a spouse, shall be deemed to be an Affiliate of such Person.

"**Agreement**" means this Limited Liability Company Agreement, as hereafter amended, restated, modified or changed in accordance with the terms of this Agreement.

-2-

"**Allocation Period**" means the period beginning on the day after the last day of the immediately preceding Allocation Period (or with respect to the first such period, the date hereof) and ending on the earliest to occur of (i) a date on which the Book Value of the Company is adjusted pursuant to clause (ii) of the definition thereof, or (ii) December 31 of any year.

"**Applicable Law**" means any statute, law, rule, or regulation, or any judgment, order, writ, injunction, or decree of any Governmental Entity to which a specified Person or property is subject.

"**Asset Acquisition**" means an acquisition of Oil and Gas Interests by the Company.

"**Book Liability Value**" means with respect to any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i), the amount of cash that a willing assignor would pay to a willing assignee to assume such liability in an arm's length transaction. The Book Liability Value of each liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) shall be adjusted at such times as provided in this Agreement for an adjustment to Book Values; provided that such adjustments shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

"**Book Value**" means, with respect to any property of the Company, such property's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Book Value of any property contributed by a Member to the Company shall be the Fair Market Value of such property as of the date of such contribution;

(ii)     The Book Values of all properties shall be adjusted to equal their respective Fair Market Values in connection with (A) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for a Capital Contribution or in exchange for the performance of services to or for the benefit of the Company, (B) the distribution by the Company to a Member of property as consideration for a Membership Interest in the Company, (C) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(1) (other than pursuant to Section 708(b)(1)(B) of the Internal Revenue Code) or (D) at such other times as the Manager shall reasonably determine necessary or appropriate in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2; provided that adjustments pursuant to clauses (A) and (B) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)     The Book Value of property distributed to a Member shall be the Fair Market Value of such property as of the date of such distribution;

(iv)     The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Internal Revenue Code Section 734(b) or Internal Revenue Code Section 743(b), but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (vii) of the definition of Profits and Losses or Section 5.1(c)(vii), provided, however, that Book Values shall not be adjusted pursuant to this clause (iv) to the extent

-3-

that an adjustment to clause (ii) above is made in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv); and

(v)     If the Book Value of property has been determined or adjusted pursuant to clause (i), (ii) or (iv) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and by Simulated Depletion with respect to such property.

"**BMA**" means Braxton Minerals-Appalachia, LLC, a Texas limited liability company and its permitted assignees.

"**Business Day**" means a day other than a Saturday or a Sunday, on which commercial banks are authorized to be open for business with the public in Oklahoma City, Oklahoma.

"**Buy Area**" means the States of West Virginia, Pennsylvania, and Ohio.

"**Capital Contribution**" means, for any Member at the particular time in question, the aggregate of the dollar amounts of any cash contributed to the capital of the Company and the Fair Market Value of any property contributed to the capital of the Company.

"**Commitment Period**" means the period beginning on the Effective Date and ending on the earliest to occur of: (a) the seventh (7th) anniversary of the Effective Date, (b) the election by EnerQuest to end the Commitment Period, in accordance with Section 4.5 hereof, (c) the occurrence of a Liquidity Event, or (d) the commencement of a bankruptcy, winding-up or similar insolvency proceeding involving the Company.

"**Company**" means Braxton Minerals III, LLC, a Delaware limited liability company.

"**Company Nonrecourse Deductions**" has the same meaning as "nonrecourse deductions" as set forth in Treasury Regulation Sections 1.704-2(b)(1) and 1.704-2(c).

"**Company Nonrecourse Liabilities**" means nonrecourse liabilities (or portions thereof) of the Company for which no Member or related party (within the meaning of Treasury Regulation Section 1.752-4(b)) bears any economic risk of loss.

"**Company Taxes**" means (i) all taxes levied on or with respect to the ownership of the Oil and Gas Interests acquired by the Company or the production or sale of Hydrocarbons produced therefrom, including property, ad valorem and severance taxes; provided, however, that where severance taxes are deducted from gross revenues received by the Company, such severance taxes shall not be treated separately as Company Taxes and (ii) all taxes assessed and payable by the Company in connection with its ownership of the Oil and Gas Interests or income produced therefrom, including without limitation all income, franchise, profits, margins, capital gains, capital stock and all other similar taxes; provided, that Company Taxes shall not include any employee payroll taxes.

"**Depreciation**" means, for each Allocation Period, an amount equal to the depreciation, amortization or other cost recovery deduction (excluding depletion with respect to a Depletable Property) allowable for federal income tax purposes with respect to property for such Allocation

-4-

Period, except that (i) with respect to any property the Book Value of which differs from its adjusted tax basis for federal income tax purposes and which difference is being eliminated by use of the "remedial method" pursuant to Treasury Regulation Section 1.704-3(d), Depreciation for such Allocation Period shall be the amount of book basis recovered for such Allocation Period under the rules prescribed by Treasury Regulation Section 1.704-3(d)(2), and (ii) with respect to any other property the Book Value of which differs from its adjusted tax basis at the beginning of such Allocation Period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such Allocation Period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Manager.

"**Direct Asset Acquisition Costs**" means the price actually paid to a seller, including an agent or representative of seller, of Oil and Gas Interests as part of an Asset Acquisition.

"**Dispose**" (including the correlative terms "**Disposed**" or "**Disposition**") means any sale, assignment, transfer, conveyance, gift, pledge, distribution, hypothecation or other encumbrance or any other disposition (excludes an execution of oil, gas and mineral lease), whether voluntary, involuntary or by operation of law, and whether effected directly or indirectly.

"**Distributable Cash Flow**" means the amount, if any, by which the Oil and Gas Revenues received by the Company in any calendar month exceed the sum of (i) the Service Fee payable with respect to such Oil and Gas Revenues, and (ii) Company Taxes paid during such calendar month.

"**Electronic Transmission**" means a form of communication that (i) does not directly involve the physical transmission of paper, (ii) creates a record that may be retained, retrieved, and reviewed by the recipient, and (iii) may be directly reproduced in paper form by the recipient through an automated process. Electronic Transmission shall include, without limitation, communication by email and facsimile.

"**EnerQuest**" means EnerQuest Oil & Gas, L.L.C., an Oklahoma limited liability company and its permitted assignees.

"**EnerQuest Commitment Amount**" means, with respect to EnerQuest, the amount set forth opposite its name in **Exhibit A** under the heading "Commitment Amount," as such amount may be increased in accordance with this Agreement.

"**Fair Market Value**" means, with respect to any property or asset, the fair market value of such property or asset as reasonably determined by the Manager and approved by the Members; provided, however, if the Manager and the Members are unable to agree upon the fair market value of a property or asset, the Company shall engage an independent appraiser that is experienced with appraising oil and gas assets similar to the Oil and Gas Interests (and which is mutually acceptable to each of EnerQuest and BMA) to determine the fair market value of the property or assets.

-5-

"**GAAP**" means United States generally accepted accounting principles and practices, consistently applied, which are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor).

"**Good Cause**" shall mean the occurrence of any of the following (a) any act or omission constituting fraud or willful misconduct by Manager; (b) a conviction of a felony or other crime involving moral turpitude by Manager; (c) the breach of any of the material terms of this Agreement, which materially and adversely affects the business of the Company, and such breach remains uncured thirty (30) days after notice from the Company or EnerQuest of such breach; or (d) the recurring breach in an immaterial respect if such recurring breach is reasonably likely to impair the conduct of business by the Company and such breach remains uncured thirty (30) days after notice from the Company or EnerQuest of such breach.

"**Governmental Entity**" means any court or tribunal in any jurisdiction (domestic or foreign) or any governmental or regulatory body, agency, department, commission, board, bureau or other authority or instrumentality (domestic or foreign).

"**Hydrocarbons**" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, products, liquids and other hydrocarbons and other minerals of every kind and description.

"**Indebtedness**" means, with respect to any Person at any date, without duplication, all (i) indebtedness of such Person for borrowed money; (ii) obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business); (iii) obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (v) capital lease obligations of such Person; (vi) obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit or similar facilities; (vii) obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any capital stock of such Person; (viii) guarantee the obligations of such Person in respect of obligations of the kind referred to in clauses (i) through (vii) above; and (ix) obligations of the kind referred to in clauses (i) through (viii) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation;.

"**Indirect Asset Acquisition Costs**" means all third-party, out of pocket costs and expenses (other than the Direct Asset Acquisition Costs) incurred by the Company or by the Manager or a Member on behalf of the Company in connection with identifying and investigating the availability of Oil and Gas Interests for acquisition by the Company, evaluating such Oil and Gas Interests and effecting Asset Acquisitions including, but not limited to, travel, title examination costs, brokers' commissions, attorneys' fees and expenses, environmental and other consultants' fees and expenses, due diligence fees and expenses and recording costs.

-6-

"**Initial Target Buy Area**" means the area described on **Exhibit B**.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any comparable successor statute or statutes.

"**Lien**" means any mortgage, lien (statutory or other), other security agreement, arrangement or interest; hypothecation, pledge or other deposit arrangement; assignment; charge, levy, executory seizure, attachment, garnishment, encumbrance (including any easement, exception, reservation or limitation, right of way, and the like), conditional sale, title retention, voting agreement or other similar agreement, arrangement, device or restriction, preemptive or similar right, the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, or any restriction on sale, transfer, assignment, disposition, or other alienation.

"**Majority Vote**" means with respect to the Members, the affirmative vote by the Member or Members holding Units representing a majority of the Percentage Interests of all Members entitled to vote thereon.

"**Material Agreement**" means any contract, agreement, document, instrument or series of related contracts, agreements, documents or instruments that would obligate the Company to expend, incur or transfer assets with a value of $25,000 or more, or which cannot be terminated by the Company upon notice of thirty (30) days or less without any liability; provided, however, that neither (i) an agreement to acquire Oil and Gas Interests pursuant to and in accordance with the terms of this Agreement; nor (ii) execution of an oil, gas and mineral lease; nor (iii) a routine division order shall be deemed to be a Material Agreement.

"**Member**" means each Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but such term does not include any Person who has ceased to be a member of the Company.

"**Member Nonrecourse Debt**" means any nonrecourse debt of the Company (or portions thereof) for which any Member or related Person (within the meaning of Treasury Regulation Section 1.752-4(b)) bears the economic risk of loss.

"**Member Nonrecourse Debt Minimum Gain**" has the same meaning as "partner nonrecourse debt minimum gain" set forth in Treasury Regulation Section 1.704-2(i)(2).

"**Member Nonrecourse Deductions**" means with respect to any Member Nonrecourse Debt, the amount of deductions, losses and expenses equal to the net increase during the year in Member Nonrecourse Debt Minimum Gain with respect to such Member Nonrecourse Debt, reduced (but not below zero) by proceeds of such Member Nonrecourse Debt distributed during the year to the Members who bear the economic risk of loss for such debt, as determined in accordance with applicable Treasury Regulations.

"**Membership Interest**" means the interest of a Member in the Company, including the right of such Member to receive distributions (liquidating or otherwise), to be allocated income, gain, loss, deduction, credit, or similar items, to receive information, and to grant consents or approvals.

-7-

"**Minimum Gain**" means with respect to Company Nonrecourse Liabilities, the amount of gain that would be realized by the Company if it Disposed of (in a taxable transaction) all properties that are subject to Company Nonrecourse Liabilities for no consideration other than full satisfaction of such liabilities, computed in accordance with applicable Treasury Regulations.

"**Oil and Gas Interests**" means interests in and rights with respect to Hydrocarbons, but limited to fee mineral interests, royalty interests and overriding royalty interests.

"**Oil and Gas Revenues**" means the gross receipts of the Company related to the Oil and Gas Interests but excluding the gross receipts from the Disposition of Oil and Gas Interests.

"**Overhead and Operating Costs**" means (i) all general, administrative and operating expenses incurred by the Company in connection with the operation of the Company's business, including, but not limited to, office space, office equipment, office supplies, courier fees, postage, insurance, legal and accounting fees and expenses, and other third party fees and expenses, (ii) specifically with respect to Oil and Gas Interests acquired by the Company, all costs and expenses related to land administration (including, without limitation, title curative costs), the preparation and filing of reports to Governmental Entities, the preparation and furnishing of reports to the Members as provided in this Agreement, division order management and revenue accounting and distribution, (iii) all limited liability company filing fees, registration fees, qualification fees, annual fees and similar fees and charges, and (iv) if at any time the Company, with the consent of the Members, should have employees, all salaries, insurance and other benefits paid or payable to such employees and all payroll taxes and burdens associated therewith. For purposes of clarification and to avoid confusion, the term "Overhead and Operating Costs" is intended to cover and include all costs and expenses incurred by the Company other than Direct Asset Acquisition Costs, Indirect Asset Acquisition Costs and Company Taxes.

"**Percentage Interest**" means with respect to any member, a fraction (expressed as a percentage), the numerator of which is the number of Units owned by the Member and the denominator of which is the total number of Units owned by all Members. The Percentage Interests as of the Effective Date are as set forth on **Exhibit A** to this Agreement.

"**Person**" means any natural person, corporation, limited partnership, general partnership, limited liability company, joint stock company, joint venture, association, company, estate, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, custodian, trustee-executor, administrator, nominee or entity in a representative capacity and any government or agency or political subdivision thereof.

"**Proceedings**" means all proceedings, actions, claims, suits, investigations and inquiries by or before any arbitrator or Governmental Entity.

"**Profits**" or "**Losses**" means, for each Allocation Period, an amount equal to the Company's taxable income or loss for such period, determined in accordance with Internal Revenue Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

-8-

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" shall increase the amount of such taxable income or decrease the amount of such taxable loss;

(ii)    Any expenditures of the Company described in Internal Revenue Code Section 705(a)(2)(B) or treated as Internal Revenue Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall decrease the amount of such taxable income or increase the amount of such taxable loss;

(iii)   In the event the Book Value of any asset is adjusted pursuant to clause (ii) or clause (iii) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses;

(iv)    In the event the Book Liability Value of any liability of the Company described in Treasury Regulation Section 1.752-7(b)(3)(i) is adjusted as required by this Agreement, the amount of such adjustment shall be treated as an item of loss (if the adjustment increases the Book Liability Value of such liability of the Company) or an item of gain (if the adjustment decreases the Book Liability Value of such liability of the Company) and such items, and any other items relating to Book Liability Values determined by the Manager to be appropriate in determining Capital Accounts, shall be taken into account for purposes of computing Profits or Losses;

(v)     Gain or loss (including Simulated Gain or Loss) resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(vi)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss (excluding depletion with respect to a Depletable Property), there shall be taken into account Depreciation; and

To the extent an adjustment to the adjusted tax basis of any asset pursuant to Internal Revenue Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining capital account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; provided, that any item that is allocated other than pursuant to Section 5.1(a) shall not be included in computing Profits and Losses.

"Remaining EnerQuest Commitment Amount" means, at the time of determination, the EnerQuest Commitment Amount *less* all Capital Contributions made (and all unfunded Capital

Contributions, if any, required to be made pursuant to previous capital calls) by EnerQuest prior to such time.

"**Service Fee**" means two percent (2%) of the amount, if any, by which the Oil and Gas Revenues received by the Company in any calendar month exceed the sum of the Company Taxes paid during such calendar month.

"**Simulated Basis**" means, with respect to any Depletable Property, the Book Value of such property as adjusted to reflect deductions for Simulated Depletion. For purposes of such computation, the Simulated Basis of each Depletable Property shall be allocated to each Member in accordance with such Member's Percentage Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Percentage Interest as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's Depletable Properties pursuant to clause (ii) of the definition of Book Value.

"**Simulated Depletion**" means a depletion allowance computed for each Depletable Property at the rate determined by the Manager to be permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)(k)(2) provided that such Simulated Depletion shall not exceed Simulated Basis prior to the adjustment that is caused by such depletion allowance.

"**Simulated Gain or Loss**" means the simulated gain or loss computed with respect to a Disposition of a Depletable Property pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(k)(2) and by reference to the Simulated Basis of such property.

"**Treasury Regulations**" (or any abbreviation thereof used in this Agreement) means temporary or final regulations promulgated under the Internal Revenue Code.

(b)     In addition to the defined terms set forth in Section 2.1(a), the following terms used in this Agreement are defined in the sections or other subdivisions of this Agreement, as referenced below:

| Defined Term | Reference |
| --- | --- |
| Certificate | Section 1.1 |
| Covered Person | Section 8.1 |
| Current Owner | 4.1(a)(i) |
| Defaulting Member | Section 4.2(a) |
| Depletable Property | Section 5.2(c) |
| Effective Date | Recitals |
| Liquidity Event | Section 10.1 |
| Manager | Section 6.1 |
| EnerQuest Related Parties | Section 11.2(a) |
| Payment Default | Section 4.2(a) |
| Previously Acquired Interests | 4.1(a)(i) |
| Regulatory Allocations | Section 5.1(c)(ix) |
| Representatives | Section 11.3(a) |
| Tax Matters Partner | Section 7.7 |

-10-

| Defined Term | Reference |
|---|---|
| Units | Section 3.6(a) |

### Section 2.2. References and Construction.

(a)    All references in this Agreement to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.

(b)    Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.

(c)    The words "this Agreement", "this instrument", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

(d)    Words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

(e)    Pronouns in masculine, feminine, or neuter gender shall be construed to state and include any other gender.

(f)    Examples shall not be construed to limit, expressly or by implication, the matter they illustrate.

(g)    The word "or" is not exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions.

(h)    No consideration shall be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement.

(i)    All references in this Agreement to "$" or "dollars" shall refer to U.S. Dollars.

(j)    Unless the context otherwise requires or unless otherwise provided in this Agreement, the terms defined in this Agreement which refer to a particular agreement, instrument or document shall also refer to and include all renewals, extensions, modifications, amendments or restatements of such agreement, instrument or document, provided that nothing contained in this subsection shall be construed to authorize such renewal, extension, modification, amendment or restatement.

### ARTICLE III– MEMBERS AND UNITS

**Section 3.1.    Members.**  The names and addresses of the Members of the Company are set forth in **Exhibit A**.

**Section 3.2.**     **Additional Members.** Additional Persons may be admitted to the Company as Members only as specifically provided in this Agreement; provided, that no additional Person shall be admitted as a Member without the unanimous consent of the Members.

**Section 3.3.**     **Liability to Third Parties.** No Member or any officer, director, manager or partner of such Member, solely by reason of being a Member, shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

**Section 3.4.**     **Withdrawal.** No Member shall have the right to withdraw, resign or retire from the Company as a Member.

**Section 3.5.**     **Members Have No Agency Authority.** Except as expressly provided in this Agreement, no Member (in its capacity as a member of the Company) shall have any agency authority on behalf of the Company.

**Section 3.6.**     **Units.**

(a)     The Company shall have one (1) class of Membership Interests consisting of 1,000 authorized Membership Interests, which shall be referred to in this Agreement as "**Units**".

(b)     The Units shall be uncertificated.

(c)     **Exhibit A** sets forth the number of Units owned by each Member as of the date set forth therein. The Manager may amend **Exhibit A** from time to time to reflect any changes thereto resulting from any additional subscriptions, issuances, transfers, or admissions effected in accordance with this Agreement.

**Section 3.7.**     **Members Right to Act.** Actions and decisions requiring the approval of the Members may be authorized or made by a Majority Vote of the Members taken at a meeting of the Members, or by written consent without a meeting, as permitted herein.

(a)     **Meetings.** Meetings of Members may be called any Member holding twenty five percent (25%) or more of the Percentage Interests. Meetings may be called to consider approval of an action or decision under any provision of this Agreement by delivering to each Member notice of the time, place and purpose of the meeting at least three (3) Business Days before the day of the meeting. A Member may waive the requirement of notice of a meeting either by attending the meeting or executing a written waiver before or after the meeting.

(b)     **Quorum.** The holders of more than fifty percent (50%) of the Percentage Interests present in person or by proxy, shall constitute a quorum for the transaction of business at all meetings of the Members; provided, however, unless the meeting of the Members involves (i) the potential removal of BMA as Manager or (ii) a potential of the Company taking action against BMA, a quorum shall only be met if BMA is present at such meeting either in person or by proxy.

-12-

(c) **Voting.** Each Member shall at every meeting of Members be entitled to vote, in person or by proxy. Unless otherwise provided by law, no proxy shall be voted on after six (6) months from its date. All matters shall be decided by a Majority Vote of the Members, in person or by proxy, except as otherwise required by this Agreement or the Act.

(d) **Action by Written Consent.** Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without prior notice, and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the Members having not less than the minimum percentage of votes which would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. The Manager may fix, in advance, the record date for determining the Members entitled to express consent to action in writing without a meeting. Any written consent of the Members must be delivered to each of the Members at approximately the same time and no less than 48 hours prior to the proposed effectiveness of such consent, which advance notice requirement may be waived by the unanimous consent of the Members.

(e) **Presence at Meeting.** Members may participate in a meeting of the Members by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall be deemed present in person at such meeting.

(f) **Records of Meetings.** The Company shall maintain permanent records of all actions taken by the Members, including minutes of Company meetings, copies of actions taken by consent of the Members and copies of proxies

## ARTICLE IV – CAPITALIZATION

**Section 4.1.** **Capital Contributions of Members.**

(a) **Initial Capital Contributions**.

(i) Prior to the date of this Agreement, BMA or an Affiliate of BMA acquired those certain Oil and Gas Interests described on **Exhibit C**, attached hereto and made a part hereof (the "**Previously Acquired Interests**"), covering the net mineral acres and for the consideration set forth on **Exhibit C**. BMA has provided to EnerQuest copies of the mineral deeds or other instruments pursuant to which the Previously Acquired Interests were acquired, together with title reports, satisfactory to EnerQuest, confirming title to the Previously Acquired Interests in the grantors of such interests at the time such interests were acquired. BMA hereby represents and warrants to EnerQuest that (A) all agreed compensation to be paid for the Previously Acquired Interests has been paid in full, (B) all of the Previously Acquired Interests cover lands lying within the Initial Target Buy Area, (C) at least ninety percent (90%) of the Previously Acquired Interests (as determined on a total net mineral acre basis) cover lands lying entirely within one or more units for which a drilling permit has been issued for the drilling of a horizontal well to test the Marcellus or Utica formation, and (D) that the current record and beneficial owner of the Previously Acquired Interests is Braxton Minerals II, LLC (the "**Current Owner**"). Within five (5) Business Days from the Effective Date, BMA will cause the Company to acquire the

-13-

Previously Acquired Interests from the Current Owner for a purchase price equal to the original acquisition cost of such interests, as set forth in **Exhibit C**, less the sum of all oil and gas revenues actually received by BMA and its Affiliates with respect to the Previously Acquired Interests from and after the date acquired. At the closing of such acquisition, EnerQuest will fund, as its initial contribution to the capital of the Company, the purchase price (calculated as hereinabove provided) of the Previously Acquired Interests by wire transfer of immediately available funds to the Current Owner, and the Current Owner will execute and deliver to the Company, as grantee, one or more mineral deeds to the Previously Acquired Interests, each in a form suitable for recording in the various counties in which such interests are located.

(ii)     Prior to or concurrently with the closing of the acquisition by the Company of the Previously Acquired Interests, BMA will fund, as its initial capital contribution to the capital of the Company, the sum of $210,000 in cash, which shall be deposited to the credit of the Company in the operating account theretofore established by the Manager in a state or federally chartered bank as the principal bank account of the Company. $200,000 of such sum shall be used to reimburse BMA for the acquisition of previously acquired title.

(b)     **Subsequent Capital Contributions by EnerQuest**.

(i)     At such time as Manager has identified additional Oil and Gas Interests for possible acquisition by the Company that cover lands lying entirely within the Initial Target Buy Area and at least ninety percent (90%) (as determined on a total net mineral acre basis) within one or more units for which a drilling permit has been issued for the drilling of a horizontal well to test the Marcellus or Utica formation, Manager shall furnish to EnerQuest (A) a list of the Oil and Gas Interests so identified by Manager including, with respect to each such interest, the name of the grantor, any relevant tract number or other identifier, the legal location, the net mineral acres covered, and the actual acquisition cost per acre (which in no event shall be greater than $6,200 per acre), (B) certification by the Manager that each such interest covers lands lying within the Initial Target Buy Area and at least ninety percent (90%) (as determined on a total net mineral acre basis) within one or more units for which a drilling permit has been issued for the drilling of a horizontal well to test the Marcellus or Utica formation, together with a copy of each such approved drilling permit, (C) an ownership report prepared by a petroleum landman, in form and substance reasonably satisfactory to EnerQuest, showing record title to each such interest in the name of the grantor listed, (D) a request for a contribution by EnerQuest to the capital of the Company of an amount equal to the total Direct Asset Acquisition Costs of such interests, and (E) a completed schedule delivered via email in excel format in the form attached hereto as Schedule 4.1(b)(i) providing additional information with respect to the Oil and Gas Interests proposed to be acquired and Oil and Gas Interests previously acquired, and (F) other material supporting such acquisition as reasonably requested by EnerQuest. Within five (5) Business Days after receipt of such information and request, EnerQuest shall contribute to the capital of the Company, by wire transfer to the financial institution(s) and account(s) specified by Manager for payment of drafts, checks, cashiers' checks, or another form of cash equivalent transaction issued to the grantors of the Oil and Gas Interests to be acquired, the full amount of the requested capital contribution. In no

-14-

event shall Manager furnish to EnerQuest more than one (1) such request in any seven (7) day period.

(ii)    Notwithstanding the foregoing, in the event an Oil and Gas Interest proposed by Manager for acquisition pursuant to a request described as clause (i) above is an overriding royalty interest, then Manager shall include with such request more specific information concerning such overriding royalty interest, including information concerning the oil and gas leases out of which such interest has been reserved or carved-out and the remaining term of each such lease. EnerQuest shall not be obligated to approve or fund the acquisition of any overriding royalty interest which EnerQuest, acting in good faith, determines does not satisfy its expectations with respect to the types of interests to be acquired by the Company. EnerQuest and BMA shall work together to establish suitable terms generally applicable to the acquisition of overriding royalty interests. Any overriding royalty interest proposed by Manager for acquisition by the Company pursuant to this clause (ii) and not approved by EnerQuest may be acquired by Manager or any Affiliate of Manager for its own account or Manager may offer the opportunity to acquire such overriding royalty interest to a third party. If EnerQuest does not approve the acquisition of an overriding royalty interest presented to it pursuant to this clause (ii), neither EnerQuest nor any of its Affiliates shall directly or indirectly acquire such overriding royalty interest outside of the Company.

(iii)    Manager may, in addition to proposing the acquisition of Oil and Gas Interests meeting the criteria set forth in clause (i) above, propose the acquisition of Oil and Gas Interests covering lands lying within the Buy Area but outside the Initial Target Buy Area or that otherwise do not meet such criteria. Such proposal shall include all of the information described in clause (i) above, together with specific identification of the attributes of such proposal that do not meet the criteria described in clause (i). In such event, Manager and EnerQuest shall discuss the proposed acquisition and if approved by EnerQuest in its sole discretion, then Manager may proceed to acquire any such interests so approved by EnerQuest and EnerQuest will proceed to fund the capital required to acquire such interests in the same manner provided in clause (i) above. EnerQuest may approve the acquisition of one or more but less than all of the Oil and Gas Interests so proposed. Any Oil and Gas Interest proposed by Manager for acquisition by the Company pursuant to this clause (iii) and not approved by EnerQuest may be acquired by Manager or any Affiliate of Manager for its own account or Manager may offer the opportunity to acquire such Oil and Gas Interest to a third party. If EnerQuest does not approve the acquisition of an Oil and Gas Interest presented to it pursuant to this clause (iii), neither EnerQuest nor any of its Affiliates shall directly or indirectly acquire such Oil and Gas Interest outside of the Company.

(iv)    In addition to the foregoing, EnerQuest shall contribute to the capital of the Company, within five (5) business days after receipt of a request therefor from the Manager, cash in an amount equal to 75% of all Company Taxes. Each such request shall include copies of tax bills and such other information sufficient for EnerQuest to ascertain the nature and amount of the taxes being assessed and the properties to which such taxes relate.

-15-

(v)     Notwithstanding anything contained herein to the contrary, in no event shall EnerQuest ever be obligated to contribute to the capital of the Company sums that exceed in the aggregate the EnerQuest Commitment Amount; provided, however, that the limitation set forth in this Section 4.1(b)(v) shall not apply to EnerQuest's obligation to make capital contributions to fund Company Taxes pursuant to Section 4.1(b)(iv).

(vi)     In no event shall EnerQuest be obligated to make a capital contribution to the Company after the expiration or termination of the Commitment Period; provided, however, that the limitation set forth in this Section 4.1(b)(vi) shall not apply to EnerQuest's obligation to make capital contributions to fund Company Taxes pursuant to Section 4.1(b)(iv).

(vii)     All Oil and Gas Interests acquired by the Company shall be acquired and held in the name of the Company and not in the name of the Manager, another Member, or a nominee, trustee or other title holder for the account of the Company.

(c)     **Subsequent Capital Contributions by BMA.**  For so long as BMA is the Manager, Manager shall furnish to BMA, not more often than weekly, a written request to furnish additional capital to the Company as may be necessary to fund and pay, fully and in a timely manner (A) 100% of all Overhead and Operating Costs, (B) 100% of all Indirect Asset Acquisition Costs, (C) 25% of all Company Taxes, and (D) such amount of cash on hand as Manager reasonably believes will be required by the Company to conduct normal business activities until the next capital call is funded.  Each such request shall include a general description of the expenditures for which capital is being requested. Within five (5) Business Days after receipt of such information and request, BMA shall contribute to the capital of the Company, by wire transfer of immediately available funds in accordance with wire transfer instructions provided by Manager, the full amount of capital so requested.  Notwithstanding the foregoing, for so long as BMA is the Manager of the Company, the above described procedures shall not be applicable; rather, BMA shall be required to contribute to the capital of the Company, from time to time as and when necessary, such funds as may be required to pay in a timely manner when due all of the costs and expenses described at clauses (A) through (D) above.  For the avoidance of doubt, if BMA ceases to be the Manager, all of its obligations to make capital contributions pursuant to this Section 4.1(c) shall terminate.

Section 4.2.     **Non-Payment of Capital Contributions.**

(a)     If any Member fails for any reason to make a Capital Contribution required pursuant to the terms of this Agreement (a "**Payment Default**"), such Member shall be provided with written notice from the Manager (or from any Member if the Member in default is also the Manager) of such Payment Default and given a period of ten (10) Business Days after receipt of such written notice to cure such Payment Default.  If such Member fails to cure such Payment Default, such Member shall be a "**Defaulting Member**".

(b)     In addition to the foregoing, the Company shall have the right to pursue any remedy existing at law or in equity for the collection of the unpaid amount of the Capital Contributions agreed to be made in Section 4.1, including the prosecution of a suit against the Defaulting Member. In the event the Defaulting Member is the Manager, the other Members may, by Majority

-16-

Vote of such Members, designate a Member to act as Manager in prosecuting such lawsuit on behalf of the Company. The Defaulting Member shall be liable for the costs and expenses (including attorneys' fees and expenses) incurred by the Company or any other Member arising under this Section 4.2.

(c)     No Member shall be obligated to contribute any amount unpaid by a Defaulting Member.

**Section 4.3.     Interest on and Return of Capital Contributions.** No interest shall accrue on any Capital Contributions and no Member shall have the right to demand or require the return of its Capital Contributions except to the extent, if any, that distributions made pursuant to the express terms of this Agreement may be considered as such by Applicable Law or by unanimous agreement of the Members, or upon dissolution and liquidation of the Company, and then only to the extent expressly provided for in this Agreement and as permitted by Applicable Law.

**Section 4.4.     No Other Capital Contributions.** The obligations of the Members to make Capital Contributions to the Company are contained only in this **Article IV** and, except as provided therein, no Members shall have any obligation to make a Capital Contribution to the Company

**Section 4.5.     EnerQuest Commitment Amount.** The Manager shall provide written notice to EnerQuest when the Remaining EnerQuest Commitment Amount is less than $1,000,000. EnerQuest shall have thirty (30) days from its receipt of such written notice to notify the Manager of its decision to increase the EnerQuest Commitment Amount by the sum of $10,000,000, in which event the EnerQuest Commitment Amount shall thereafter be $20,000,000 for all purposes hereunder (and which, consistent with the procedures outlined in this Section 4.5, may be further increased by additional $10,000,000 tranches). In the event EnerQuest elects not to increase the EnerQuest Commitment Amount or fails to respond to Manager within such thirty (30) day period, then upon the first to occur of (i) such time as EnerQuest has funded the EnerQuest Commitment Amount in full, or (ii) a period of sixty (60) days has expired since the end of the thirty (30) day period, a Liquidity Event shall occur, as provided in Section 10.1 and the Commitment Period shall terminate.

## ARTICLE V – ALLOCATIONS AND DISTRIBUTIONS

**Section 5.1.     Allocations for Purposes of Maintaining Capital Accounts.**

(a)     Except as set in this Section 5.1 or Section 10.2 in connection with liquidating distributions, Profits or Losses (and, if necessary, items of income, gain, loss and deduction) for each Allocation Period shall be allocated among the Members in accordance with their respective Percentage Interests.

(b)     Upon a sale or disposition (or a deemed sale or disposition in conjunction with a Liquidity Event) of all or a portion of the Company's assets, items of Company income, gain, loss, and deduction (determined in the same manner as such items are determined for purposes of determining Profits or Losses) attributable to such event, all items of Company income, gain, loss, and deduction (determined in the same manner as such items are determined for purposes of

-17-

determining Profits or Losses) for the Allocation Period in which such sale or disposition occurs and each succeeding Allocation Period shall be allocated among the Members (in each case allocating items of income and gain differently than items of deduction and loss, if necessary) in such a manner as shall cause the capital account of each Member as adjusted through the end of each Allocation Period (including the effect of allocations pursuant to Section 5.1(c) therefor), to equal, as nearly as possible, the amount necessary such that the Members' relative capital account balances reflect the Percentage Interests as it relates to such portion of the Company's assets included in such sale or disposition (or all of the Company's assets in the case of a deemed sale or disposition in conjunction with a Liquidity Event).

(c)     Notwithstanding any of the foregoing provisions of this Section 5.1 to the contrary, items of the Company's income, gain, loss, and deduction for each Allocation Period (determined in the same manner as such items are determined for purposes of determining Profits or Losses) shall be allocated among the Members as follows:

(i)     If during any Allocation Period there is a net increase in Member Nonrecourse Debt Minimum Gain that gives rise to Member Nonrecourse Deductions, each Member bearing the economic risk of loss for such Member Nonrecourse Debt shall be allocated items of Company deductions and losses for such period equal to such Member's share of Member Nonrecourse Deductions, as determined in accordance with applicable Treasury Regulations. If during any Allocation Period there is a net increase in Minimum Gain that gives rise to Company Nonrecourse Deductions, each Member shall be allocated items of Company deductions and losses for such period equal to such Member's share of such net increase, as determined in accordance with applicable Treasury Regulations.

(ii)     If for any Allocation Period there is a net decrease in Minimum Gain attributable to Company Nonrecourse Liabilities, each Member shall be allocated items of Company income and gain for such period equal to such Member's share of such net decrease, as determined in accordance with applicable Treasury Regulations. This clause (ii) is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(iii)     If for any Allocation Period there is a net decrease in Member Nonrecourse Debt Minimum Gain, each Member bearing the economic risk of loss for such Member Nonrecourse Debt shall be allocated items of Company income and gain for such period equal to such Member's share of such net decrease as determined in accordance with applicable Treasury Regulations. This clause (iii) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(iv)     In the event that a Member unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4)-(6) that causes or increases a deficit balance in such Member's Adjusted Capital Account, items of Company income and gain shall be allocated to that Member in an amount and manner sufficient to eliminate the deficit balance as quickly as possible; provided that, an allocation pursuant to this clause (iv) shall be made only if and to the

-18-

extent that such Member would have deficit Adjusted Capital Account balance after all other allocations provided for in this **Article V** have been tentatively made as if this clause (iv) were not in this Agreement. It is intended that this clause (iv) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

(v)     In the event that any Member has a deficit balance in its Adjusted Capital Account at the end of any Allocation Period, such Member shall be allocated items of Company gross income and gain in the amount of such deficit as quickly as possible; provided that an allocation pursuant to this clause (v) shall be made only if and to the extent that such Member would have a deficit balance in its Adjusted Capital Account after all other allocations provided for in this **Article V** have been tentatively made as if clause (iv) and this clause (v) were not in this Agreement.

(vi)     Simulated Depletion for each Depletable Property and Simulated Loss upon the Disposition of a Depletable Property shall be allocated among the Members in proportion to their shares of the Simulated Basis in such property.

(vii)     To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Internal Revenue Code Section 734(b) or Internal Revenue Code Section 743(b) is required pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining capital accounts as the result of a distribution to any Member in complete liquidation of such Member's Membership Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) if such Section applies, or in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), if such Section applies.

(viii)     The losses and deductions allocated pursuant to this Section 5.1 shall not exceed the maximum amount of losses and deductions that can be allocated to a Member without causing or increasing a deficit balance in the Member's Adjusted Capital Account. If, at the end of any Allocation Period, as a result of the allocations otherwise provided for in this Section 5.1, the Adjusted Capital Account balance of any Member shall become negative, items of deduction and loss otherwise allocable to such Member for such period, to the extent such items would have caused such negative balance, shall instead be allocated to Members having positive Adjusted Capital Account balances remaining at such time in proportion to such balances.

(ix)     The allocations set forth in Sections 5.1(c)(i) through (ix) (collectively, the **"Regulatory Allocations"**) are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations that are made be offset either with other Regulatory Allocations or with special allocations pursuant to this Section 5.1(c)(x). Therefore, notwithstanding any other provisions of this Section 5.1 (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations in whatever manner they determine

-19-

appropriate so that, after such offsetting allocations are made, each Member's Adjusted Capital Account balance is, to the extent possible, equal to the Adjusted Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to the remaining subsections of this Section 5.1.

### Section 5.2.    Allocations for Federal Income Tax Purposes.

(a)    Except as otherwise provided in this Section 5.2, the taxable income or loss of the Company (and items thereof) for any taxable year shall be allocated among the Members to the maximum extent possible in the same manner as the corresponding items (if any) are allocated among the Members for purposes of maintaining their capital accounts.

(b)    In accordance with Section 704(c) of the Internal Revenue Code, the Treasury Regulations thereunder, and the portions of the Treasury Regulations under Section 704(b) that apply the principles of Section 704(c), income and deductions with respect to any property carried on the books of the Company at an amount that differs from such property's adjusted tax basis shall, solely for federal income tax purposes, be allocated among the Members in a manner to take into account any variation between the adjusted tax basis of such property to the Company and such book value. In making such allocations, the Manager shall use such method or methods as it determines to be reasonable and in accord with applicable Treasury Regulations.

(c)    Cost and percentage depletion deductions with respect to property the production from which is subject to depletion (herein sometimes called "**Depletable Property**") shall be computed separately by the Members rather than the Company.    For purposes of such computations, the federal income tax basis of each Depletable Property shall be allocated to each Member in accordance with such Member's Percentage Interest as of the time such Depletable Property is acquired by the Company, and shall be reallocated among the Members in accordance with the Members' Percentage Interest as determined immediately following the occurrence of an event giving rise to an adjustment to the Book Values of the Company's Depletable Properties pursuant to clause (ii) of the definition of Book Value  (or at the time of any material additions to the federal income tax basis of such Depletable Property).   Such allocations are intended to be applied in accordance with the "partners' interests in partnership capital" under Section 613A(c)(7)(D) of the Internal Revenue Code; provided that the Members understand and agree that the Manager may authorize special allocations of tax basis, income, gain, deduction or loss, as computed for federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted federal income tax basis with respect to Depletable Properties, in such manner as determined consistent with the principles of Section 704(c) of the Internal Revenue Code, the Treasury Regulations thereunder and the portions of the Treasury Regulations under Section 704(b) that apply the principles of Section 704(c).

(d)    For purposes of the separate computation of gain or loss by each Member on the taxable Disposition of Depletable Property, the amount realized from such Disposition shall be allocated (i) first, to the Members in an amount equal to the Simulated Basis in such Depletable Property and in the same proportion as their shares thereof were allocated and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gains; provided, however, that the Members understand and agree that the Manager may authorize special

allocations of tax basis, income, gain, deduction or loss, as computed for federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted federal income tax basis with respect to Depletable Properties, in such manner as determined consistent with the principles of Section 704(c) of the Internal Revenue Code, the Treasury Regulations thereunder and the portions of the Treasury Regulations under Section 704(b) that apply the principles of Section 704(c). The provisions of this Section 5.2(d) and the other provisions of this Agreement relating to allocations under Section 613A(c)(7)(D) of the Internal Revenue Code are intended to comply with Treasury Regulation Section 1.704-1(b)(4)(v) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(e)     Each Member shall separately keep records of its share of the adjusted tax basis in each Depletable Property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition of such property by the Company. Upon the request of the Company, each Member shall advise the Company of its adjusted tax basis in each Depletable Property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection. The Company may rely on such information and, if it is not provided by the Member, may make such reasonable assumptions as it shall determine with respect thereto.

(f)     All recapture of income tax deductions resulting from the taxable Disposition of Company property shall, to the maximum extent possible, be allocated to the Member to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the Disposition of such property.

(g)     All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning such interest, without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under Section 706 of the Internal Revenue Code and the applicable Treasury Regulations.

(h)     In the event the Units are issued to a Person and the issuance of such Units results in items of income or deduction to the Company, such items of income or deduction shall be allocated to the Members immediately before the issuance of such Units.

### Section 5.3.     Distributions.

(a)     Except as provided in **Article X**, distributions from the Company shall be made as provided in this Section 5.3.

(i)     Distributable Cash Flow shall be distributed 75% to EnerQuest and 25% to BMA on a monthly basis on or before the 15th day following the month for which such Distributable Cash Flow is calculated.

(ii)     Proceeds from Asset Disposition other than in connection with a liquidating distribution shall be distributed 75% to EnerQuest and 25% to BMA.

-21-

(iii) Upon dissolution of the Company, liquidating distributions shall be made as provided in **Article X**.

(b) Payment of all cash distributions made by the Company to a Member shall be made by wire transfer of immediately available funds in accordance with such written instructions to the Company as may be provided by such Member from time to time.

(c) The Company shall withhold tax on distributions or otherwise as required by Applicable Law, and such withheld amounts shall be considered distributions received by Members for purposes of this Agreement. The Members shall furnish to the Manager from time to time all such information as is required by Applicable Law or otherwise reasonably requested by the Manager (including certificates in the form prescribed by the Internal Revenue Code and applicable Treasury Regulations or applicable state, local, or foreign law) to permit the Manager to ascertain whether and in what amount withholding is required of the Members.

## ARTICLE VI– MANAGEMENT AND GOVERNANCE PROVISIONS

### Section 6.1.   **Management by Manager.**

(a) Except for matters in which the approval of the Members is required by this Agreement or by nonwaivable provisions of the Act, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of a manager (the "**Manager**").

(b) BMA shall be the initial Manager.

**Section 6.2.   Removal of Manager.** The Manager may be removed, with or without cause, by a Majority Vote of the Members; provided, however, that so long as EnerQuest and BMA are the sole Members, BMA may be removed as Manager only for Good Cause.

**Section 6.3.   Vacancies.** In the event of the resignation or removal of a Manager, the Members shall select a replacement Manager through the Majority Vote of the Members.

**Section 6.4.   Compensation of Manager.** As sole compensation for its services as Manager of the Company, the Manager shall be entitled to a monthly payment by the Company of the Service Fee.

**Section 6.5.   Actions Requiring Manager and EnerQuest Approval.**

(a) Until such time as the Manager resigns or is removed, the Manager is hereby delegated the day-to-day authority to manage the Company and, subject to the provisions of this Agreement, make decisions on behalf of the Company.

(b) Notwithstanding any other provision of this Agreement, neither the Company, nor the Manager, nor any of its officers, employees or agents acting on behalf of the Company, shall take any of the following actions without having first received the approval of EnerQuest:

-22-

(i)        acquire any asset, property right or interest other than Oil and Gas Interests;

(ii)       acquire any Oil and Gas Interest not satisfying the criteria set out in Section 4.1(a)(i) or 4.1(b)(i);

(iii)      sell, assign or otherwise Dispose of any Oil and Gas Interest;

(iv)     enter into or conduct any business other than the acquisition and ownership of Oil and Gas Interests;

(v)       participate as a working interest owner in the drilling of any well;

(vi)     issue any Units;

(vii)    enter into a Material Agreement;

(viii)   hire any Person as an employee of the Company;

(ix)     create, incur, assume, guarantee, refinance or prepay any Indebtedness;

(x)       guarantee in the name or on behalf of the Company the performance of any contract or other obligation of any Person other than the Company or any of its subsidiaries;

(xi)     mortgage, pledge, assign in trust or otherwise encumber any property or assets of the Company or its subsidiaries, or assign any monies owed or to be owed to the Company or its subsidiaries;

(xii)    admit any other Person as a Member;

(xiii)   acquiesce to the appointment of a receiver or trustee or initiate or commence any bankruptcy, winding-up or similar insolvency proceeding involving the Company;

(xiv)   obligate or cause the Company to liquidate or dissolve; or

(xv)    take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

**Section 6.6.**    **Officers and other Appointments.**

(a)    The Manager may, from time to time, designate one or more persons to be officers of the Company; however, no such officer shall be an employee of the Company. No officer need be a resident of the State of Delaware, a Member or a Manager. Any such officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them. The Manager may assign titles to particular officers. Unless the Manager decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporate Law (or any successor statute), the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Manager pursuant to this Section 6.6 and the other terms and provisions hereof.

-23-

(b)     Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Manager.  Designation of an officer shall not of itself create contract rights.  Any vacancy occurring in any office of the Company may be filled by the Manager.

## ARTICLE VII– ACCOUNTING AND BANKING MATTERS; CAPITAL ACCOUNTS; TAX MATTERS

**Section 7.1.     Books and Records; Reports.**

(a)     The Company shall keep and maintain full and accurate books of account for the Company on the modified cash basis of accounting in accordance with the terms of this Agreement. Such books shall be maintained at the principal United States office of the Company.  The Members and their respective Affiliates and designated representatives shall have full and complete access at all reasonable times to review, inspect and copy the books and records of the Company.

(b)     The Manager, on behalf of the Company, shall provide to each Member the following reports in substantially the format as reasonably requested by EnerQuest:

(i)     monthly, within fifteen (15) days after the end of each month (A) a statement detailing revenues and expenses of the Company for such month, all in the form attached hereto as Schedule 7.1(b)(i), (B) a calculation of the Distributable Cash Flow for such month, and (C) a schedule of accounts payable as of the last day of such month, with aging information in thirty (30) day increments;

(ii)     annually, within sixty (60) days after the end of each fiscal year of the Company (A) financial statements as of the end of and for such period, including a balance sheet and the related statements of operations, Members' capital, and of cash flows, prepared in accordance with the modified cash basis of accounting, and (B) a schedule reflecting the Capital Account balances of each Member at the end of such period prepared pursuant to the provisions of Section 7.4;

(iii)     annually, within thirty (30) days after each calendar year end, a cumulative schedule listing all Oil and Gas Properties owned by the Company; and

(iv)     such other reports as reasonably requested by EnerQuest.

**Section 7.2.     Fiscal Year.**  The calendar year shall be selected as the accounting year of the Company and the books of account shall be maintained on the modified cash basis.

**Section 7.3.     Bank Accounts.**  The Manager shall cause one or more bank accounts to be maintained in the name of the Company in such bank or banks as may be determined by the Manager, which accounts shall be used for the payment of expenditures incurred by the Company and in which shall be deposited any and all receipts of the Company.

-24-

All such receipts shall be and remain the property of the Company, shall be received, held and disbursed by the Manager for the purposes specified in this Agreement and shall not be commingled with the funds of any other Person.

**Section 7.4.    Capital Accounts.**

(a)    A capital account shall be established and maintained for each Member. Each Member's capital account (i) shall be increased by (A) the amount of money contributed by that Member to the Company, (B) the Fair Market Value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Internal Revenue Code), and (C) the amount of any item of income or gain allocated to such Member under Section 5.1, and (ii) shall be decreased by (A) the amount of money distributed to that Member by the Company, (B) the Fair Market Value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Internal Revenue Code), and (C) the amount of any deduction or loss allocated to such Member under Section 5.1.

(b)    It is the intention of the Members that the capital accounts of each Member be kept in the manner required under Treasury Regulation Section 1.704-1(b)(2)(iv). The Manager may amend the provisions hereof as to the maintenance of capital accounts and allocation of the items of income, gain, loss and deduction for such purposes and for federal, state and local income tax purposes if after conferring with its tax advisers it determines that such amendment is appropriate in order to comply with Applicable Law; provided, however, that any such amendment shall not affect the right of any Member to distributions pursuant to Section 5.3, to distributions pursuant to Section 5.4 in respect of taxable income (as it may then be computed) that is allocated to such Member, or to distributions pursuant to any other provision hereof.

(c)    On the transfer of all or part of a Member's Membership Interest, the capital account of the transferor that is attributable to the transferred interest shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

**Section 7.5.    Tax Partnership.** The Members agree to classify the Company as a partnership for federal tax purposes. Neither the Company, any Member nor any officer or other representative of any of the foregoing shall file an election to classify the Company as an association taxable as a corporation for federal tax purposes. Notwithstanding the foregoing, it is agreed that this Section 7.5 shall not be applicable if the tax status of the Company were to be reclassified as a result of a merger or other transaction whereby the Company is being sold to a third party and such merger or transaction is approved by the Manager in accordance with the terms of this Agreement.

**Section 7.6.    Tax Elections.** The Company will make the following elections:

(a)    To elect the calendar year as the Company's taxable year if permitted by Applicable Law;

(b)    To elect the accrual method of accounting;

(c)     If requested by a Member, to elect, in accordance with Sections 734, 743 and 754 of the Internal Revenue Code and applicable regulations and comparable state law provisions, to adjust basis in the event any Membership Interest is transferred in accordance with this Agreement or any Company property is distributed to any Member;

(d)     In the event the Company shall, with the consent of all Members, participate as a working interest owner in any well, to deduct when incurred intangible drilling and development costs (if applicable) described in Section 263(c) of the Internal Revenue Code; and

(e)     To elect with respect to such other federal, state and local tax matters as the Manager shall approve, except as provided in Section 7.5.

**Section 7.7.     Tax Matters Partner.** BMA shall act as the "tax matters partner" under Section 6231 of the Internal Revenue Code, subject to replacement by the Members (the "**Tax Matters Partner**"). The Tax Matters Partner shall promptly notify the Members if any tax return or report of the Company is audited or if any adjustments are proposed by any Governmental Entity. In addition, the Tax Matters Partner shall promptly furnish to the Members all notices concerning administrative or judicial Proceedings relating to federal income tax matters as required under the Internal Revenue Code. During the pendency of any such administrative or judicial Proceeding, the Tax Matters Partner shall furnish to the Members periodic reports, not less often than monthly, concerning the status of any such Proceeding. Without the consent of a Majority Vote of the Members, the Tax Matters Partner shall not extend the statute of limitations, file a request for administrative adjustment, file suit concerning any tax refund or deficiency relating to any Company administrative adjustment or enter into any settlement agreement relating to any Company item of income, gain, loss, deduction or credit for any fiscal year of the Company.

**Section 7.8.     Tax Returns.** The Company shall deliver to each of the Members the following schedules and tax returns: (a) within sixty (60) days after the Company's year-end, a draft Schedule K-1, and (b) within ninety (90) days after the Company's year-end, a final Schedule K-1, along with copies of all other federal, state, or local income tax returns or reports filed by the Company for the previous year as may be required as a result of the operations of the Company. In addition, the Company shall provide, to the extent reasonably available, such other information as a Member may reasonably request for purposes of complying with applicable tax reporting requirements.

## ARTICLE VIII– INDEMNIFICATION

**Section 8.1.     Power to Indemnify in Actions, Suits or Proceedings.** The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or Proceeding, whether civil, criminal, administrative or investigative by reason of the fact that he is or was a Member, officer, or Manager of the Company, or is or was serving at the request of the Company as a member, officer, or director of another limited liability company, corporation, partnership, joint venture, trust or other enterprise or an agent of the Company (a "**Covered Person**"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such Covered Person in connection with such action, suit or

-26-

Proceeding, provided that (a) such Covered Person acted in good faith and in a manner such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, (b) with respect to a Manager of the Company, such Covered Person had no reasonable cause to believe his conduct was unlawful, or (c) with respect to any criminal action or Proceeding, such Covered Person had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that a Covered Person did not act in good faith and in a manner which such Covered Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, had reasonable cause to believe that his conduct was unlawful.

Section 8.2. **Expenses Payable in Advance.** Expenses incurred by a Covered Person in defending or investigating a threatened or pending action, suit or Proceeding shall be paid by the Company in advance of the final disposition of such action, suit or Proceeding upon receipt of an unsecured undertaking by or on behalf of such Covered Person to repay such amount if it shall ultimately be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this **Article VIII**.

Section 8.3. **Survival of Indemnification and Advancement of Expenses.** The indemnification and advancement of expenses provided by, or granted pursuant to, this **Article VIII** shall, unless otherwise provided when authorized or ratified, continue as to a Person who has ceased to be a Member, officer or Manager and shall inure to the benefit of the heirs, executors and administrators of such a Person and shall survive the liquidation of the Company. No amendment or repeal of the provisions of this **Article VIII** which adversely affects the rights of any Covered Person under this **Article VIII** with respect to the acts or omissions of such Covered Person at any time prior to such amendment or repeal shall apply to such Covered Person without the written consent of the Covered Person.

Section 8.4. **Limitation on Indemnification.** Notwithstanding anything else in this Agreement to the contrary, the Company shall not be obligated to indemnify any Covered Person for (a) any Proceeding initiated by such Covered Person against the Company unless that Proceeding was brought to enforce such Covered Person's right to indemnification under this **Article VIII** and, in such Proceeding, it is determined that such Covered Person is entitled to indemnification, or (b) any Proceeding brought by the Company against such Covered Person unless such Covered Person is found not to be liable to the Company.

Section 8.5. **No Obligation to Contribute Capital**. The Company's indemnification obligations set forth in this Article VIII shall be payable solely out of the Company's assets and operating cash flow. The Company shall not make a capital call and no Member shall be obligated to contribute capital to the Company for the purpose of directly or indirectly funding the Company's indemnification obligations.

-27-

## ARTICLE IX– DISPOSITIONS OF MEMBERSHIP INTERESTS

**Section 9.1.** **Dispositions.**

(a)     No Member may Dispose of its Membership Interest, in whole or in part other than in accordance with the terms of this **Article IX**, and any attempted Disposition that is not in accordance with this **Article IX** shall be, and is hereby declared, null and void *ab initio*. The Members agree that a breach of the provisions of the restrictions on Dispositions set forth in this **Article IX** may cause irreparable injury to the Company and the Members for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Person to comply with such provisions, and (ii) the uniqueness of the Company's business and the relationship among the Members. Accordingly, the Members agree that the restrictions on Dispositions may be enforced by specific performance.

(b)     Neither EnerQuest nor BMA may directly or indirectly Dispose of all or any part of its Membership Interest other than a Disposition approved by all Members.

(c)     The foregoing Section 9.1(b) to the contrary notwithstanding, a Disposition of a Membership Interest approved by the Members shall be null and void *ab initio* (i) if the transferee fails to deliver to the Company all documents required pursuant to Section 9.2, or (ii) such Disposition would result in the violation of any applicable federal or state securities laws. Any costs incurred by the Company in connection with any proposed or actual Disposition by a Member of all or a part of its Membership Interest shall be borne by such Member.

**Section 9.2.** **Substitution.**

(a)     Unless an assignee of a Membership Interest becomes a Member in accordance with the provisions set forth below, such assignee shall not be entitled to any of the rights granted to a Member hereunder in respect of such Membership Interest, other than the right to receive allocations of income, gain, loss, deduction, credit and similar items and distributions to which the assignor would otherwise be entitled, to the extent such items are assigned.

(b)     An assignee of the Membership Interest of a Member, or any portion thereof, may become a Member entitled to all of the rights of a Member in respect of such Membership Interest if (i) the assignor gives the assignee such right, (ii) the Members unanimously consent in writing to such substitution, and (iii) the assignee executes and delivers such instruments (including the a joinder agreement), in form and substance reasonably satisfactory to the Manager, as the Manager may deem reasonably necessary to effect such substitution and to confirm the agreement of the assignee to be bound by all of the terms and provisions of this Agreement.

## ARTICLE X– DISSOLUTION, LIQUIDATION, AND TERMINATION

**Section 10.1.** **Dissolution.** The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following (each, a "**Liquidity Event**"):

(a)     upon election by all of the Members to dissolve the Company;

(b)     upon the removal or resignation of BMA as Manager;

(c)     upon the expiration of the Commitment Period;

(d)     upon an election by BMA; provided, however, BMA's election must be in conjunction with BMA's execution of a sale or other transfer of the Company's assets distributable to BMA pursuant to this **Article X** to a publicly registered master limited partnership of which BMA or its members are principals; provided, further, that BMA must provide to EnerQuest the right, but not the obligation, to participate in such sale or other transfer with respect to its distributable share of the Company's assets on the same terms and conditions as BMA; or

(e)     entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

**Section 10.2.     Liquidation and Termination.**  On dissolution of the Company, the liquidator shall be a Person selected by the Manager and approved by EnerQuest.  The liquidator shall proceed diligently to wind up the affairs of the Company at the direction of the Manager and make final distributions as provided in this Agreement and in the Act.  The costs of liquidation shall not be an Overhead and Operating Expense, unless such liquidation is pursuant to Section 10.1(b).  The steps to be accomplished by the liquidator are as follows:

(a)     As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(b)     The liquidator shall pay, satisfy or discharge from Company funds all of the debts (including debts owing to any Member), liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).

(c)     To the extent that the Company has any assets remaining, the Fair Market Value of that property shall be determined and the capital accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in the property that has not been reflected in the capital accounts previously would be allocated among the Members such that, as nearly as possible, the positive balance in the Members' respective capital accounts will be in the same proportion as their respective Percentage Interests.  All remaining assets shall then be distributed to the Members in accordance with positive balance of such Member's capital account.

(d)     All distributions in kind to the Members shall be valued for purposes of determining each Member's interest therein at its Fair Market Value (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Internal Revenue Code) at the time of such distribution.  Further each Oil and Gas Interest distributed in kind shall be distributed so that each Member receives an undivided interest in each Oil and Gas Interest equal to its relative share of the total capital of the Company after giving effect to Section 10.2(c).  Notwithstanding the foregoing, to the extent that at the time of

-29-

liquidation, any Member is a Defaulting Member, any amount of money or property otherwise distributable to such Defaulting Member shall be reduced as necessary by an amount of cash or property equal to such Defaulting Member's unfunded Capital Contribution.

(e)     Any distribution to the Members in liquidation of the Company shall be made by the later of the end of the taxable year in which the liquidation occurs or 90 days after the date of such liquidation. For purposes of the preceding sentence, the term "liquidation" shall have the same meaning as set forth in Treasury Regulation Section 1.704-1(b)(2)(ii). The distribution of cash and/or property to a Member in accordance with the provisions of this Section 10.2 constitutes a complete return to the Member of its Capital Contribution and a complete distribution to the Member of its Membership Interest and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

Section 10.3.     **Deficit Capital Accounts.** No Member shall be obligated to restore a deficit balance in its capital account at any time or make a contribution to the Company except as provided herein or as it may have agreed in a separate agreement.

Section 10.4.     **Certificate of Cancellation.** On completion of the distribution of Company assets as provided in this Agreement, the Company shall be terminated and the Members shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 1.5, and take such other actions as may be necessary to terminate the Company.

## ARTICLE XI – ADDITIONAL COVENANTS

Section 11.1.     **Exclusive Dealings in the Buy Area.**

(a)     During the Commitment Period (i) BMA shall, and shall cause its Affiliates to, use commercially reasonable efforts with the exercise of due diligence to evaluate, negotiate, and propose for acquisition by the Company Oil and Gas Interests located in the Buy Area, (ii) such activities shall be conducted by BMA and its Affiliates on an exclusive basis solely for the account of the Company, provided that BMA may offer Oil and Gas Interests that are proposed for acquisition by the Company but not approved by EnerQuest to third parties as provided in Section 4.1(b)(ii) and (iii), and (iii) neither BMA nor any of its Affiliates will acquire any Oil and Gas Interests in the Buy Area other than Oil and Gas Interests that are proposed for acquisition by the Company but not approved by EnerQuest as provided in Section 4.1(b)(ii) and (iii).

(b)     During the Commitment Period, BMA agrees (i) that it shall cause Brad Ashburn to devote substantially of his business time and attention performing the services for the Company as contemplated in this Agreement and (ii) that it shall cause Scott Bauer to devote the amount of his business time reasonably necessary to support Brad Ashburn in the performance of the services for the Company as contemplated in this Agreement; provided, however, at no time will Scott Bauer's amount of business time devoted to the Company be less than 50% of Scott Bauer's total business time as determined on a weekly basis.

(c)     If BMA either resigns as Manager or is removed as Manager for Good Cause, BMA shall not, and shall cause its Affiliates not to, directly or indirectly, for itself or on behalf of or in conjuction with any other person, acquire an Oil and Gas Interest in the Buy Area until the 7th anniversary of the Effective Date. Nothing contained in this Section 11.1(c) shall restrict BMA from acquiring any Oil and Gas Interest that BMA previously proposed for acquisition by the Company but which was not approved by EnerQuest as provided in Section 4.1(b)(ii) and (iii).

### Section 11.2.     Outside Activities of EnerQuest.

(a)     The Members acknowledge and affirm that EnerQuest and its Affiliates (the "EnerQuest Related Parties") are engaged in the oil and gas business and may acquire for their own account leasehold and other interests in oil and gas properties located within the Buy Area subject to the restrictions set forth in Section 4.1(b)(ii) and (iii); provided, however, that during the Commitment Period, EnerQuest will not acquire or seek to acquire Oil and Gas Interest in the Buy Area, except to the extent an Oil and Gas Interest is included in a larger package of primarily leasehold or working interest properties acquired by EnerQuest.

(b)     Subject to the foregoing, the Members (in their own names and in the name and on behalf of the Company) expressly waive any such conflicts of interest or potential conflicts of interest and agree that no EnerQuest Related Party shall have any liability to any Member, any Affiliate thereof, or the Company with respect to such conflicts of interest or potential conflicts of interest.

(c)     The Members (in their own names and in the name and on behalf of the Company):

(i)     agree that (A) the terms of this **Article XI**, to the extent that they modify or limit a duty or other obligation, if any, that an EnerQuest Related Party may have to the Company or another Member under the Act or other Applicable Law, are reasonable in form, scope and content; and (B) the terms of this **Article XI** shall control to the fullest extent possible if it is in conflict with a duty, if any, that an EnerQuest Related Party may have to the Company or another Member, the Act or any other Applicable Law; and

(ii)     waive any duty or other obligation, if any, that an EnerQuest Related Party may have to the Company or another Member, pursuant to the Act or any other Applicable Law, to the extent necessary to give effect to the terms of this **Article XI**.

(d)     The Members (in their own names and in the name and on behalf of the Company) acknowledge, affirm and agree that (i) the execution and delivery of this Agreement by the EnerQuest Related Parties is of material benefit to the Company and the Members, and that EnerQuest would not be willing to (A) execute and deliver this Agreement, and (B) make their agreed Capital Contributions to the Company, without the benefit of this Section 11.2(d) and the agreement of the Members, thereto; and (ii) they have reviewed and understand the provisions of Section 18-1101(b) of the Act.

### Section 11.3.     Confidentiality.

(a)     Each Member agrees that all non-public and confidential information furnished to it pursuant to this Agreement will be kept confidential and will not be disclosed or used by such

-31-

Member, or by any of its agents, representatives or employees (collectively, "Representatives"), in any manner whatsoever (other than to the Company or another Member), in whole or in part, except that (i) each Member shall be permitted to disclose such information to those Representatives who need to be familiar with such information in connection with such Member's investment in the Company, as well as to its accountants, attorneys, bankers, other funding sources, investors and potential investors of such Member and who in each case are apprised of the confidential nature of such information, (ii) each Member shall be permitted to disclose information to the extent required by Applicable Law, so long as such Member shall have used its reasonable efforts to first afford the Company with a reasonable opportunity to contest the necessity of disclosing such information, (iii) each Member shall be permitted to disclose such information to prospective purchasers of all or a portion of the Member's Membership Interest, provided that (A) the sale of all or a portion of such Member's Membership Interest to such prospective purchaser has been approved by the Members, and (B) such prospective purchaser has executed a confidentiality agreement in a form approved by the Company containing terms not less restrictive than the terms set forth herein, (iv) each Member shall be permitted to disclose information to the extent necessary for the enforcement of any right of such Member arising under this Agreement, and (v) each Member shall be permitted to report to its shareholders, limited partners, members or other owners, as applicable, regarding the general status of its investment in the Company (without disclosing specific confidential information); provided, however, that information shall not be deemed confidential information for purposes of this Section 11.3(a), where such information (w) was already known to such Member (or its Representatives) at the time of disclosure, (x) later becomes known to such Member by having been disclosed to such Member (or its Representatives) by a third Person without any obligation of confidentiality imposed on such third Person to such Member's knowledge, (y) is or becomes publicly known through no wrongful act of such Member (or its Representatives), or (z) is independently developed by such Member (or its Representatives) without reference to any confidential information disclosed to such Member under this Agreement. Each Member shall be responsible for any breach of this Section 11.3(a) by its Representatives.

## ARTICLE XII– GENERAL PROVISIONS

**Section 12.1.** **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and shall be deemed to be given (a) when delivered by hand (with written confirmation of receipt); (b) on the next Business Day after the date of deposit by the addressee with a nationally recognized overnight courier; (c) on the date sent by Electronic Transmission (without receipt of any notice of failure of delivery) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on **Exhibit A** or such other address as that Member may specify by notice to the other Members. All notices, requests, and consents to be sent to the Company must be sent to or made to the attention of the Manager at the address specified for the Company in Section 1.4(b) or such other address as the Company may specify by notice to the Members.

**Section 12.2.** **Amendment and Waivers.** This Agreement may not be amended

-32-

or modified, and no provisions hereof may be waived, without the unanimous consent of the Members.

**Section 12.3.** **Entire Agreement.** This Agreement and the certificates, documents, instruments and writings that are delivered pursuant hereto constitute the entire agreement and understanding of the Members in respect of its subject matters and supersedes all prior understandings, agreements, or representations by or among the Members, written or oral, to the extent they relate in any way to the subject matter of this Agreement or the transactions contemplated by this Agreement.

**Section 12.4.** **Successors and Assigns.** Subject to **Article IX**, this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**Section 12.5.** **Governing Law.** **THIS AGREEMENT AND THE PERFORMANCE OF THE TRANSACTIONS AND THE OBLIGATIONS OF THE COMPANY OR THE MEMBERS HEREUNDER WILL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW PRINCIPLES.**

**Section 12.6.** **Arbitration.** Each of the parties shall use its commercial reasonable efforts to resolve any dispute between the parties that relates to this Agreement or the performance of the transactions and the obligations of the Company or the Members hereunder and to settle any such dispute through joint cooperation and consultation. If the parties are unable to settle such dispute within sixty (60) days, such dispute shall be resolved by final and binding arbitration before a single arbitrator selected and serving under the Commercial Arbitration Rules of the American Arbitration Association. Any such arbitration shall be held in Oklahoma County, Oklahoma unless another location is mutually agreed upon by the parties. Such arbitration shall be the exclusive remedy hereunder with respect to the subject matter of such arbitration; provided, however, that nothing contained in this Section 12.6 shall limit any party's right to bring (a) post arbitration actions seeking to enforce an arbitration award or (b) actions seeking specific performance of this Agreement or injunctive or other similar relief in the event of a breach or threatened breach of any of the provisions of this Agreement.

**Section 12.7.** **Venue and Consent of Jurisdiction; Waiver of Jury Trial.** If Section 12.6 is for any reason held to be invalid or otherwise inapplicable with respect to any dispute between the parties that relates to this Agreement or the performance of the transactions and the obligations of the Company or the Members hereunder, the parties agree as follows:

(a)    Any action or proceeding shall be exclusively brought in any state or federal court located in Oklahoma County, Oklahoma and each party irrevocably consents to the jurisdiction and service of process out of such courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in such courts; and

(b)     THE MEMBERS WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND THE PERFORMANCE OF THE TRANSACTIONS AND THE OBLIGATIONS OF THE COMPANY AND THE MEMBERS HEREUNDER.

**Section 12.8.**     **Directly or Indirectly.**  Where any provision of this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person.

**Section 12.9.**     **Severability.**  If any provision of this Agreement is held to be unenforceable, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed unenforceable, and in all other respects this Agreement shall remain in full force and effect; provided, however, that if any provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by Applicable Law.

**Section 12.10.**     **Further Assurances.**  In connection with this Agreement and the transactions contemplated by this Agreement, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 12.11.**     **Title to Company Property.**  All Oil and Gas Interests and other properties and assets acquired by the Company, whether real or personal, tangible or intangible, shall be owned by and held in the name of the Company and no Member, individually, shall have any ownership of such property. No Oil and Gas Interests or other property of the Company shall be held in the name of the Manager or any other Person as nominee.

**Section 12.12.**     **No Third Party Beneficiaries.**  Except as otherwise provided in **Article VIII**, it is the intent of the Members that no third-party beneficiary rights be created or deemed to exist in favor of any Person not a party to this Agreement, unless otherwise expressly agreed to in writing by the Members.

**Section 12.13.**     **Expenses.**  The parties agree that if an action or proceeding is brought by a party against one or more other parties that relates to this Agreement or the performance of the transactions and the obligations of the Company or the Members hereunder, the prevailing party or parties shall be entitled to the payment of reasonable attorneys' fees from the non-prevailing party. For purposes of the foregoing, the prevailing party shall mean the party or parties obtaining substantially the relief sought, whether by compromise, settlement, arbitration award, or judgment.

**Section 12.14.**     **Counterparts.**  This Agreement may be executed in any number of counterparts, including by Electronic Transmission, each of which will be deemed an original but all of which together will constitute one and the same instrument.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Members have caused this Agreement to be executed effective as of the Effective Date.

**MEMBERS**

**ENERQUEST OIL & GAS, L.L.C.,**
an Oklahoma limited liability company

By: _____
Name: Gregory W. Olson
Title: President

**BRAXTON MINERALS-APPALACHIA, LLC**
a Texas limited liability company

By: _____
Name: Brad Ashburn
Title: President

*[Signature Page to Amended and Restated Limited Liability Company Agreement of Braxton Minerals III, LLC]*

## Exhibit A

## Members and Commitments

| Member: | Commitment Amount | Units | Percentage Interest |
|---|---|---|---|
| EnerQuest Oil & Gas, L.L.C.<br>Attn: Greg Olson, President<br>12368 Market Drive<br>Oklahoma City, Oklahoma 73114 | $10,000,000.00 | 750 | 75.00% |
| Braxton Minerals-Appalachia, LLC<br>Attn: Brad Ashburn and Scott Bauer<br>3973 W. Vickery Blvd, Suite 102<br>Fort Worth, Texas 76107 | See Note. | 250 | 25.00% |
| Total: | | 1,000 | 100.00% |

Note: BMA will contribute to the capital of the Company such sums in cash as may be required to satisfy, in a timely manner and from time to time as incurred, the capital contribution obligations described in Sections 4.1(a)(ii) and 4.1(c) of this Agreement.

# EXHIBIT 1B



March 10, 2016

EnerQuest Oil & Gas, LLC
12368 Market Drive
Oklahoma City, OK 73114

Attn: Greg Olson

> **Re:** Limited Liability Company Agreement of Braxton Minerals, III, LLC dated November 12, 2015 (the "Agreement")

Dear Greg:

Reference is hereby made to the above Agreement.  As the Remaining EnerQuest Commitment Amount is less $1,000,000.00, this letter shall serve as the written notice required under Section 4.5.  Please indicate your election by marking below and returning to the undersigned.

Sincerely,

Brad Ashburn

_____  EnerQuest elects to increase the EnerQuest Commitment Amount pursuant to Section 4.5.

_____  EnerQuest elects to **not** increase the EnerQuest Commitment Amount pursuant to Section 4.5.

ENERQUEST OIL & GAS, LLC

_____                                    _____
Greg Olson, President                                                                    Date

# EXHIBIT 1C

| From: | Greg Olson <G.Olson@enerquest.net> |
|---|---|
| Sent: | Friday, April 08, 2016 11:37 AM |
| To: | Brad Ashburn |
| Subject: | RE: Election Letter |
| Attachments: | model with matt's eur-1st prod. 4.2016.xlsx; Marcellus EUR vs Lateral Length.pdf; EQ Type Curve vs EQT.PDF; Peak Rate Per Ft vs Lateral.pdf; 2014 Aries Decline Curves.pdf; 2013 Aries Decline Curves.pdf; 2012 Aries Decline Curves.pdf; Before 2012 Aries Decline Curves.pdf; Antero Well Map.pdf; Pennsylvannia Marcellus EUR Study - March, 2016.pdf; Spotfire Plots.pdf; Marcellus Type Curve Analysis.pdf |

Brad, we're going to elect not to move forward with funding. As you know, what really hurt the economics compared to the way I was looking at the deal before making the investment, is the deducts Antero started charging. If not for the general deterioration in the gas market, we still may have been able to model a rate of return that made sense.

You had asked for the results of our analysis. Attached is the model. The model is using a 10.2 bcf eur. Also attached are a number of displays and spreadsheets Matt used in determining his type curve eur of 10.2 bcf. If you're interested, we can schedule a call where Matt can walk you through the analysis and how to interpret some of his displays. Just let me know if you want to schedule something.

You and your team are a talented group. I sincerely hope we can do business in the future. There were just some unexpected (Antero deducts) and uncontrollable (gas market deterioration) events that make it difficult to do anything at this time.

I've enjoyed working with and getting to know you. I wish you all the best.

*Gregory W. Olson*
*President*
*EnerQuest Oil & Gas, LLC*
*12368 Market Drive*
*Oklahoma City, OK 73114*
*(405) 478-3300 ext. 101*

**From:** Brad Ashburn [mailto:brad@braxtonenergy.com]
**Sent:** Thursday, March 10, 2016 4:20 PM
**To:** Greg Olson <G.Olson@enerquest.net>
**Subject:** Election Letter

Greg:

I trust that Courtland answered all of your questions on Draw 9. Please let me know if you need anything additional.

Attached is the election letter per Section 4.5. –Brad

Best,

Brad Ashburn
Braxton Minerals III, LLC

607 Bailey Avenue
Fort Worth, Texas 76107

P: 817-698-0020
C: 817-360-9162



# EXHIBIT 1D



August 9, 2017

**VIA FEDEX OVERNIGHT AND EMAIL**
Braxton Minerals-Appalachia, LLC
Attn: Brad Ashburn and Scott Bauer
3973 W. Vickery Blvd, Suite 102
Fort Worth, Texas 76107
Email to:    brad@postoakroyalty.com
               scott@braxtonenergy.com

        Re:     Certain Matters related to Braxton Minerals
                     III, LLC, a Delaware limited liability
                     company ("BMIII")

Dear Brad and Scott:

The purpose of this letter is to demand compliance by Braxton Minerals-Appalachia, LLC, a Texas limited liability company ("BMA"), in its capacity as Manager of BMIII, with the terms of that certain Limited Liability Company Agreement of BMIII dated November 12, 2015 (such agreement, the "BMIII Agreement"). Capitalized terms used in this letter not otherwise defined in this letter shall have the meanings assigned to them in the BMIII Agreement.

**Failure to Liquidate BMIII**

Pursuant to the Section 10.1 of the BMIII Agreement, BMIII "shall dissolve and its affairs shall be wound up upon" a Liquidity Event. As provided in Section 4.5 of the BMIII Agreement, upon an election by EnerQuest Oil & Gas, L.L.C. ("EnerQuest") to not increase the EnerQuest Commitment Amount, a Liquidity Event occurs "upon the first to occur of (i) such time as EnerQuest has funded the EnerQuest Commitment Amount in full, or (ii) a period of sixty (60) days has expired since the end of the thirty (30) day period" after EnerQuest's receipt of written notice from BMA that the Remaining EnerQuest Commitment Amount is less than $1,000,000.

As you are aware, on or about March 10, 2016, BMA provided the above described written notice to EnerQuest. On or about April 8, 2016, EnerQuest responded to BMA's written notice indicating that it elects to not increase the EnerQuest Commitment Amount. Based on the foregoing and pursuant to the terms of the BMIII Agreement, a Liquidity Event occurred on or

about June 10, 2016. Upon the occurrence of the Liquidity Event, pursuant to Section 10.2 of the BMIII Agreement, BMA, as Manager, has an obligation to propose a liquidator which shall be approved by EnerQuest. As of the date of this letter, BMA has failed to fulfill its obligation to propose a liquidator to carry out the liquidation of BMIII. **ENERQUEST HEREBY DEMANDS THAT BMA IN ITS CAPACITY AS MANAGER OF BMIII COMPLY WITH THE PROVISIONS OF THE BMIII AGREEMENT, INCLUDING, THE PROPOSAL OF A LIQUIDATOR TO CARRY OUT THE DILIGENT LIQUIDATION OF BMIII.**

## Obligation to Provide Certain Reports to EnerQuest

Pursuant to Section 7.1(b) of the BMIII Agreement, BMA as the Manager of BMIII is obligated to prepare or caused to be prepared certain reports and provide to EnerQuest including (i) monthly reports related to the revenues and expenses of BMIII including the calculation of Distributable Cash Flow and a details related to accounts payable, (ii) annual reports including financial statements of BMIII and a schedule reflecting the Capital Accounts of the BMIII Members, (iii) annual schedule of BMIIIs Oil and Gas Properties, and (iv) such other reports as reasonably requested by EnerQuest. BMA has continuously failed to prepare (or caused to be prepared) and deliver the above required reports. **ENERQUEST HEREBY DEMANDS THAT BMA IN ITS CAPACITY AS MANAGER OF BMIII COMPLY WITH THE PROVISIONS OF THE BMIII AGREEMENT AS IT RELATES TO ITS OBLIGATION TO PREPARE (OR CAUSED TO BE PREPARED) AND PROVIDE TO ENERQUEST CERTAIN INFORMATIONAL REPORTS RELATED TO BMIII AND ITS ASSETS.**

## Obligation to Manage BMIII Assets in a Reasonable Manner

BMA, in its capacity as Manager of BMIII, has a duty to manage BMIII's assets in a reasonable manner. As you are aware, since about May 2017, Antero as the purchaser of oil and gas production related to BMIII's Oil and Gas Interests suspended revenue payments to BMIII as a result of certain threatened and actual litigation between you. You have failed to diligently work with Antero to remove BMIII from suspense status. Rather, it has come to my attention that as recently as in July 2017, Scott has exchanged emails with Antero's outside counsel stating "I would agree that Braxton Minerals III, LLC is claim overlapping interests and tied up entirely". Effectively, instead of diligently working with Antero to cause them to remove BMIII from suspense and pay the accrued, unpaid revenue, you have perpetuated the continual non-payment of BMIII's revenue for several months now. **ENERQUEST HEREBY DEMANDS THAT BMA IN ITS CAPACITY AS MANAGER OF BMIII WORK DILIGENTLY WITH ANTERO TO CAUSE BMIII TO BE REMOVED FROM SUSPENSE AND THE ACCRUED AND UNPAID REVENUE TO BE PAID TO BMIII.**

It is EnerQuest's belief that BMA's actions and/or omissions over the last several months may constitute "Good Cause" as defined in the BMIII Agreement such that BMA may be removed as Manager of BMIII. With that said, and without waiving any right to assert the occurrence of "Good Cause", EnerQuest hereby demands that BMA comply with the demands set forth in this letter immediately pursue the full satisfaction of these demands without delay. If BMA fails to

fully comply, as determined in EnerQuest's sole discretion, by September 10, 2017, EnerQuest may elect to deem the existence of Good Cause to remove BMA as Manager of BMIII.

Very truly yours,

**ENERQUEST OIL & GAS, L.L.C.,**
an Oklahoma limited liability company

Gregory W. Olson
President

# EXHIBIT 1E

**SEPTEMBER 29, 2017**

Pursuant to Section 18-302(d) of the Delaware Limited Liability Company Act and Section 3.7 of that certain Limited Liability Company Agreement of Braxton Minerals III, LLC, a Delaware limited liability company (the "Company"), dated November 12, 2015 (such agreement, the "Company Agreement"), which each provide that the members may take any action without a meeting, without prior notice and without a vote if consented to in writing by members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all the members entitled to vote thereon were present and voted, the undersigned, representing the holder of a majority of the issued and outstanding Membership Interests of the Company, does hereby adopt and consent to the following resolutions as of the date first stated above (capitalized terms used herein not otherwise defined herein shall have the meanings assigned to them in the BMIII Agreement):

**Removal of Manager**

WHEREAS, Section 6.2 of the Company Agreement provides that "[t]he Manager may be removed, with or without cause, by a Majority Vote of the Members; provided, however, that so long as EnerQuest and BMA are the sole Members, BMA may be removed a Manager only for Good Cause";

WHEREAS, the undersigned is the holder of a majority of the issued and outstanding Membership Interests of the Company such that an affirmative vote of the undersigned of its Membership Interest constitutes a Majority Vote;

WHEREAS, the undersigned deems it advisable and in the best interest of the Company that BMA be removed as Manager of the Company; and

WHEREAS, the undersigned has determined that Good Cause exists for the removal of BMA as Manager of the Company.

NOW, THEREFORE, BE IT RESOLVED, that BMA is hereby removed as Manager of the Company for Good Cause.

**Election of Manager**

WHEREAS, Section 6.3 of the Company Agreement provides that "[i]n the event of the resignation or removal of a Manager, the Members shall select a replacement Manager through the Majority Vote of the Members";

WHEREAS, the undersigned is the holder of a majority of the issued and outstanding Membership Interests of the Company such that an affirmative vote of the undersigned of its Membership Interest constitutes a Majority Vote; and

WHEREAS, the undersigned deems it advisable and in the best interest of the Company that EnerQuest Oil & Gas, L.L.C., an Oklahoma limited liability company ("EnerQuest"), be selected as replacement Manager of the Company.

NOW, THEREFORE, BE IT RESOLVED, that EnerQuest is hereby elected as a Manager of the Company.

### General

FURTHER RESOLVED, that this written consent is ordered to be filed with the minutes of the Members of the Company.

EXECUTED as of the date first written above.

**ENERQUEST OIL & GAS, L.L.C.,**
an Oklahoma limited liability company

By: _____
Name: Gregory W Olson
Title: President

2

# EXHIBIT 1F



September 29, 2017

**VIA FEDEX OVERNIGHT AND EMAIL**
Braxton Minerals-Appalachia, LLC

Attn: Brad Ashburn
607 Bailey Ave.
Fort Worth, Texas 76107

Attn: Scott Bauer
8851 Camp Bowie Blvd. West
Fort Worth, Texas 76116

Email to:     brad@postoakroyalty.com
             scott@braxtonenergy.com

        Re:    Notice of Removal of Braxton Minerals-
                Appalachia, LLC, a Texas limited liability
                company ("BMA") as Manager of Braxton
                Minerals III, LLC, a Delaware limited
                liability company ("BMIII") and
                appointment of successor Manager

Dear Brad and Scott:

Reference is made to that certain letter dated August 9, 2017, from the undersigned on behalf of EnerQuest Oil & Gas, L.L.C. ("EnerQuest") to you in your capacity as member-managers of BMA in its capacity as Manager of BMIII, a copy of which is enclosed herewith (such letter, the "Prior EQ Letter"). Reference is further made to that certain Limited Liability Company Agreement of BMIII dated November 12, 2015 (such agreement, the "BMIII Agreement"). Capitalized terms used in this letter not otherwise defined in this letter shall have the meanings assigned to them in the BMIII Agreement.

As provided in the Prior EQ Letter, EnerQuest, as the majority Member of BMIII and pursuant to certain rights granted to EnerQuest in the BMIII Agreement, demanded BMA to take the following actions (collectively, the "EQ Demands"):

1. EnerQuest demanded that BMA in its capacity as Manager of BMIII comply with the provisions of the BMIII Agreement, including as it relates to, the proposal of a liquidator to carry out the diligent liquidation of BMIII.
2. EnerQuest demanded that BMA in its capacity as Manager of BMIII comply with the provisions of the BMIII Agreement as it relates to its obligation to prepare (or caused to be prepared) and provide EnerQuest certain information reports related to BMIII and its assets as more fully described in the Prior EQ Letter.
3. EnerQuest demanded that BMA in its capacity as Manager of BMIII work diligently with Antero to cause BMIII to be removed from suspense and the accrued and unpaid revenue to be paid to BMIII.

In the Prior EQ Letter, EnerQuest demanded compliance with the above demands on or before September 10, 2017 (the "Compliance Deadline"). As of the Compliance Deadline, you have failed to provide any response to the Prior EQ Letter or the EQ Demands. Further, although, subsequent to the Compliance Deadline, you provided certain correspondence in response to the Prior EQ Letter, you have failed to take any material step towards satisfying the EQ Demands. Accordingly, and as provided in the Prior EQ Letter, EnerQuest believes that BMA's actions and/or omissions over the last several months may have constituted "Good Cause" as defined in the BMIII Agreement such that BMA may be removed as Manager of BMIII.

Further to such belief and based on, among many things, BMA's failure to timely respond to the EQ Demands, EnerQuest has determined that Good Cause exists and has elected to remove BMA as Manager of BMIII and appoint itself as replacement Manager of BMIII effective as of the date of this letter. Enclosed with this letter is a copy of a Written Consent of Members of BMIII related to such removal and replacement which has been executed by EnerQuest in its capacity as majority Member (and constituting a Majority Vote) of BMIII.

Very truly yours,

ENERQUEST OIL & GAS, L.L.C.,
an Oklahoma limited liability company

Gregory W. Olson
President

Enclosures

# EXHIBIT 2



STEPTOE &
JOHNSON
PLLC
ATTORNEYS AT LAW

400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8000    (304) 933-8183 Fax
www.steptoe-johnson.com

Writer's Contact Information
(304) 933-8186
hank.lawrence@steptoe-johnson.com

February 23, 2018

Jeremy Black, Esquire
McAfee & Taft
10th Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102

> Re: Penn Investment Funds, LLC
> v. Braxton Energy, LLC, et al.
> Cause No. 141-290089-17

Dear Mr. Black:

Antero Resources Corporation ("Antero") has retained this firm to seek the return of confidential and proprietary business records and trade secret information. We have recently learned that Scott Bauer and Brad Ashburn and their affiliated entities, including Braxton Minerals III, LLC, may have mineral title opinions prepared by Antero's counsel relating to properties owned by Braxton Minerals III, LLC. We also believe they may have shared Antero's Critical Date Report and SWN Defects June 2016 Acquisition Report with Braxton Minerals III, LLC and consequently EnerQuest Oil & Gas, LLC. Antero considers such records as confidential and proprietary business records and trade secrets. Antero has never consented to Mr. Bauer, Mr. Ashburn, or EnerQuest Oil & Gas, LLC's possession of such documents or information. If such information was provided to your client by a third party, that third party had no authorization to provide them. Antero demands the immediate return of all such information.

Antero obtained the enclosed Temporary Injunction Order dated June 14, 2017, that restrains persons from divulging and/or communicating any trade secret documents of Antero. The Order also requires persons to provide notice to Antero of any reasonably identifiable confidential and proprietary trade secret documents of Antero in their possession and return same to Antero. The Temporary Injunction Order further requires persons to identify any individuals or entities to whom the parties have shared Antero's trade secret documents.

Please advise if your client, EnerQuest Oil & Gas, LLC, has such information and, if so, please return such information to me as counsel for Antero and verify that EnerQuest Oil & Gas, LLC has not retained copies. Please further advise whether EnerQuest Oil & Gas, LLC is aware of any third parties to whom such information has been disseminated and the identity of such third parties. We are aware of the proposed sale by Braxton Minerals III, LLC of its mineral interests in West Virginia. Antero requests that you verify that EnerQuest Oil & Gas, LLC and Braxton Minerals III, LLC have not shared such confidential and proprietary records and trade secrets with any prospective purchasers of such interests. If EnerQuest Oil & Gas, LLC does not possess such information, please verify this to me. We ask for your response by 5:00 p.m. EST on Monday, February 26, 2018. Antero will pursue all legal remedies to

obtain the return of this information and to insure no further dissemination of such information. In addition, Antero will seek recovery for any damages arising from the use or disclosure of such information.

Should you have questions regarding the foregoing, please do not hesitate to contact me.

Very truly yours,

W. Henry Lawrence

WHL/cee
Enclosure

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| ANTERO RESOURCES CORPORATION, | § | |
| *Intervenor* | § | |
| | § | |
| VS. | § | |
| | § | |
| BRAXTON ENERGY, LLC, | § | TARRANT COUNTY, T E X A S |
| BRAXTON ACQUISITIONS, LLC, | § | |
| BRAXTON MINERALS II, LLC, | § | |
| ROBERT SCOTT BAUER, JOHN | § | |
| BRADLEY ASHBURN, MICHAEL | § | |
| FISHER, MAEGEN FISHER, M&M | § | |
| CONSULTING and KELLY O'CONNOR | § | |
| *Defendants* | § | 141st JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION ORDER AND
## ORDER SETTING TRIAL

On the 14th day of June, 2017, the Application for a Temporary Injunction of Intervenor, ANTERO RESOURCES CORPORATION ("ANTERO"), was heard before this Court. After considering ANTERO's Application, the pleadings, the evidence presented, and arguments of counsel, the Court finds that ANTERO'S Application should be GRANTED.

The Court's reasons for ordering the Temporary Injunction are its findings that:

1.     ANTERO is engaged in the business of oil and gas exploration and production from wells located in West Virginia.

2.     On or about May 22, 2017, ANTERO learned of Plaintiff's and Defendants' possession of confidential and proprietary business records and trade secret information by electronic communication from Texhoma Land Consultants ("TEXHOMA"). Such electronic communication contained a Demand for Preservation of Evidence dated May 20, 2017, from Plaintiff's counsel to TEXHOMA. TEXHOMA is the land agent of ANTERO.

3. In response to ANTERO'S request that the parties identify any trade secret documents in their possession, Plaintiff's counsel identified portions of ANTERO'S Critical Date Report dated November 15, 2016, and a portion of ANTERO'S SWN June 2016 Acquisition Defects report. (See text message exchange produced by Plaintiff and bates labeled ~~admitted collectively as Exhibits~~ PENN000212 which included two photographs ~~that are attached to this Order under seal 1 and collectively as Exhibit 1~~). In addition, Plaintiff's counsel identified ANTERO'S Title Opinions 14 Nos. 1522, 1914, and 2894 pertaining to ANTERO'S drilling units in West Virginia. (See documents produced by Plaintiff and bates labeled **PENN000407-000557**). ANTERO'S Critical Date Reports, SWN June 2016 Acquisition Defects report, Title Opinions, and other similar documents/reports are highly confidential and proprietary information containing trade secrets ("Trade Secret Documents").

4. ANTERO's Critical Date Reports reflect the status of ANTERO's well activities in West Virginia including, among other data, the dates of drilling and dates for first gas and oil sales from the wells. ANTERO's SWN June 2016 Acquisition Defects report reflects due diligence conducted by ANTERO as part of its proposed acquisition of West Virginia leases from SWN Energy Services Company, LLC. Such report identifies leases ANTERO proposed to acquire from SWN Energy Services Company, LLC. Finally, ANTERO's Title Opinions were prepared by ANTERO's counsel to reflect the ownership of minerals and the rights to develop such minerals for properties in West Virginia.

5. ANTERO has never consented to possession of such Trade Secret Documents by the Plaintiff or any of the Defendants. ANTERO made a reasonable effort to keep such documents secret, and the information is generally unknown to and not readily ascertainable by third parties. ANTERO maintains these Trade Secret Documents on its computer server. Access

to such documents is limited to ANTERO employees and its land agents through TEXHOMA. Access is password protected. TEXHOMA's contracts with landmen and others included confidentiality provisions preventing the personal use and disclosure of ANTERO's confidential documents and information.

6. ANTERO utilizes said Critical Date Reports, the SWN June 2016 Acquisition Defects report, and Title Opinions to plan and conduct its exploration and production operations, as well as its acquisition of mineral interests. ANTERO will be irreparably injured pursuant to the Texas Uniform Trade Secrets Act because ANTERO's confidential and proprietary trade-secret documents and information are already in the possession of Plaintiff and Defendants and will most likely be disseminated to and utilized by third parties to gain an unfair market advantage in relation to surface and mineral real property interest rights thereby disrupting ANTERO's business operations and jeopardizing ANTERO's confidential information, employment relations, existing and prospective business relationships, reputation, and goodwill. Such damages to ANTERO are not easily calculable and cannot be measured by a certain standard.

7. The harm to ANTERO is imminent and irreparable. Because the Texas Uniform Trade Secrets Act has a specific provision for an injunction for its enforcement, no showing of inadequate remedy at law is required to have injunctive relief granted to enforce the TUTSA. Regardless of the necessity of proving irreparable harm, the only adequate remedy would be to immediately enjoin Plaintiff and Defendants from disseminating or using ANTERO's Trade Secret Documents pending the outcome of ANTERO's claims.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Plaintiff, PENN INVESTMENT FUNDS, LLC, and Defendants, BRAXTON ENERGY, LLC, BRAXTON

ACQUISITIONS, LLC, BRAXTON MINERALS II, LLC, ROBERT SCOTT BAUER, JOHN BRADLEY ASHBURN, MICHAEL FISHER, MAEGEN FISHER, M&M CONSULTING AND KELLY O'CONNOR, as well as Plaintiff's and Defendants' agents, servants, employees, successors, assigns, and attorneys are hereby immediately restrained from divulging, revealing, describing, summarizing, quoting, transmitting, communicating or using outside this Lawsuit or related lawsuit any and all Trade Secret Documents and/or information of Intervenor, ANTERO RESOURCES CORPORATION, including but not limited to:

1.　Critical Date Reports;

2.　The SWN June 2016 Acquisition Defect report; and

3.　Real Property Title Opinions prepared by ANTERO's attorneys.

This Court further ORDERS Plaintiff, PENN INVESTMENT FUNDS, LLC, and Defendants, BRAXTON ENERGY, LLC, BRAXTON ACQUISITIONS, LLC, BRAXTON MINERALS II, LLC, ROBERT SCOTT BAUER, JOHN BRADLEY ASHBURN, MICHAEL FISHER, MAEGEN FISHER, M&M CONSULTING AND KELLY O'CONNOR, to produce to ANTERO within three (3) days of the date of this Order any and all documents previously exchanged between the parties through the discovery process (unless already done so pursuant to the June 5, 2017 Temporary Restraining Order) so that ANTERO may review same and designate any of such documents as "PROTECTED" and thereby subject to the terms and conditions of the Agreed Protective Order entered on May 18, 2017 in this Lawsuit. Plaintiff and Defendants must also comply with the Texas Rules of Civil Procedure and provide ANTERO with copies for review of any documents produced after the date of this Order. In addition, the terms of this Court's previously issued Order Granting Level III Discovery Control Plan regarding the discovery of electronic information continue to apply.

Pursuant to Section 134A.003(c) of the Texas Uniform Trade Secrets Act, IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, PENN INVESTMENT FUNDS, LLC, and Defendants, BRAXTON ENERGY, LLC, BRAXTON ACQUISITIONS, LLC, BRAXTON MINERALS II, LLC, ROBERT SCOTT BAUER, JOHN BRADLEY ASHBURN, MICHAEL FISHER, MAEGEN FISHER, M&M CONSULTING AND KELLY O'CONNOR provide notice to ANTERO and all other parties within five (5) days of the date of this Order of any additional reasonably identifiable confidential and proprietary trade-secret documents of ANTERO in the actual or constructive possession of the parties (including their agents, servants, employees, successors, assigns, and attorneys) and return to ANTERO and their respective counsel any such reasonably identifiable confidential and proprietary trade-secret documents (unless already done so pursuant to the June 5, 2017 Temporary Restraining Order). The parties' obligation to comply with this paragraph remains in effect during the pendency of this temporary restraining order and any future temporary injunction/permanent injunction.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, PENN INVESTMENT FUNDS, LLC, and Defendants, BRAXTON ENERGY, LLC, BRAXTON ACQUISITIONS, LLC, BRAXTON MINERALS II, LLC, ROBERT SCOTT BAUER, JOHN BRADLEY ASHBURN, MICHAEL FISHER, MAEGEN FISHER, M&M CONSULTING AND KELLY O'CONNOR provide ANTERO and all other parties within five (5) days of the date of this Order a list detailing any persons or entities to whom the parties shared ANTERO'S Trade Secret Documents or any additional reasonably identifiable confidential and proprietary trade-secret documents of ANTERO (unless already done so pursuant to the June 5, 2017 Temporary Restraining Order).

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, PENN INVESTMENT FUNDS, LLC, and Defendants, BRAXTON ENERGY, LLC, BRAXTON ACQUISITIONS, LLC, BRAXTON MINERALS II, LLC, ROBERT SCOTT BAUER, JOHN BRADLEY ASHBURN, MICHAEL FISHER, MAEGEN FISHER, M&M CONSULTING AND KELLY O'CONNOR maintain, preserve and not destroy, modify, alter, or misplace any and all computers, phones, tablets, servers, flash drives, memory cards, online cloud storage locations, and email systems that contain ANTERO'S Trade Secret Documents or any additional reasonably identifiable confidential and proprietary trade-secret documents of ANTERO until such can be secured through subpoena or deposition. These items must be preserved in their exact condition, without destruction or alteration of any kind in relation to Antero's Trade Secret Documents, intentional or unintentional. To the extent these devices must necessarily remain in use, the Plaintiff and Defendants must ensure that no destructive routines are allowed to run on these devices. Such destructive routines preclude the use of any programs, applications, routines, whether manually or automatically initiated, that have the ability to alter or destroy data of any kind. Examples, which are merely examples and not exhaustive, include defragmentation, cleaning programs of any kind, repair programs of any kind, and programs designed to destroy data of any kind. Plaintiffs and Defendants are required to actively prevent the alteration or destruction of any Trade Secret Document data on these devices, including data that they may not consider relative to this matter, because alteration or destruction of any kind can hamper the forensic recovery of data and other important and germane data artifacts.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that ANTERO's and DEFENDANT KELLY O'CONNOR'S respective counsels of record will execute and agree to

be bound by the terms of the Agreed Protective Order entered on May 18, 2017 in this Lawsuit or any subsequent amended Agreed Protective Order.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that trial of the merits in this cause is set for April 2, 2018.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this temporary injunction order shall not be effective unless and until ANTERO has filed an appropriate bond or cash deposit via personal check in lieu thereof in the amount of $ _100.00_ .

_____
PRESIDING JUDGE

# EXHIBIT 3

| From: | Black, Jeremy |
|---|---|
| Sent: | Monday, March 05, 2018 2:59 PM |
| To: | 'Hank Lawrence' |
| Cc: | 'Jason Grill' |
| Subject: | RE: Braxton - letter to Jeremy Black (2/23/18) |
| Attachments: | Emails.zip; Text.zip; Attachments.html |

Hank,

In response to Antero's letter dated 2/23/18, EnerQuest has reviewed the materials in its possession or control including (1) various correspondence (email and texts messages) and (2) paper files EnerQuest received upon taking over the management of BMIII from Braxton Minerals-Appalachia, LLC ("BMA"). The focus of EnerQuest's review was to determine whether any of Antero's confidential and proprietary business records and trade secret information was shared with EnerQuest. Included with this email are the following materials:

1. A zip file containing six (6) emails involving Scott Bauer which reference and/or include a Critical Date Report and/or drilling schedule.
2. A zip file containing a text message exchange between Scott Bauer and Greg Olson w/ EnerQuest that includes a screen shot of a drill schedule.
3. A ShareFile link whereby certain additional information that was sent by Scott Bauer to Greg Olson w/ EnerQuest via Dropbox. These are being shared via ShareFile due to the size of the files.

It is EnerQuest's belief that all of the information included in this email was received by EnerQuest in February 2017 (or later) and this information was shared by Scott Bauer in conjunction with Scott Bauer's attempt to have EnerQuest commit additional funds to his mineral acquisition program. As background, BMIII is the only mineral acquisition venture sponsored by Scott Bauer or Brad Ashburn (or any of their affiliated entities) in which EnerQuest has participated. BMIII acquired all of its minerals between November 2015 and April 2016, almost a year before any of the materials referenced in this email were provided by Scott Bauer to EnerQuest. EnerQuest has not shared this information with any party other than Scott Bauer and Brad Ashburn.

Please let me know if you have any questions about or otherwise would like to discuss anything included in this response.

Regards,
Jeremy

---

### ShareFile Attachments

| Title | Size |
|---|---|
| EQ Response to Antero Letter Dated 2-23-18 | 589.8 MB |

**Download Attachments**    Jeremy Black uses ShareFile to share documents securely. Learn More.

---

**From:** Hank Lawrence [mailto:Hank.Lawrence@Steptoe-Johnson.com]
**Sent:** Monday, February 26, 2018 6:48 PM
**To:** Black, Jeremy
**Cc:** Jason Grill
**Subject:** RE: Braxton - letter to Jeremy Black (2/23/18)

Jeremy,

Antero Resources Corporation ("Antero") agrees to EnerQuest Oil & Gas, LLC's ("EnerQuest") request for a one week extension, i.e., until March 5, 2018 at 5:00 p.m. EST, to: (1) advise Antero if EnerQuest possesses any Antero confidential and proprietary business records and trade secret information; (2) identify any individuals or entities to whom EnerQuest shared any Antero confidential and proprietary business records and trade secret information; and (3) return any Antero confidential and proprietary business records and trade secret information.

Please also be advised that it is our understanding that the "Notice to Potential Bidders" posted on Energynet.com related to the proposed sale by Braxton Minerals III, LLC ("BMIII") of its mineral interests in West Virginia states that Antero has not advised BMIII "why the revenue is in suspense…." As previously communicated, Antero initially placed the relevant royalty payments in suspense due to the ongoing ownership dispute between the members of BMIII. As you know, Robert Scott Bauer objected to EnerQuest's replacement as manager of BMIII, and it is therefore unclear to Antero if BMIII possesses the proper authority to post said minerals for sale. Antero's uncertainty in this regard will necessarily carry forward to effect any buyers from BMIII. More recently, Antero discovered information that raises concerns as to whether BMIII may have acquired said mineral interests in West Virginia through the use of improperly misappropriated confidential and proprietary business records in violation of the Texas Uniform Trade Secrets Act ("TUTSA").

Based on the foregoing, Antero reserves the right to not recognize any mineral deed ownership transfers in the event of a sale of any of BMIII's mineral interests in West Virginia. In other words, Antero provides no assurance that the royalty payments will be released to any new owners of said minerals until the above issues are resolved, and Antero can be assured that it is paying the true owner. As you can appreciate, Antero does not want to be exposed to paying these royalties more than once. Antero therefore recommends that BMIII cancel any sale of its mineral interests in West Virginia. In the alternative, BMIII should advise any potential buyers of the disputed issues pertaining to the mineral properties.

I look forward to hearing from you.


Hank Lawrence
Steptoe & Johnson PLLC
304-933-8186

---

**From:** Black, Jeremy [mailto:jeremy.black@mcafeetaft.com]
**Sent:** Monday, February 26, 2018 1:50 PM
**To:** Hank Lawrence
**Cc:** Jason Grill
**Subject:** RE: Braxton - letter to Jeremy Black (2/23/18)

Hank,

I have discussed your letter with EnerQuest Oil & Gas, LLC ("EnerQuest") and they have confirmed that none of Antero's confidential and proprietary materials described in your letter have been shared with any prospective purchaser of the mineral interests held by Braxton Minerals III, LLC ("BMIII"). As for your request to verify whether EnerQuest possesses such information, we request a one week extension of the response date to 5pm EST on Monday, March 5, 2018. The additional time is necessary to allow EnerQuest to review the various materials received from Scott Bauer and/or Brad Ashburn related to BMIII in order to determine whether any of the referenced Antero materials are included therein. Please confirm whether you are agreeable to the extension.

Also, thank you for requesting BMIII's suspense information from Antero and we look forward to receiving this information from you.

Regards,
Jeremy

---

**From:** Hank Lawrence [mailto:Hank.Lawrence@Steptoe-Johnson.com]
**Sent:** Friday, February 23, 2018 4:24 PM
**To:** Black, Jeremy
**Cc:** Jason Grill
**Subject:** FW: Braxton - letter to Jeremy Black (2/23/18)

Jeremy,

Please see attached correspondence outlining our conversation earlier today regarding Antero's title opinions. I have requested that Antero send me the current suspense balance for Braxton Minerals III, LLC and will forward that to you. I will later send you the updated information through the end of February 2018 as you requested.

Hank Lawrence
Steptoe & Johnson PLLC
304-933-8186

---

Steptoe & Johnson PLLC Note:
This e-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

---

Steptoe & Johnson PLLC Note:
This e-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

# EXHIBIT B

FILED
TARRANT COUNTY
5/2/2018 5:32 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| ANTERO RESOURCES CORPORATION, | § | |
| *Intervenor* | § | |
| | § | |
| VS. | § | |
| | § | |
| BRAXTON ENERGY, LLC, | § | |
| BRAXTON ACQUISITIONS, LLC, | § | |
| BRAXTON MINERALS II, LLC, | § | |
| ROBERT SCOTT BAUER, JOHN | § | |
| BRADLEY ASHBURN, MICHAEL | § | |
| FISHER, MAEGEN FISHER AND | § | |
| M&M CONSULTING, | § | |
| | § | |
| *Original Defendants* | § | 141st JUDICIAL DISTRICT |
| | § | |
| | § | |
| AUSTIN FOX, JOE F. PENN JR., | § | |
| BRAXTON MINERALS III, VENTURE | § | |
| STRONG II LLC, POST OAK | § | |
| APPALACHIA LLC, TURN 2 ENERGY | § | |
| LLC, BRAXTON-MINERALS | § | |
| APPALACHIA LLC, AND   ENERGY | § | |
| CORPORATION  OF AMERICA, | § | |
| ENERQUEST OIL & GAS, L.L.C., | § | |
| | § | |
| *New Defendants.* | § | TARRANT COUNTY, TEXAS |

## INTERVENOR ANTERO RESOURCES CORPORATION'S RESPONSE TO ENERQUEST OIL & GAS L.L.C.'S SPECIAL APPEARANCE AND MOTION TO CONTINUE

Intervenor Antero Resources Corporation ("Antero") files this Response to EnerQuest Oil & Gas, L.L.C.'s ("EnerQuest") Special Appearance to Object to Personal Jurisdiction.

EnerQuest's special appearance should be denied.  EnerQuest, a company registered to do business in Texas, entered into a joint venture with a Texas entity.  That venture, to be based in Fort Worth, was manned by two Texans tasked with collecting information about oil and gas

properties and conveying that information to EnerQuest. As agreed, EnerQuest received information from Texas and then sent money to Texas to invest in those properties. We now know that the two Texans EnerQuest designated for this work, Scott Bauer and Brad Ashburn, acquired Antero's trade secrets in the course of and in furtherance of that work. EnerQuest even admits that it ultimately received Antero's trade-secret documents from Bauer. Therefore, EnerQuest had sufficient contacts with Texas for this Court to exercise personal jurisdiction in connection with this matter.

To assure that the Court would be fully informed of the timing, quantity, and scope of EnerQuest's relevant contacts, Antero served limited discovery requests on EnerQuest before this special appearance was set for hearing. EnerQuest's responses are not yet due. Therefore, to the extent the Court requires additional information on EnerQuest's relationship to Texas and the matter at hand, Antero moves for a continuance of the special appearance hearing so that it may conduct discovery limited to the issue of personal jurisdiction.

## I.     FACTUAL BACKGROUND

EnerQuest is registered to do business in Texas, operating oil and gas wells and owning non-operating oil and gas interests here,[1] but EnerQuest's connection with this specific case begins with the formation of a Texas-based company. In November of 2015, EnerQuest and Braxton Minerals-Appalachia, LLC ("BMA"), an existing Texas company, entered into a Limited Liability Company Agreement to form Braxton Minerals III, LLC ("the BMIII Agreement").[2] EnerQuest

---

[1] EnerQuest's Special Appearance at 4.

[2] Affidavit of Gregory W. Olson (attached as Exhibit 1 to EnerQuest's Special Appearance, henceforth, "Olson Affid.") ¶ 5; BMIII Agreement (attached as Exhibit 1-A to Special Appearance) § 2.1.

2

concedes that BMIII was "sponsored by" Brad Ashburn and Scott Bauer,[3] both of whom are Texas residents and defendants in this case. The BMIII Agreement, which was executed by Brad Ashburn as president of the Texas-based BMA,[4] designated the new company's principal place of business as Fort Worth, Texas.[5]

As part of its initial investment in BMIII, EnerQuest obtained information from its Texan colleagues that may have included the Antero trade secret information in question. Under the BMIII Agreement, the new company BMIII was to acquire mineral interests from another Braxton entity, defendant Braxton Minerals II, LLC.[6] The BMIII Agreement recites that, prior to execution, BMA provided EnerQuest with "title reports" concerning the title of the grantors from whom Braxton Minerals II acquired its acreage.[7] It has already been shown that Ashburn and Bauer, the men running Braxton Minerals II, possessed Antero's confidential title opinions and other trade-secret documents dated in the summer and fall of 2015 because Bauer and Ashburn produced such trade secret documents to Antero in discovery.[8] Based on the information Ashburn and Bauer provided through BMA, EnerQuest sent more than $975,000 to Texas to fund BMIII's acquisition of the West Virginia acreage that BMA and Braxton Minerals II (both Texas entities) had previously acquired.[9]

---

[3] *See* Exhibit 1 (Email from Jeremy Black, EnerQuest, to Hank Lawrence and Jason Grill, Steptoe & Johnson PLLC (March 5, 2018), enclosed with Letter from Joseph M. Cox, Bracewell, to Jason Grill (April 26, 2018) (henceforth, "Cox Letter")).

[4] Olson Affid. ¶ 5.

[5] BMIII Agreement § 1.4(b).

[6] BMIII Agreement § 4.1(a).

[7] BMIII Agreement § 4.1(a).

[8] Before EnerQuest was added to this case, other parties had produced 2014 and 2015 Title Opinions subject to the Court's Temporary Injunction. These documents are not attached due to their confidential nature, but Antero will make them available for the Court's review during the hearing on this Special Appearance.

[9] Olson Affid. ¶ 6.

Moreover, EnerQuest's involvement with Texas through BMIII was expected to be long-lasting. Under the seven-year agreement,[10] EnerQuest committed to invest ten million dollars in BMIII's property acquisition work,[11] which would be carried out from the Fort Worth office by Ashburn and Bauer.[12] The BMIII Agreement required Ashburn to devote all of his time to BMIII, and required Bauer to devote at least fifty percent of his time to BMIII, and mandated that all their West Virginia leasing activity would be performed exclusively for Fort Worth-based BMIII.[13] Moreover, EnerQuest agreed it would not dispose of its interest in Texas-based BMIII without the approval of its Texas-based co-venturer, BMA.[14]

EnerQuest agreed that Texas-based BMIII would seek out oil and gas information for EnerQuest's benefit; and the information EnerQuest demanded was likely tainted by BMA's improper possession of Antero trade secret documents. For each property acquisition after the company's creation, the Texas-based BMA, acting as Manager of BMIII, was required to send EnerQuest certain information about acreage BMIII planned to acquire, including property and grantor details.[15] Critically, BMA was to propose acquisitions in units for which horizontal drilling permits already issued.[16] Details regarding the property identification and drilling units could have been taken from the title opinions and other Antero trade secret information in Bauer and Ashburn's possession. Under the BMIII Agreement, BMA was to turn this information over to

---

[10] BMIII Agreement § 2.1.

[11] *See* BMIII Agreement Exhibit A-Members and Commitments.

[12] *See* BMIII Agreement § 6.4(a).

[13] BMIII Agreement § 11.1(b).

[14] *See* BMIII Agreement § 9.1(b).

[15] BMIII Agreement § 4.1(b)(i).

[16] *See id.*

4

EnerQuest, who would decide whether or not to approve the acquisitions based on the information provided.[17]

Based on the information Antero has now, Bauer and Ashburn did as EnerQuest asked, presumably sending EnerQuest information about the West Virginia acreage they were targeting and to which Antero's trade secret documents relate. BMIII acquired the majority of its West Virginia minerals between November 2015 through April 2016,[18] a time frame for which Bauer and Ashburn possessed a significant amount of Antero's trade secret information.[19] It would have been consistent with Bauer's practice, in the course of sending information from Texas to solicit EnerQuest's funding, to use the improperly-obtained confidential information of Antero in BMA's possession. For example, Bauer admits to soliciting Joe Penn's investment using Antero trade secrets and the promise of access to such secrets.[20]

EnerQuest admits that it received at least one such trade-secret-based offer from Bauer, and the documents show that in the course of that discussion, EnerQuest specifically sought out Antero's confidential information. EnerQuest concedes that in or after February 2017, Bauer sent EnerQuest some of Antero's trade secret documents that Bauer had maintained in Texas: two drilling schedules with detailed information on Antero's drilling program, a permit list showing Antero's active permits, and other information Bauer hoped would prompt EnerQuest to invest in

---

[17] *See id.*

[18] Olson Affid. ¶ 7; Cox Letter.

[19] *See* Antero's Title Opinions; Drill Schedule as of 6.15.2015-Patterson 340; Drill Schedule as of 6.15.2015-Rig 10; Exhibit 5 WV Permits as of 6.5.2015; Antero's Critical Date Report (to be made available for the Court's review at the hearing on this Special Appearance).

[20] *See* Exhibit 2 (Transcript of Temporary Injunction hearing at 36:25-37:3 (explaining that he told Joe Penn of Antero's trade secret documents because: "He was looking to invest other money in the deal. I was making him money on deals, and then I wanted to keep it rolling, and so I overstepped my bounds.")).

5

more mineral acquisitions.[21] These documents, dated from June of 2015 to 2016, contained detailed information on Antero's permits and drilling schedules that could only have been derived from Antero's confidential business information, and in some cases, had Antero's logo on the documents. What EnerQuest does not mention in its papers is that EnerQuest's then-president Greg Olson actually reached out to Bauer in Texas and *requested* Antero's drilling schedule information from Bauer.[22] Discovery could turn up additional trade-secret information sent by Bauer and Ashburn to EnerQuest in earlier time periods, as EnerQuest has not specifically denied receiving any other trade-secret documents or information pulled from trade-secret documents.

In September 2017, EnerQuest sought to take control of Fort Worth-based BMIII. After repeated correspondence directed to Texas citizens and entities (attached to EnerQuest's Special Appearance as Exhibits 1-C, 1-D, 1-E, and 1-F), EnerQuest asserted its apparent role of manager of BMIII.

## II. LEGAL STANDARD

Courts have personal jurisdiction over a nonresident defendant when the state's long-arm statute permits such jurisdiction and the exercise of jurisdiction is consistent with federal and state due-process guarantees. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013). As for the Texas long-arm statute, it broadly allows courts to exercise personal jurisdiction over a nonresident who contracts with Texas residents with the intent that either party perform in

---

[21] Olson Affid. ¶ 13; Cox Letter. The documents EnerQuest obtained and produced to Antero include: Drill Schedule as of 6.15.2015-Patterson 340 (a document EnerQuest obtained from Bauer listing detailed information about property interests in West Virginia); Drill Schedule as of 6.15.2015-Rig 10 (a document EnerQuest may have obtained from Bauer on August 6, 2016, per the marking on the document, listing detailed information about property interests in West Virginia); WV Permits as of 6.5.2015 (a document EnerQuest obtained from Bauer listing detailed permitting information about properties in West Virginia); Antero's Critical Date Report (a document EnerQuest obtained from Bauer containing Antero's logo and clearly indicating it belonged to Antero). These materials will be available for the Court's review at the hearing.

[22] *See* Exhibit 3 (February 16, 2017 Email from Greg Olson, EnerQuest, to Scott Bauer, BMA, specifically requesting the drill schedule to see how the wells were scheduled).

Texas, and over a nonresident who "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE § 17.042(2). As for due process concerns, because the Texas statute reaches "as far as the federal constitutional requirements for due process will allow," *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010), a state court can exercise jurisdiction over a nonresident defendant if (1) the defendant has established "minimum contacts" with the state and (2) the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

A nonresident's contacts can give rise to general or specific personal jurisdiction. Continuous and systematic contacts create general jurisdiction, while specific jurisdiction exists when the cause of action arises from or is related to the defendant's purposeful activities with the state. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009).

## III. ARGUMENT

### A. EnerQuest is Subject to Personal Jurisdiction Because it Committed a Tort in Texas.

The evidence demonstrates that EnerQuest committed a tort in Texas, making it subject to specific jurisdiction here. Using, disclosing, or merely acquiring trade secrets constitutes the tort of misappropriation as defined by the Texas Uniform Trade Secrets Act ("TUTSA"). *See* TEX. CIV. PRAC. & REM. CODE § 134A; *Seismic Wells, LLC v. Matthews*, 2016 WL 3390507, at *3 (N.D. Tex. Feb. 22, 2016) ("The tort of misappropriation is defined by TUTSA."). There is no doubt that EnerQuest requested information about oil and gas properties from Bauer, Ashburn, BMIII and/or BMA—all Texas residents or entities—in furtherance of EnerQuest's business relationship with these Texas entities, and as a result, EnerQuest acquired Antero's trade secrets. Therefore, Antero has claims for misappropriation and conspiracy that arise directly out of EnerQuest's conduct directed at Texas. EnerQuest admits it had documents containing Antero's trade secrets

7

in 2017, making it amenable to Texas jurisdiction in connection with the misappropriation and conspiracy claims in this case.[23] Exactly which documents EnerQuest had and when, and the extent to which EnerQuest may be liable in damages in addition to injunctive relief, is a matter for ultimate merits determination. But tracing specific documents and timing is in no way relevant to the jurisdiction question to be decided today.

EnerQuest's connection to these Texas events was hardly the result of random or fortuitous actions of other defendants. EnerQuest, seeking profit, reached outside of Oklahoma to create a seven-year relationship with a Texas business and two Texas residents in an agreement specifically designating they would do their work in Fort Worth. *See Moncrief*, 414 S.W.3d at 151 (requiring, for specific personal jurisdiction, that the defendant "reach out beyond one state and create continuing relationships and obligations" and "seek some benefit, advantage or profit by availing itself of the jurisdiction"). EnerQuest specifically requested information regarding permits and acreage in West Virginia,[24] and then accepted Antero's trade secrets documents that had been procured and maintained in Texas by EnerQuest's Texas business partners,[25] who conceivably acquired the information using EnerQuest's funding. Based on the extraordinary level of detail in these documents and the fact that Antero would have no reason to disclose this data to someone pursuing a competing interest in the minerals in question, EnerQuest knew or should have known that this information was confidential and proprietary information of Antero. Nevertheless, EnerQuest kept the trade secret documents in its possession without notifying Antero until Antero expressly requested them.[26]

---

[23] *See* Cox Letter.

[24] BMI Agreement § 4.1; *see* Exhibit 3, Olson-Bauer Emails (specifically requesting the drilling schedule).

[25] Cox Letter (acknowledging receipt of Antero's trade secret documents).

[26] Cox Letter (explaining that Bauer sent EnerQuest the information in February of 2017).

8

The Supreme Court of Texas has found that the receipt of trade secrets, even if the recipient did not request them, was a contact weighing in favor of personal jurisdiction. *See id.* (finding personal jurisdiction proper when the defendants "accepted Moncrief's alleged trade secrets"). The Court need not await discovery to find out whether EnerQuest ever came to Texas to obtain these secrets or meet with their partners, as EnerQuest's "[p]hysical presence in the state is not required" to exercise jurisdiction. *Moncrief*, 414 S.W.3d at 152. EnerQuest's actions contributing to the misappropriation of Antero's trade secrets in Texas, and EnerQuest's admitted possession of trade secret documents from Texas, are sufficient for personal jurisdiction to attach.

**B.      EnerQuest is Subject to Personal Jurisdiction Because it Formed a Contract with Texas Entities to be Performed in Texas.**

EnerQuest sought and received the benefit of Texas laws, purposefully forming a contract with Texas entities with the intent that the contract be performed in Texas and engaging in numerous communications with Texas residents, all of which ultimately led to the disclosure of Antero's trade secrets. These contacts gave rise to some or all of the claims at issue and subject EnerQuest to specific personal jurisdiction in Texas. *See* TEX. CIV. PRAC. & REM. CODE § 17.042. By entering into the contract with Texas entities who would perform the contract in Texas, EnerQuest purposefully availed itself of Texas' laws and protections. *See Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878, 887 (Tex. App. 2011) (finding that a defendant purposefully availed itself of Texas laws through forming a contract to be performed in Texas). The BMIII Agreement contemplated that Bauer and Ashburn, Texas residents, would largely perform the contract in Texas, giving EnerQuest reason to anticipate being haled into court there. *See Nogle & Black Aviation, Inc.*, 290 S.W.3d 277, 283 (Tex. App. 2009) (finding personal jurisdiction, even though the defendant did "not locat[e] any employees or offices in Texas and [did] not target[] the Texas market," because "it specifically chose to use the work of this Texas resident"). Moreover, even

9

if Bauer and Ashburn never performed under the contract, the contract's direction that BMA, Bauer and Ashburn perform the contract in Texas gave EnerQuest sufficient notice that harm might occur in Texas and that there was a reasonable prospect of litigation there. *Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662, 665–66 (Tex. 1987) (finding personal jurisdiction when a contract was to be performed in Texas, even though performance never occurred).

EnerQuest's formation of BMIII was only the beginning of the contacts giving rise to the claims. BMIII was an ongoing venture that imposed obligations on both parties to work together under the contract. The evidence already shows that EnerQuest participated in communications with its Texas business partner in furtherance of their working relationship and that Olson even asked Bauer to send him Antero's secret drilling schedule.[27] These communications (which discovery will likely show were not isolated) give rise to jurisdiction. *See Max Protetch*, 340 S.W.3d at 887 (describing the defendants' regular communications with Texas plaintiff). EnerQuest also sent significant payments to its Texas partner and contemplated sending up to twenty million dollars to Texas (with the option to increase this amount "by additional $10,000,000 tranches") in furtherance of this business relationship.[28] *See Burger King*, 471 U.S. at 468, 478 (forming an enterprise in one state to send payments to a corporation in the forum state was sufficient to confer specific jurisdiction). Additionally, when EnerQuest sought to take over management of BMIII, it did so through repeated and directed correspondence with Texas residents.[29] EnerQuest cannot credibly claim that it has insufficient Texas contacts when it contemplated investing *tens of millions* of dollars by entering into a seven-year contract to be performed in Texas.

---

[27] *See* Exhibit 3, Olson-Bauer Emails.

[28] BMIII Agreement § 4.5.

[29] *See* Exhibit 1D to EnerQuest's Special Appearance, Letter from Gregory Olson to BMI, dated August 9, 2017.

10

The extent to which EnerQuest representatives were physically present in Texas in the course of this transaction remains to be discovered, but even if EnerQuest had never set foot in Texas, the purposeful and continuous nature of its Texas contacts make it amenable to jurisdiction here. In fact, the Supreme Court of Texas has "found jurisdiction over nonresidents with no physical ties to Texas when an out-of-state contract was formed 'for the sole purpose of building a hotel in Texas,' *Zac Smith & Co., Inc. v. Otis Elevator Co.*, 734 S.W.2d 662, 665–66 (Tex. 1987), and when enrollment for out-of-state school was executed in Arizona but was 'actively and successfully solicited' in Texas, *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437 (Tex. 1982)." *Moncrief*, 414 S.W.3d at 154. EnerQuest cannot avoid this result by arguing that its LLC agreement chose a law or forum other than Texas.[30] "[E]ven in instances where a contract was signed in another state, an out-of-state company with no physical ties to Texas still has minimum contacts with Texas when it is clear the company purposefully directed its activities towards Texas." *Retamco*, 278 S.W.3d at 340.

EnerQuest sought the benefits of a Texas forum. By doing business with a Texas entity, EnerQuest intended to profit from work Bauer and Ashburn performed in Texas. *See Max Protetch*, 340 S.W.3d at 887 (finding personal jurisdiction and noting that the defendant would receive a $65,000 payment from a Texas customer). Antero's misappropriation claim arises directly out of EnerQuest's communications and connections with Bauer, Ashburn, BMA, and BMIII, providing a substantial connection between EnerQuest's business contacts with Texas and the operative facts of the litigation. *See Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 576, 585 (Tex. 2007).

---

[30] *See Smart Call, L.L.C. v. Genio Mobile*, 349 S.W.3d 755, 766 (Tex. App. 2011); *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 285-86 (Tex. App. 2009).

11

**C. EnerQuest is Subject to Personal Jurisdiction Because it Reached Out to Texas in Furtherance of a Conspiracy.**

The long-arm statute grants jurisdiction over out-of-state defendants when their contacts with Texas in furtherance of a conspiracy are sufficient to satisfy due process. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995). Here, the BMIII Agreement demonstrates Ashburn and Bauer acted in service of BMIII when they acquired and maintained information (in Texas) intended to justify EnerQuest's investment in West Virginia properties.[31] EnerQuest specifically contracted for this service, requiring Ashburn and Bauer to send EnerQuest information relating to the West Virginia minerals. In addition to soliciting the information, EnerQuest accepted what it knew or should have known were trade secrets and maintained those trade secrets in its possession instead of alerting Antero to the disclosure.[32]

On the basis of that information, EnerQuest paid substantial sums to Texas to acquire the ill-gotten property interests. Such payments support personal jurisdiction. *Bissbort v. Wright Printing & Pub. Co.*, 801 S.W.2d 588, 589 (Tex. App. 1990) (finding that, through "the act of wiring a large sum of money to a Texas bank, Wright has availed itself of the protection and remedies of Texas law and Texas courts"). EnerQuest's purposeful and sustained contacts with Texas in furtherance of the conspiracy at issue are sufficient to grant personal jurisdiction over EnerQuest. *See Henkel v. Emjo Investments, Ltd.*, 480 S.W.3d 1, 7 (Tex. App. 2015) (finding personal jurisdiction over a non-resident for conspiracy to commit fraud, even though the non-resident was not alleged to have personally made misrepresentations).

---

[31] BMIII Agreement § 4.1.

[32] *See* Cox Letter (admitting to possession of Antero's trade secret documents for at least one year).

12

**D. Personal Jurisdiction Over EnerQuest Comports with Notions of Fair Play and Substantial Justice.**

Finally, exercising jurisdiction over EnerQuest comports with traditional notions of fair play and substantial justice. EnerQuest is not burdened by jurisdiction here; EnerQuest's Oklahoma City headquarters is nearer to this Court than EnerQuest is to some destinations in its own home state, and nearer to this Court than Houston is. Moreover, EnerQuest also has businesses and oil and gas operations in Texas. Second, Texas has a strong interest in adjudicating the dispute as the major players in the misappropriation did so in Texas, using funding from EnerQuest to make use of Antero's trade secrets. Third, adjudicating the dispute in Texas would be both effective and convenient given that all witnesses are located a short drive from Tarrant County. Fourth, Tarrant County is an efficient and convenient location for the remainder of the parties and witnesses. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010); *Moncrief*, 414 S.W.3d at 155. On balance, requiring EnerQuest to litigate in Texas would not offend traditional notions of fair play and substantial justice, and personal jurisdiction is proper.

**IV. ALTERNATIVELY, ANTERO SEEKS A CONTINUANCE TO CONDUCT PERSONAL JURISDICTION DISCOVERY.**

Under Rule 120a(3) of the Texas Rules of Civil Procedure, if the party opposing a special appearance cannot "present by affidavit facts essential to justify his opposition, the court may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." TEX. R. CIV. P. 120a(3). When the movant seeks a continuance so it may obtain testimony, "the party applying therefor shall make affidavit that such testimony is material, showing the materiality thereof, and that he has used due diligence to procure such testimony, stating such diligence, and the cause of failure if known . . . ." TEX. R. CIV. P. 252. The Court has discretion to permit discovery on a special appearance. *BMC Software Belgium,*

13

*N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Barron v. Vanier*, 190 S.W.3d 841, 847 (Tex. App—Fort Worth 2006, no pet.).

Antero has requested discovery to confirm what the evidence already suggests: EnerQuest received or used trade secrets misappropriated by Texas residents and entities from other Texas residents and entities. Evidence already in hand shows that EnerQuest deputized Texans to get information related to West Virginia minerals and to send that information to EnerQuest so that EnerQuest could invest on the basis of it. Though EnerQuest has not described what information it received relating to any of the properties BMIII acquired, it admits having received Antero's misappropriated documents from Texas and holding them for at least one year.[33] EnerQuest does not deny knowing that Bauer and Ashburn had misappropriated information in Texas about properties BMIII acquired, and EnerQuest does not deny that Bauer and Ashburn represented they had access to misappropriated information; EnerQuest denies only knowing that the certain trade secret documents in EnerQuest's possession were obtained by unlawful means.[34] However, misappropriation under TUTSA is defined as "acquisition of a trade secret of another by a person who knows *or has reason to know* that the trade secret was acquired by improper means." TEX. CIV. PRAC. & REM. CODE § 134A.002(3). The supposed limit on what EnerQuest knew is not relevant to the jurisdictional dispute and should not be a basis on which to deny discovery.

In short, while Antero knows that EnerQuest obtained some of its trade secrets from Texas, Antero does not know the full extent of this misappropriation, when it started, how long it lasted, and how EnerQuest profited from it. Antero also does not yet have full visibility on the locations and means by which its information—calls, emails, in-person meetings—was communicated to

---

[33] *See* Cox Letter.

[34] Olson Affid. ¶ 13.

14

EnerQuest. Antero therefore cannot provide the Court with the complete litany of EnerQuest's contacts with Texas, which deprives Antero of the ability to adequately prepare for the special appearance hearing without further discovery. Testimony and discovery on these issues is likely to generate evidence material to determining the issue of EnerQuest's personal jurisdiction and should be permitted. *See Lamar v. Poncon*, 305 S.W.3d 130, 139–40 (Tex.App.-Houston [1st Dist.] 2009, pet. denied); *see also Said v. Maria Investments, Inc.*, No. 01–08–00962–CV, 2010 WL 457463, at *3 (Tex. App.–Houston [1st Dist.] Feb. 11 2010, no pet.) (mem. op.) (observing that "Rule 120a(3) gives the trial court the discretion to continue a special appearance hearing and thereby extend the time in which evidence may be served").

Antero diligently sought this needed information as quickly as possible, serving its discovery requests (attached as Exhibit 4) only days after EnerQuest filed its Special Appearance on April 18. Rather than responding to reasonable jurisdictional discovery, EnerQuest noticed its special appearance for a hearing in an attempt to insure Antero does not obtain full discovery on EnerQuest's contacts and knowledge, which cannot be procured from another source. Antero is therefore entitled to a continuance to obtain discovery on this jurisdictional issue. *In re Stern*, 321 S.W.3d 828, 839 (Tex. App. 2010) ("The trial court may permit a continuance so that the opposing party may obtain the necessary jurisdictional discovery.").

## V. CONCLUSION AND PRAYER

Intervenor Antero Resources Corporation requests that the Court overrule EnerQuest's special appearance, or alternatively, continue the hearing on same until jurisdictional discovery can be obtained, and grant Antero such additional and further relief to which it may show itself entitled.

Respectfully submitted,

**STEPTOE & JOHNSON PLLC**

By:     */s/ Jason R. Grill*
Jason R. Grill
State Bar No. 24002185
jason.grill@steptoe-johnson.com
W. Henry Lawrence
WV State Bar No. 2156
10001 Woodloch Forest Drive, Suite 300
The Woodlands, Texas 77380
281.203.5700
281.203.5701 (facsimile)

**VINSON & ELKINS LLP**

By:     */s/ Phillip B. Dye*
Phillip B. Dye, Jr.
State Bar No. 06311500
pdye@velaw.com
Jason M. Powers
State Bar No. 24007867
jpowers@velaw.com
Caroline C. Stewart
State Bar No. 24098477
cstewart@velaw.com
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
713.758.2222
713.758.2346 (facsimile)

**ATTORNEYS FOR INTERVENOR**

16

## CERTIFICATE OF CONFERENCE

I hereby certify that on May 1 and May 2, 2018, I conferred by telephone and e-mail with Spencer Smith, counsel for EnerQuest, regarding the merits of Antero's alternative motion to continue the hearing on EnerQuest's special appearance. A reasonable effort has been made to resolve the motion to continue without the necessity of court intervention and the effort failed, as EnerQuest would not agree to Antero's request. Therefore, this dispute is presented to the Court for determination.

_/s/Jason M. Powers_____
Jason M. Powers

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all parties listed below via E-service and/or via facsimile, on this the 2nd day of May, 2018:

| | |
|---|---|
| *Via E-Service: ghamm@hammfirm.com*<br>Gene A. Hamm, II<br>The Hamm Firm<br>1333 W. McDermott, Suite 200<br>Allen, Texas 75013<br>*Attorney for Plaintiff, Penn Investment Funds, LLC and New Defendants Venture Strong II, LLC and Joe F. Penn Jr.* | *Via E-Service: apennington@phblaw.com*<br>H. Allen Pennington, Jr.<br>Matthew D. Germany<br>Pennington Hill, LLP<br>Tindall Square – Warehouse No. 3<br>509 Pecan Street, Suite 101<br>Fort Worth, Texas<br>*Attorneys for Defendants John Bradley Ashburn and New Defendant Post Oak Appalachia, LLC* |
| *Via E-Service: mhassett@tarrantbusinesslaw.com*<br>Michael Hassett<br>Jones Hassett, PC<br>440 North Center<br>Arlington, Texas 76011<br>*Attorney for Defendants Michael Fisher, Maegan Fisher and M&M Consulting* | *Via E-Service: avery@averymcdaniel.com*<br>Avery McDaniel<br>Law Office of Avery McDaniel<br>1205 N. Main Street<br>Fort Worth, Texas 76164<br>*Attorney for Braxton Minerals II, LLC* |
| *Via E-Service: Scott@braxtonenergy.com*<br>R. Scott Bauer<br>8851 Camp Bowie Boulevard W<br>Suite 200<br>Fort Worth, Texas 76116<br>*Attorney for Braxton Acquisitions, LLC; Braxton Energy, LLC and R. Scott Bauer* | *Via E-Service: awoodward@hrepc.com*<br>C. Andrew Woodward<br>Holman Robertson Eldridge<br>8226 Douglas Ave., Suite 550<br>Dallas, Texas 75225<br>*Attorney for Kelly O'Connor* |
| *Via E-Service: rolandjohnson@hfblaw.com*<br>Roland K. Johnson<br>Harris, Finley & Bogle, PC<br>777 Main Street, Suite 1800<br>Fort Worth, Texas 76102<br>*Attorney for Energy Corporation of America* | *Via E-Service: joe.cox@bracewell.com*<br>Joseph M. Cox and Andrea D. Broyles<br>1445 Ross Avenue, Suite 3800<br>Dallas, Texas 75202<br>Spencer F. Smith<br>McAfee & Taft<br>211 N. Robinson Ave.<br>Oklahoma City, Oklahoma 73102.<br>*Attorneys for EnerQuest Oil & Gas, L.L.C. and Braxton Minerals III, LLC* |
| *Via E-Service: jnt@turnerandallen.com*<br>Jess N. Turner, III<br>Turner & Allen, P.C.<br>P.O. Box 930<br>Graham, Texas 76450<br>*Attorney for Turn 2 Energy, LLC* | *Via E-Service: cd@peebleslaw.com*<br>C.D. Peebles<br>The Peebles Law Firm<br>1604 Devon Court<br>Southlake, TX 76092<br>*Attorney for Austin Fox* |

| | |
|---|---|
| *Via E-Service: brad@postoakroyalty.com*<br>Brad Ashburn<br>100 N. Forest Park Blvd., Suite 201<br>Fort Worth, Texas 76102<br>*Attorney for Braxton Minerals-Appalachia, LLC* | |

 /s/ Caroline C. Stewart

CAROLINE C. STEWART

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| ANTERO RESOURCES CORPORATION, | § | |
| *Intervenor* | § | |
| | § | |
| VS. | § | |
| | § | |
| BRAXTON ENERGY, LLC, | § | |
| BRAXTON ACQUISITIONS, LLC, | § | |
| BRAXTON MINERALS II, LLC, | § | |
| ROBERT SCOTT BAUER, JOHN | § | |
| BRADLEY ASHBURN, MICHAEL | § | |
| FISHER, MAEGEN FISHER AND | § | |
| M&M CONSULTING, | § | |
| | § | |
| *Original Defendants* | § | 141st JUDICIAL DISTRICT |
| | § | |
| | § | |
| AUSTIN FOX, JOE F. PENN JR., | § | |
| BRAXTON MINERALS III, VENTURE | § | |
| STRONG II LLC, POST OAK | § | |
| APPALACHIA LLC, TURN 2 ENERGY | § | |
| LLC, BRAXTON-MINERALS | § | |
| APPALACHIA LLC, AND   ENERGY | § | |
| CORPORATION  OF AMERICA, | § | |
| ENERQUEST OIL & GAS, L.L.C., | § | |
| | § | |
| *New Defendants.* | § | TARRANT COUNTY, TEXAS |

## AFFIDAVIT AND VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Jason R. Grill who, after being duly sworn upon his oath, stated as follows:

1. My name is Jason R. Grill. I am an attorney at Steptoe & Johnson PLLC and I represent Intervenor and Counter-Claimant Antero Resources Corporation ("Antero") in the above-captioned case. As a result of my representation of Antero, I am familiar with the papers filed and served in the above-captioned lawsuit.

2. EnerQuest Oil & Gas, L.L.C., through its counsel, has produced certain documents to Antero in connection with this case, including the documents referenced in footnotes 8, 19 and 21 in Antero's Response to Special Appearance and Motion for Continuance ("Response"), which were produced to counsel for Antero by EnerQuest in March of 2018. Antero's counsel is presently in possession of these documents and will make them available for review by the Court at the hearing on EnerQuest's Special Appearance as needed rather than file the documents under seal as trade secret documents.

3. Exhibit 1 to the Response is a true and correct copy of correspondence exchanged between counsel for the parties in this case.

4. Exhibit 2 to the Response is a true and correct copy of the transcript for the June 14, 2017 temporary injunction hearing in this case.

5. Exhibit 3 is a true and correct copy of a document produced by EnerQuest to Antero in March of 2018 as described above.

6. Exhibit 4 is a true and correct copy of discovery requests served by Antero on EnerQuest on April 25, 2018.

7. I have read the foregoing Response. The facts pertaining to Antero's motion for continuance are within my personal knowledge and are true and correct.

2

_____
Jason Grill

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, on this the

2nd day of May, 2018.

_____
Notary in and for the State of Texas



TRACEY TARVIN
MY COMMISSION EXPIRES
May 8, 2019

3

# Exhibit 1

# BRACEWELL

April 26, 2018

Jason Grill
Steptoe & Johnson
10001 Woodloch Forest Drive, Suite 300
The Woodlands, Texas 77380

Re:     Cause No. 141-290089-17; *Penn Investment Funds, LLC v. Braxton Energy, LLC et al*; in the 141st
        Judicial District Court of Tarrant County, Texas

Dear Jason:

Pursuant to the Rule 11 Agreement entered into on April 17, 2018 between counsel for Antero Resources Corporation ("Antero") and counsel for EnerQuest Oil and Gas, LLC ("EnerQuest") and Braxton Minerals III, LLC ("BMIII"), EnerQuest and BMIII are required to provide notice of any Trade Secret Documents of Antero in their possession and provide copies of any such Trade Secret Documents to Antero's counsel.

By email on March 5, 2018, EnerQuest's counsel provided a copy of all of the Trade Secret Documents of Antero in its possession (including as manager of BMIII) to you and Hank Lawrence, through two zip files and a ShareFile link. A copy of the March 5, 2018 email is attached hereto. All of the information included in that email was received by EnerQuest and/or BMIII during or after February 2017 from Scott Bauer. The March 5, 2018 email includes all the Trade Secret Documents of Antero in the possession of EnerQuest or BMIII, and no additional Trade Secret Documents have come into their possession since March 5, 2018.

While EnerQuest and BMIII have provided all of the Trade Secret Documents in their possession, EnerQuest and BMIII have no knowledge or control over what Scott Bauer, Brad Ashburn, or their entity, Braxton Minerals-Appalachia, LLC, have in their possession.

The only EnerQuest employees that have viewed the Trade Secret Documents are Greg Olson and Matt Mollman, each of whom made only a cursory review of the information and did not use the Trade Secret Documents to make any business decisions. The Trade Secret Documents have not been shared with any person or entity other than: (1) EnerQuest and BMIII's attorneys in the above-referenced litigation, (2) Scott Bauer, and (3) Brad Ashburn, pursuant to a subpoena issued by Ashburn's counsel prior to the involvement of EnerQuest or BMIII in the above-referenced litigation.

**Joseph M. Cox**
Partner

T: +1.214.758.1077      F: +1.800.404.3970
1445 Ross Avenue, Suite 3800, Dallas, Texas 75202-2724
joe.cox@bracewell.com      bracewell.com

# BRACEWELL

Please let me know if you have any questions or would like to discuss any of the information contained in this letter.

Very truly yours,

Joseph M. Cox
Partner

Enclosure

# BRACEWELL

Cc:

| | |
|---|---|
| H. Allen Pennington, Jr.<br>Matthew D. Germany<br>Pennington Hill, LLP<br>Tindall Square-Warehouse No. 3<br>509 Pecan Street, Suite 101<br>Fort Worth, Texas 76102<br>apennington@phblaw.com<br>**Attorneys for Defendant John Bradley Ashburn and Post Oak Appalachia, LLC** | Phillip B. Dye, Jr.<br>Jason M. Powers<br>Caroline C. Stewart<br>Vinson & Elkins LLP<br>1001 Fannin Street, Suite 2500<br>Houston, Texas 77002-6760<br>pdye@velaw.com<br>jpowers@velaw.com<br>cstewart@velaw.com<br>**Attorneys for Intervenor Antero Resources Corporation** |
| Gene A. Hamm, II<br>The Hamm Firm<br>1333 W. McDermott, Suite 200<br>Allen, Texas 75013<br>ghamm@hammfirm.com<br>**Attorney for Plaintiff Penn Investment Funds, LLC, Joe F. Penn Jr., and Venture Strong II, LLC** | Roland K. Johnson<br>Harris, Finley & Bogle, P.C.<br>777 Main Street, Suite 1800<br>Fort Worth, Texas 76102<br>rolandjohnson@hfblaw.com<br>**Attorneys for Energy Corporation of America** |
| Michael Hassett<br>Jones Hasset, PC<br>440 North Center<br>Arlington, Texas 76011<br>mhasset@tarrantbusinesslaw.com<br>**Attorney for Defendants Michael Fisher, Maegan Fisher, and M&M Consulting** | Avery McDaniel<br>Law Office of Avery McDaniel<br>1205 N. Main Street<br>Fort Worth, Texas 76164<br>avery@avrymcdaniel.com<br>**Attorney for Braxton Minerals II, LLC** |
| R. Scott Bauer<br>8851 Camp Bowie Boulevard W<br>Suite 200<br>Fort Worth, Texas<br>scott@braxtonenergy.com<br>**Attorney for Braxton Acquisitions, LLC, Braxton Energy LLC, and himself** | C. Andrew Woodward<br>Holman Robertson Eldridge<br>8226 Douglas Ave., Suite 550<br>Dallas, Texas 75225<br>awoodward@hrepc.com<br>**Attorney for Kelly O'Connor** |
| Charles W. Sartain<br>Gray Reed & McGraw<br>1601 Elm Street, Suite 4600<br>Dallas, Texas 75201<br>**Attorneys for Global Oil and Gas Fields** | |

**Attachments:** Emails.zip
Text.zip
Attachments.html

**From:** Black, Jeremy
**Sent:** Monday, March 05, 2018 2:59 PM
**To:** 'Hank Lawrence'
**Cc:** Jason Grill
**Subject:** RE: Braxton - letter to Jeremy Black (2/23/18)

Hank,

In response to Antero's letter dated 2/23/18, EnerQuest has reviewed the materials in its possession or control including (1) various correspondence (email and texts messages) and (2) paper files EnerQuest received upon taking over the management of BMIII from Braxton Minerals-Appalachia, LLC ("BMA"). The focus of EnerQuest's review was to determine whether any of Antero's confidential and proprietary business records and trade secret information was shared with EnerQuest. Included with this email are the following materials:

1.  A zip file containing six (6) emails involving Scott Bauer which reference and/or include a Critical Date Report and/or drilling schedule.
2.  A zip file containing a text message exchange between Scott Bauer and Greg Olson w/ EnerQuest that includes a screen shot of a drill schedule.
3.  A ShareFile link whereby certain additional information that was sent by Scott Bauer to Greg Olson w/ EnerQuest via Dropbox. These are being shared via ShareFile due to the size of the files.

It is EnerQuest's belief that all of the information included in this email was received by EnerQuest in February 2017 (or later) and this information was shared by Scott Bauer in conjunction with Scott Bauer's attempt to have EnerQuest commit additional funds to his mineral acquisition program. As background, BMIII is the only mineral acquisition venture sponsored by Scott Bauer or Brad Ashburn (or any of their affiliated entities) in which EnerQuest has participated. BMIII acquired all of its minerals between November 2015 and April 2016, almost a year before any of the materials referenced in this email were provided by Scott Bauer to EnerQuest. EnerQuest has not shared this information with any party other than Scott Bauer and Brad Ashburn.

Please let me know if you have any questions about or otherwise would like to discuss anything included in this response.

Regards,
Jeremy

**ShareFile Attachments**

| Title | Size |
|---|---|
| EQ Response to Antero Letter Dated 2-23-18 | 589.8 MB |

Download Attachments    Jeremy Black uses ShareFile to share documents securely. Learn More.

# Exhibit 2

REPORTER'S RECORD

VOLUME 1 OF 1

Cause No. 141-290089-17

| PENN INVESTMENT FUNDS, LLC, | X | IN THE DISTRICT COURT |
|---|---|---|
| Plaintiff, | X | |
| ANTERO RESOURCES CORPORATION, | X | |
| Intervenor | X | |
| VS. | X | 141ST JUDICIAL DISTRICT |
| BRAXTON ENERGY, LLC, BRAXTON ACQUISITIONS, LLC, BRAXTON MINERALS II, LLC, ROBERT SCOTT BAUER, JOHN BRADLEY ASHBURN, MICHAEL FISHER, MAEGEN FISHER, M&M CONSULTING and KELLY O'CONNOR | X | |
| Defendants. | X | TARRANT COUNTY, TEXAS |

*-*-*-*-*-*-*-*-*-*-*-*-*-*

TEMPORARY INJUNCTION HEARING

*-*-*-*-*-*-*-*-*-*-*-*-*-*

BE IT REMEMBERED that on the 14th day of June, 2017, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable John P. Chupp, judge presiding, held in Fort Worth, Tarrant County, Texas.

The proceedings were reported by machine shorthand.

defected acreage on the Southwestern acquisition that was defected b-c, assume that's because, leases expired; is that correct?

A.     It does say that, yes.

Q.     Is that correct, did Kelly O'Connor give you the Southwestern defect report?

A.     I generated it prior.  No, I didn't have it -- I mean, I generated it on my own, but I wanted to -- I'll say I overstepped my bounds and wanted to make sure Joe was comfortable with the investment.

Q.     So is it your testimony, sir, that Kelly O'Connor did not give you the Southwestern defect report?

A.     Yes, sir.

Q.     So the statement in this email to Mr. Penn is false, the statement in the second sentence?

A.     Yes, sir.  Mr. Penn had become very difficult at this point.  I was working for free, he gave me a release, supposedly, from this case.

MR. HAMM:  Objection.  Nonresponsive.

THE COURT:  Sustained.

Q.     (By Mr. Lawrence)  Why did you tell Mr. Penn that Kelly O'Connor gave you the Southwestern defect report?

A.     He was looking to invest other money in the

deal.  I was making him money on deals, and then I wanted to keep it rolling, and so I overstepped my bounds.

Q.     I'll put up a text that was identified as Penn 153 --

A.     Yes, sir.

Q.     -- it's part of a text messages that you sent to Mr. Penn.  Have you reviewed the documents that were produced by Penn Investment in discovery?

A.     Yes, sir, most of them.

Q.     So the email that I just showed you, Exhibit 8, you are familiar with?

A.     Yes, I knew this was coming -- or, yes, I knew the stuff that was put in these messages were not flattering in any way and looked different than they are.

Q.     Did you find this email on your server or on any of your computers when you searched for documents responsive to the subpoena duces tecum?

A.     No, I couldn't find any of my emails as we did the pull back.

Q.     I'm sorry, let me clarify the question.

Not whether you found any, did you perform a search for emails on your computers and server such as this email, Exhibit 8?

# Exhibit 3

███████████

**From:** Scott Bauer <Scott@braxtonenergy.com>
**Sent:** Thursday, February 16, 2017 6:57 PM
**To:** Greg Olson
**Subject:** Re: WV aoi maps

Hey Greg,

I can send the drill schedule, but as of now, the dates on when mineral owners get paid is not something listed, the date of expected first production is, but we have in our order for payment, if a royalty check is received during our due diligence period, we don't close. We keep track of when checks are going out and I have a contact now that will let me know if a unit is in pay status. Jacob was asking me about the map today, He said should I take out what is in pay, I told him no bc you really want to see the area as whole, but we won't pay for anything that is in pay status and I confirm every acre before we buy with my contact at Antero. She keeps me up to date if a division order is about to be mailed and what goes into pay status to the mineral owner. I don't keep the drill schedule digital, I keep it on my person at all times, bc its one of my prize possessions. I don't have a scanner here that will feed that size paper, but I'll get it done tonight.

Our deeds are clear on first production and Antero actually has instructed the division order department to star every Braxton deed and interest bc they know of our unique language. They actually complimented us on it. We've had two issues ever that have arisen, each where easy to handle, the deed was filed in between the last revision to interests and checks being cut, and that was when Brad filed some deeds later than the effective date, just didn't get them in for some reason, but in both instances, the landowners quickly returned the checks to Antero and Antero re-issued us checks. That won't happen with our filing system. I have a law firm that I have referred a lot of business to that has made their runners at my disposal. They have four offices, so I can have deeds filed same day every time, and I'm not waiting for a mailed deed, I am taking the deed in person. But before a single dollar exchanges, I will have confirmation from Antero, they give me weekly updates on what division orders are going out and what is going into pay. But they don't know the date that they are going to get cleared for pay until maybe two weeks out, but we know its usually 30 days from the division orders, so we stay just ahead of those so the division order comes to us. But as important, I make it part of an order for payment that they sign and I sign, that we are entitled to those royalties. But simple answer, I stay ahead of division orders and if they are sent, I confirm the hell out of the pay status. I won't miss on that, that is one thing I am very clear on makes the economics. So this is something I don't take chances on and will loop you in if the DO has been sent out. But we know who is getting paid and who isn't and keep a running list of every unit and have them prioritized based on dates as well. We keep track in about three different list that we cross reference, but most importantly we have it contracted and have updates from Antero. They can tell you as detailed of info as I had on the critical well status sheet, but they can't tell you that far out when they will pay. Kelly, the President of TEXHOMA said Antero wants them to be down to 6 months by the end of the year, Kelly said he needs more guys to reach that level consistently.

Scott Bauer, CEO
Braxton Energy, LLC
(817) 698-0020 office
(817) 905-7268 cell
scott@braxtonenergy.com

On Feb 16, 2017, at 5:42 PM, Greg Olson <G.Olson@enerquest.net> wrote:

1

Scott, could you send me the drill schedule? I'd like to see how the AOI wells are scheduled. Also, if a well has been drilled, how do we get comfortable with the notion that we'll get paid back to date of first production. I'm putting the final touches on a proposed letter of intent but would like to address the matters before sending to you.

*Gregory W. Olson*
*President*
*EnerQuest Oil & Gas, LLC*
*12368 Market Drive*
*Oklahoma City, OK 73114*
*(405) 478-3300 ext. 101*

---

**From:** Matt Mollman
**Sent:** Thursday, February 16, 2017 2:19 PM
**To:** Greg Olson <G.Olson@enerquest.net>
**Cc:** Aaron Ivey <A.Ivey@enerquest.net>
**Subject:** FW: WV aoi maps

Greg,

Attached is a quick base map I put together using the information Jacob sent today.  Please note the following:

1) The oil and gas well symbols are limited to active producing wells.
2) If the wellbore stick is straight it is just a permit or a well that has no directional data filed with the State.
3) If the wellbore stick is curved the well has been drilled and directional data is on file with the State.
4) If the wellbore stick does not have a gas well symbol at the end of it then the well was not an active producing well at the end of 2015.

Matt

---

**From:** Jacob Patrylick [mailto:Jacob.Patrylick@braxtonenergy.com]
**Sent:** Thursday, February 16, 2017 11:32 AM
**To:** Matt Mollman <M.Mollman@enerquest.net>; Scott Bauer <Scott@braxtonenergy.com>; Greg Olson <G.Olson@enerquest.net>
**Subject:** Re: WV aoi maps


Matt,


To start, here are two shapes and a map. First are the units you request and second is a rough outline of the AOI we would like to present because not all of the unit declarations have been filed with the county. There are a few other company priority units based on drill dates. We are starting withe the Monroe as first focus area and the other sent are ares will be hitting very soon.  https://www.dropbox.com/s/ksjyxk128u3xett/WV_Braxton_43x70_Enerquest_AOI_map.pdf?dl=0

[x] **WV_Braxton_43x70_Enerquest_AOI_map.pdf**

www.dropbox.com

Shared with Dropbox

Thanks,

Jacob

---

**From:** Matt Mollman <M.Mollman@enerquest.net>
**Sent:** Thursday, February 16, 2017 10:02:09 AM
**To:** Jacob Patrylick; Scott Bauer; Greg Olson
**Subject:** RE: WV aoi maps

Jacob,

I think we can get things moving along quicker if you could forward a shapefile that only contains the Units in the vicinity of where Scott is working with Greg to define an AOI for purchasing additional minerals.  If you have any questions please give me a call.

**Matt Mollman**

**Vice President**

**EnerQuest Oil & Gas, LLC**

**12368 Market Dr**

**Oklahoma City, OK 73114**

**Office:  405-478-3300 ext 102**

**Cell: 405-760-3896**

---

**From:** Jacob Patrylick [mailto:Jacob.Patrylick@braxtonenergy.com]
**Sent:** Monday, February 13, 2017 11:58 AM
**To:** Scott Bauer <Scott@braxtonenergy.com>; Greg Olson <G.Olson@enerquest.net>; Matt Mollman <M.Mollman@enerquest.net>
**Subject:** WV aoi maps

Gentlemen,

Here are links to aoi maps in West Virginia.

Overview map is kinda large file.

WV_Braxton_43x70_2+bcf_60k.pdf

Smaller area maps

WV_Braxton_13x19_Monroe_aoimap.pdf

WV_Braxton_13x19_Noland_aoimap.pdf
WV_Braxton_13x19_Hamilton_aoimap.pdf

WV_Braxton_13x19_Davis_aoimap.pdf

Best regards,

Jacob

<BraxtonWV_AOI_BaseMap.pdf>

# Exhibit 4

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| ANTERO RESOURCES CORPORATION, | § | |
| *Intervenor* | § | |
| | § | |
| VS. | § | |
| | § | |
| BRAXTON ENERGY, LLC, | § | |
| BRAXTON ACQUISITIONS, LLC, | § | |
| BRAXTON MINERALS II, LLC, | § | |
| ROBERT SCOTT BAUER, JOHN | § | |
| BRADLEY ASHBURN, MICHAEL | § | |
| FISHER, MAEGEN FISHER AND | § | |
| M&M CONSULTING, | § | |
| | § | |
| *Original Defendants* | § | 141st JUDICIAL DISTRICT |
| | § | |
| | § | |
| AUSTIN FOX, JOE F. PENN JR., | § | |
| BRAXTON MINERALS III, VENTURE | § | |
| STRONG II LLC, POST OAK | § | |
| APPALACHIA LLC, TURN 2 ENERGY | § | |
| LLC, BRAXTON-MINERALS | § | |
| APPALACHIA LLC, AND   ENERGY | § | |
| CORPORATION  OF AMERICA, | § | |
| ENERQUEST OIL & GAS, L.L.C., | § | |
| | § | |
| *New Defendants.* | § | TARRANT COUNTY, TEXAS |

**INTERVENOR ANTERO RESOURCES CORPORATION'S FIRST
SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION
TO ENERQUEST OIL & GAS, L.L.C.**

TO:   Defendant EnerQuest Oil & Gas, L.L.C., by and through its attorneys of record, Joseph M. Cox and Andrea D. Broyles, 1445 Ross Avenue, Suite 3800, Dallas, Texas 75202, and Spencer F. Smith, McAfee & Taft, 211 N. Robinson Ave. Oklahoma City, Oklahoma 73102.

Pursuant to Rules 192, 196 and 197 of the Texas Rules of Civil Procedure, Antero

Resources Corporation ("Antero"), Intervenor in the above-captioned case, serves upon Defendant

EnerQuest Oil & Gas, L.L.C. ("EnerQuest"), the following interrogatories and requests for production, the answers to which shall be made under oath separately and fully in writing within thirty (30) days after the date of service of these interrogatories and requests for production and shall be given to the undersigned counsel of record.

# I.
# INSTRUCTIONS

1.      Unless otherwise specified, produce all requested documents in your possession, custody, or control. Without limitation, a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person or public or private entity having actual possession thereof. Such documents include any documents that you do now or did at any time during the period covered by these requests maintain or keep in personal files, private papers, electronic storage or devices, homes, personal automobiles, or anywhere else on or off your premises.

2.      If you have in your possession, custody, or control a copy of a requested document, but not an original, please so state and produce the copy.

3.      In lieu of producing original documents which are in your possession, custody, or control, you may produce copies provided that the copies are accurate and complete copies of original documents and provided that the originals are preserved and made accessible upon request during this or any subsequent proceeding.

4.      If any document is responsive to a request for production and was, but is no longer, in your possession or custody or subject to your control, state what disposition was made of it and why, who disposed of the document, and the date(s) (or approximate date(s)) on which the document was disposed.

5.      If any request asks for documents that are no longer in existence, identify the request and, with respect thereto:

        a.      identify all such documents;

        b.      state the time period during which such documents were maintained;

        c.      state the circumstances under which such documents ceased to exist;

        d.      state the date when such documents ceased to exist;

        e.      identify all persons having knowledge of the circumstances under which such documents ceased to exist; and

        f.      identify all persons who have knowledge or had knowledge of the documents and the contents thereof.

2

6. If any documents called for in response to any of these requests were furnished in response to another of these requests, or in response to previous requests of any party to this action, they need not be furnished again. Indicate, however, what the documents are and pursuant to which of those requests they were produced.

7. For each document withheld under a claim of privilege, state:

    a. the name and title of the author(s);

    b. the name and title of the person(s) to whom a copy of the document was sent or to whom any part of the document or a copy was shown;

    c. the date of the document;

    d. the name and title of the person(s) to whom the document was addressed;

    e. the number of pages;

    f. a brief description of the subject matter;

    g. the nature of the privilege claimed;

    h. the facts that support such claim of privilege; and

    i. the request(s) to which the document is otherwise responsive.

8. When a person is referred to or identified in an answer to an interrogatory, or identified as a source or partial source of an answer, set forth with respect to each such person: (1) his or her full name, employer, and position at the time in question, (2) his or her present employer and position, and (3) his or her present business and home address.

9. When a corporation, firm or other entity is referred to or identified in an answer to an interrogatory, or as a source or partial source of an answer, set forth with respect to such entity: (1) the full name of such entity, and (2) the address of such entity.

10. When a document is referred to or identified in an answer to an interrogatory, or as a source or partial source of an answer, set forth with respect to such document: (1) the identity of each person who either wholly or in part originated, initialed, signed, prepared or revised (and if the same was done on behalf of any person, the identity of such person), or who is referred to in any way on the face or back of such document, (2) the date of such document, (3) the type of document, (4) any identifying numbers on the face or back of such document, (5) the substance of such document, (6) the identity and location of each person who has possession, custody or control over each copy of such document, including, if such person is not an individual, the person exercising such possession, custody or control on behalf of such, and if such document has been destroyed or otherwise disposed, identify as herein required each person who destroyed or otherwise disposed of such document or who directed or participated in such destruction or other disposal of such document, and (7) if any document ever existed which referred or related to such

3

document, identify as herein required each such document which referred or related to such document.

11.    Wherever an oral communication is referred to or identified in answer to any interrogatory, or as a source or partial source of an answer: (1) identify each person participating in or present during all or part of such oral communication and specify the date, time of day and duration of such oral communication, (2) state whether such oral communication took place in a face-to-face meeting or by means of a telephone, radio or other means of communication, (3) state the substance of what was said by each person during such oral communication, and (4) identify each document relating or referring to such oral communication.

12.    With respect to and as part of the answer to each interrogatory, state whether the answer is given upon personal knowledge and, if so, identify each person upon whose knowledge the answer is given. If any answer is not given upon personal knowledge, identify the source of the information and belief. If any answer is based upon documents, identify each such document. If any answer is based upon oral communications, identify each such oral communication.

13.    All interrogatories herein are continuing and are to be supplemented to the fullest extent required by the Texas Rules of Civil Procedure. Intervenor reserves the right to serve further interrogatories.

14.    If you are asked to identify a document or an oral communication and object to identifying or to describing the document or oral communication because it allegedly constitutes privileged matter or work product, or is otherwise allegedly protected from discovery, you must still identify the document or oral communication in accordance with the definitions and instructions herein, except that instead of fully describing the substance of the document or oral communication for which privileged is claimed, you must describe the subject of the document or oral communication to the fullest extent consistent with the privilege or protection claimed, and you must hold the document or evidence of such oral communication subject to the further orders of the Court.

## II.
## DEFINITIONS

1.    "**Antero**" and "**Intervenor**" shall mean Intervenor, Antero Resources Corporation.

2.    "**BMA**" means Braxton Minerals-Appalachia LLC and any of its employees, officers, directors, agents, or contractors.

3.    "**BMII**" means Braxton Minerals II and any of its employees, officers, directors, agents, or contractors.

4.    "**BMIII**" means Braxton Minerals III and any of its employees, officers, directors, agents, or contractors.

5.    "**Communication**" means a transmission from one person to another or in the presence of another, whether written, oral, telephonic, electronic or by any other means, including text messages.

4

6. "**Defendants**" shall mean Braxton Energy, LLC, Braxton Acquisitions, LLC, Braxton Minerals II, LLC, Robert Scott Bauer, John Bradley Ashburn, Michael Fisher, Maegan Fisher, M&M Consulting, Kelly O'Connor, Austin Fox, Joe F. Penn Jr., Braxton Minerals III, Venture Strong II LLC, Post Oak Appalachia LLC, Turn 2 Energy LLC, Braxton-Minerals, Appalachia LLC, Energy Corporation of America, EnerQuest, and any other persons or entities acting or purporting to act on their respective behalf.

7. "**Document**" means any printed, type-written or handwritten instrument of whatever character where the physical expression of any means of storage of information and includes, without limitation, any correspondence, memorandum, agreement, letter, hand or type written note, computer printout, computer tape, microfilm, microfiche, tape recording, photograph, motion picture, plat, diagram, survey, voice tapes, recordings, computer information, including but not limited to the text of e-mails, and other items of a similar nature, originals and non-identical copies and where originals and/or non-identical copies are in existence, a copy of the original and copy of all non-identical copies.

8. "**Identify**" means the following unless additional information is requested in a given interrogatory:

    a. With respect to a natural person, "identify" means to state the person's full name, present employer, title, job description, business and home addresses and telephone numbers, and the person's relationship, if any, with any party to this action;

    b. With respect to a person other than a natural person including any business entity, "identify" means to include its name, its address "all business addresses," its date and place of formation, the type of legal entity which it is, and its chief executive officer;

    c. With respect to a "document," "identify" means to state its title, date, author, addressee, recipient, subject matter or general nature, present location and custodian. Such documents shall be so identified whether or not the documents are in the possession of you or your attorney and whether or not the document is privileged; and

    d. With respect to oral statements or communications, identification means to state the maker, recipient, the date made, the place made, the persons present when the communication was made, the mode of communication, the subject matter, and the date of the communication.

9. "**Person**" means the plural as well as the singular and includes, without limitation, any natural person as well as any firm, corporation, unincorporated association, partnership of any kind, or any other form of legal entity unless the context clearly indicates otherwise.

10. The "**Lawsuit**" means the case styled Cause No. 141-290089-17; *Penn Investment Funds, LLC, Plaintiff and Antero Resources Corporation, Intervenor v. Braxton Energy, LLC, et al.;* in the 141st Judicial District Court of Tarrant County, Texas.

11. "**Trade Secret Documents**" means:

    a. Antero's Critical Date Report dated November 15, 2016;

b. Any other Antero Critical Date Reports;

c. The SWN June 2016 Acquisition Defects Report;

d. Real Property Title Opinions prepared by Antero's attorneys;

e. All other documents setting forth Antero's plans to drill wells, operate wells, form units, or acquire oil and gas interests;

f. All other forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, created by or for Antero or its agents, attorneys, contractors, or similar personnel, not generally known or readily ascertainable through proper means by persons other than Antero and Texhoma Land Consultants I, Inc.

12. "**Texhoma**" means Texhoma Land Consultants I Inc. and any of its employees or contractors.

13. "**Trade Secret Information**" means any information embodied in a Trade Secret Document.

14. "**You**" or "**Your**" shall mean EnerQuest (together with its respective agents, employees, attorneys, affiliates, members, officers, directors, predecessors, successors, assigns, and any other person or entity acting or purporting to act on behalf of any of them) answering Antero's written discovery requests.

## III.
## INTERROGATORIES

**INTERROGATORY NO. 1**

Identify any and all persons who have knowledge of EnerQuest's contacts with the State of Texas, including, but not limited to, persons located in or residents of the State of Texas.

**ANSWER:**

**INTERROGATORY NO. 2**

Identify any and all persons who have knowledge of EnerQuest's contacts with Bauer, Ashburn, BMA, BMII, or BMIII.

**ANSWER:**

**INTERROGATORY NO. 3**

If you contend that this lawsuit should be dismissed for want of jurisdiction pursuant to a special appearance by you, please identify any facts, documents, and/or witnesses that support your contention.

**ANSWER:**

**INTERROGATORY NO. 4**

State the times, sources, and means by which you obtained possession of each of the Trade Secret Documents, including identification of all agents, employees, or other individuals affiliated with you who obtained or viewed such Trade Secret Documents.

**ANSWER:**

**INTERROGATORY NO. 5**

State the times, sources, and means by which you conveyed to any other person any Trade Secret Document, or any Trade Secret Information.

**ANSWER:**

**IV.**
**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1**

Produce any Trade Secret Documents still in your possession.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2**

Produce any and all documents that relate to the formation of BMIII, including, but not limited to, discussions of potential members, employees, agents, office locations, and business to be conducted by BMIII.

**RESPONSE:**

7

**REQUEST FOR PRODUCTION NO. 3**

Produce all communications received from or sent to any person or location in Texas relating to the formation of BMIII.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 4**

Produce all communications received from or sent to any person or location in Texas relating to the business activities or prospective business activities of BMIII.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 5**

Produce all communications received from or sent to any person or location in Texas relating to the leasing activities or prospective leasing activities of BMIII.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 6**

Produce all communications received from or sent to any person or location in Texas relating to Antero's leasing, production, operations, plans, or business in West Virginia.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 7**

Produce all communications received from or sent to any person or location in Texas relating to EnerQuest's investment or potential investment in the ownership or leasing of any oil and gas interests located in units operated, to be operated, drilled, or to be drilled by Antero.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 8**

Produce any and all communications with Robert Scott Bauer.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9**

Produce any and all communications with John Bradley Ashburn.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10**

Produce any and all communications with Austin Fox, Kelly O'Connor, or any other person employed by Texhoma Land Consultants I Inc.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11**

Produce all documents relating to payments made by EnerQuest to any person or entity located in Texas or organized under the laws of the State of Texas for the purpose of acquiring or leasing oil and gas interests located in units operated, to be operated, drilled, or to be drilled by Antero (regardless of what entity would hold those minerals or leases).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12**

Produce all documents relating to BMIII's sale of West Virginia oil and gas properties.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13**

Produce all documents relating to EnerQuest's awareness of, management of, or participation in BMIII's sale of West Virginia oil and gas properties.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14**

Produce all communications with BMA.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15**

Produce all documents you transmitted to or received from BMA.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16**

Produce all documents in your possession, custody, or control relating to Texhoma Land Consultants I Inc.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17**

Produce all documents in your possession, custody, or control transmitted to or received from Texhoma Land Consultants I Inc.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18**

Produce any and all documents related to the locations and/or residences of all members, directors, officers, employees, and agents of EnerQuest.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19**

Produce any and all documents related to the locations and/or residences of all members, directors, officers, employees, and agents of BMIII.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20**

Produce any and all documents that relate to any offices owned, maintained, or used, in the State of Texas, by or on behalf of EnerQuest.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21**

Produce any and all documents that relate to any offices owned, maintained, or used, in the State of Texas, by or on behalf of BMIII.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 22**

Produce any and all documents that relate to business conducted in the State of Texas by or on behalf of EnerQuest, including, but not limited to, contacts with Bauer, Ashburn, BMA, or BMIII.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 23**

Produce any and all documents that relate to business conducted in the State of Texas by or on behalf of BMIII.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 24**

Produce any and all documents that relate to records or documents, owned or maintained by or on behalf of EnerQuest that are located in the State of Texas.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 25**

Produce any and all documents that relate to records or documents, owned or maintained by or on behalf of BMIII that are located in the State of Texas

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 26**

Produce documents sufficient to identify all property owned in the State of Texas by or on behalf of EnerQuest, including any oil and gas wells operated by EnerQuest.

**RESPONSE:**

11

**REQUEST FOR PRODUCTION NO. 27**

Produce documents sufficient to identify all property owned in the State of Texas by or on behalf of BMIII.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 28**

Produce any and all documents that relate to bank accounts maintained in the State of Texas by or on behalf of EnerQuest.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 29**

Produce any and all documents that relate to bank accounts maintained in the State of Texas by or on behalf of BMIII.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 30**

Produce any and all documents that relate to mailing addresses or telephone numbers maintained in the State of Texas by or on behalf of EnerQuest.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 31**

Produce any and all documents that relate to mailing addresses or telephone numbers maintained in the State of Texas by or on behalf of BMIII.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 32**

Produce any and all documents that relate to agents for service of process maintained in the State of Texas by or on behalf of EnerQuest.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 33**

Produce any and all documents that relate to agents for service of process maintained in the State of Texas by or on behalf of BMIII.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 34**

Produce any and all documents that relate to any correspondence, e-mails, or phone calls to or from a person located in the State of Texas by or on behalf of EnerQuest.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 35**

Produce any and all documents that relate to trips by or on behalf of EnerQuest to the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 36**

Produce any and all documents that relate to meetings conducted by or on behalf of EnerQuest in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 37**

Produce any and all documents that relate to meetings conducted by or on behalf of BMIII in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 38**

Produce any and all documents that relate to the purchase or sale of any goods or services by or on behalf of EnerQuest in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 39**

Produce any and all documents that relate to the purchase or sale of any goods or services by or on behalf of BMIII in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 40**

Produce any and all documents that relate to advertisements or marketing done by or on behalf of EnerQuest in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 41**

Produce any and all documents that relate to advertisements or marketing done by or on behalf of BMIII in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 42**

Produce any and all documents that relate to the solicitation of business or employees conducted by or on behalf of EnerQuest in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 43**

Produce any and all documents that relate to the solicitation of business or employees conducted by or on behalf of BMIII in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 44**

Produce any and all documents that relate to any contracts entered into by or on behalf of EnerQuest with any resident of or Person located in the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 45**

Produce any and all documents that relate to any contracts entered into by or on behalf of BMIII with any resident of or person located in the State of Texas.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 46**

Produce any and all documents that relate to taxes paid to any governmental entity in the State of Texas by or on behalf of EnerQuest.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 47**

Produce any and all documents that relate to taxes paid to any governmental entity in the State of Texas by or on behalf of BMIII.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 48**

Produce any and all documents that relate to lawsuits filed in the State of Texas (other than the instant suit) in which EnerQuest is a party or named third-party.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 49**

Produce any and all documents that relate to lawsuits filed in the State of Texas (other than the instant suit) in which BMIII is a party or named third-party.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 50**

If you contend that access to sources of proof will be easier if this lawsuit is tried in Oklahoma, please produce any and all documents that support that contention.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 51**

If you contend that the costs of securing the presence of willing witnesses will be lower if this lawsuit is tried in Oklahoma, please produce any and all documents that support that contention.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 52**

If you contend that compulsory process will be available to secure the attendance of unwilling witnesses if this lawsuit is tried in Oklahoma, please produce any and all documents that support that contention.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 53**

If you contend that the administrative burden of this lawsuit on a court in Oklahoma would be less than the burden on a court in Texas, please produce any and all documents that support that contention.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 54**

Produce any and all documents that Gregory W. Olson relied upon or consulted when he provided the affidavit attached to EnerQuest's Special Appearance.

**RESPONSE:**

Respectfully submitted,

**STEPTOE & JOHNSON PLLC**

By:     */s/ Jason R. Grill*
        Jason R. Grill
        State Bar No. 24002185
        jason.grill@steptoe-johnson.com
        W. Henry Lawrence
        WV State Bar No. 2156
        10001 Woodloch Forest Drive, Suite 300
        The Woodlands, Texas 77380
        281.203.5700
        281.203.5701 (facsimile)


**VINSON & ELKINS LLP**

By:     */s/ Phillip B. Dye*
        Phillip B. Dye, Jr.
        State Bar No. 06311500
        pdye@velaw.com
        Jason M. Powers
        State Bar No. 24007867
        jpowers@velaw.com
        Caroline C. Stewart
        State Bar No. 24098477
        cstewart@velaw.com
        1001 Fannin Street, Suite 2500
        Houston, TX  77002-6760
        713.758.2222
        713.758.2346 (facsimilie)


**ATTORNEYS FOR INTERVENOR**

17

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all parties listed below via E-service and/or via facsimile, on this the 25th day of April, 2018:

| | |
|---|---|
| *Via E-Service: ghamm@hammfirm.com*<br>Gene A. Hamm, II<br>The Hamm Firm<br>1333 W. McDermott, Suite 200<br>Allen, Texas 75013<br>*Attorney for Plaintiff, Penn Investment Funds, LLC and New Defendants Venture Strong II, LLC and Joe F. Penn Jr.* | *Via E-Service: apennington@phblaw.com*<br>H. Allen Pennington, Jr.<br>Matthew D. Germany<br>Pennington Hill, LLP<br>Tindall Square – Warehouse No. 3<br>509 Pecan Street, Suite 101<br>Fort Worth, Texas<br>*Attorneys for Defendants John Bradley Ashburn and New Defendant Post Oak Appalachia, LLC* |
| *Via E-Service: mhassett@tarrantbusinesslaw.com*<br>Michael Hassett<br>Jones Hassett, PC<br>440 North Center<br>Arlington, Texas 76011<br>*Attorney for Defendants Michael Fisher, Maegan Fisher and M&M Consulting* | *Via E-Service: avery@averymcdaniel.com*<br>Avery McDaniel<br>Law Office of Avery McDaniel<br>1205 N. Main Street<br>Fort Worth, Texas 76164<br>*Attorney for Braxton Minerals II, LLC* |
| *Via E-Service: Scott@braxtonenergy.com*<br>R. Scott Bauer<br>8851 Camp Bowie Boulevard W<br>Suite 200<br>Fort Worth, Texas 76116<br>*Attorney for Braxton Acquisitions, LLC; Braxton Energy, LLC and R. Scott Bauer* | *Via E-Service: awoodward@hrepc.com*<br>C. Andrew Woodward<br>Holman Robertson Eldridge<br>8226 Douglas Ave., Suite 550<br>Dallas, Texas 75225<br>*Attorney for Kelly O'Connor* |
| *Via E-Service: rolandjohnson@hfblaw.com*<br>Roland K. Johnson<br>Harris, Finley & Bogle, PC<br>777 Main Street, Suite 1800<br>Fort Worth, Texas 76102<br>*Attorney for Energy Corporation of America* | *Via E-Service: joe.cox@bracewell.com*<br>Joseph M. Cox and Andrea D. Broyles<br>1445 Ross Avenue, Suite 3800<br>Dallas, Texas 75202<br>Spencer F. Smith<br>McAfee & Taft<br>211 N. Robinson Ave.<br>Oklahoma City, Oklahoma 73102.<br>*Attorneys for EnerQuest Oil & Gas, L.L.C.* |
| *Via E-Service: jnt@turnerandallen.com*<br>Jess N. Turner, III<br>Turner & Allen, P.C.<br>P.O. Box 930<br>Graham, Texas 76450<br>*Attorney for Turn 2 Energy, LLC* | *Via E-Service: cd@peebleslaw.com*<br>C.D. Peebles<br>The Peebles Law Firm<br>1604 Devon Court<br>Southlake, TX 76092<br>*Attorney for Austin Fox* |

| *Via E-Service: brad@postoakroyalty.com*<br>Brad Ashburn<br>100 N. Forest Park Blvd., Suite 201<br>Fort Worth, Texas 76102<br>*Attorney for Braxton Minerals-Appalachia, LLC* | |

 */s/ Caroline C. Stewart*

CAROLINE C. STEWART

**EXHIBIT C**

FILED
TARRANT COUNTY
4/26/2018 4:52 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | ) | IN THE DISTRICT COURT OF |
| *Plaintiff*, | ) | |
| | ) | |
| ANTERO RESOURCES CORPORATION, | ) | |
| *Intervenor*, | ) | TARRANT COUNTY, TEXAS |
| | ) | |
| vs. | ) | |
| | ) | |
| BRAXTON ENERGY, LLC, et al., | ) | |
| *Defendants*. | ) | 141ST JUDICIAL DISTRICT |

## NOTICE OF HEARING

Please take notice that Defendant EnerQuest Oil & Gas, L.L.C.'s Special Appearance to Object to Personal Jurisdiction dated April 18, 2018 is set for hearing on **Wednesday, May 9, 2018 at 1:30 p.m.** in the 141st District Court for Tarrant County, located at 100 N. Calhoun Street, Fort Worth, Texas 76196.

Respectfully submitted,

BRACEWELL LLP
By:     */s/ Joseph M. Cox*
      Joseph M. Cox
      State Bar No. 04950200
      Joe.Cox@bracewell.com
      Andrea D. Broyles
      State Bar No. 24082744
      Andrea.Broyles@bracewell.com
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Telephone: (214) 468-3800
Facsimile: (800) 404-3970

- and –
Spencer F. Smith
State Bar No. 24008625
MCAFEE & TAFT A Professional Corporation
Tenth Floor, Two Leadership Square
211 N. Robinson Ave.
Oklahoma City, Oklahoma 73102-7103
spencer.smith@mcafeetaft.com
**Attorneys for Defendant EnerQuest Oil & Gas, L.L.C.**

#5689156

## Certificate of Service

I hereby certify that on April 26, 2018, a true and correct copy of the foregoing document was served on the following counsel of record in accordance with the Texas Rules of Civil Procedure:

| | |
|---|---|
| Jason R. Grill<br>W. Henry Lawrence<br>Steptoe & Johnson PLLC<br>10001 Woodlock Forest Drive, Suite 300<br>The Woodlands, Texas 77380<br>jason.grill@steptoe-johnson.com<br>hank.lawrence@stptoe-johnson.com<br>**Attorneys for Intervenor Antero Resources Corporation** | Phillip B. Dye, Jr.<br>Caroline C. Stewart<br>Vinson & Elkins LLP<br>1001 Fannin Street, Suite 2500<br>Houston, Texas 77002-6760<br>pdye@velaw.com<br>cstewart@velaw.com<br>**Attorneys for Intervenor Antero Resources Corporation** |
| Gene A. Hamm, II<br>The Hamm Firm<br>1333 W. McDermott, Suite 200<br>Allen, Texas 75013<br>ghamm@hammfirm.com<br>**Attorney for Plaintiff Penn Investment Funds, LLC, Joe F. Penn Jr., and Venture Strong II, LLC** | H. Allen Pennington, Jr.<br>Matthew D. Germany<br>Pennington Hill, LLP<br>Tindall Square-Warehouse No. 3<br>509 Pecan Street, Suite 101<br>Fort Worth, Texas 76102<br>apennington@phblaw.com<br>**Attorneys for Defendant John Bradley Ashburn and Post Oak Appalachia, LLC** |
| Michael Hassett<br>Jones Hasset, PC<br>440 North Center<br>Arlington, Texas 76011<br>mhasset@tarrantbusinesslaw.com<br>**Attorney for Defendants Michael Fisher, Maegan Fisher, and M&M Consulting** | Avery McDaniel<br>Law Office of Avery McDaniel<br>1205 N. Main Street<br>Fort Worth, Texas 76164<br>avery@avrymcdaniel.com<br>**Attorney for Braxton Minerals II, LLC** |
| R. Scott Bauer<br>8851 Camp Bowie Boulevard W<br>Suite 200<br>Fort Worth, Texas<br>scott@braxtonenergy.com<br>**Attorney for Braxton Acquisitions, LLC, Braxton Energy LLC, and himself** | C. Andrew Woodward<br>Holman Robertson Eldridge<br>8226 Douglas Ave., Suite 550<br>Dallas, Texas 75225<br>awoodward@hrepc.com<br>**Attorney for Kelly O'Connor** |
| Roland K. Johnson<br>Harris, Finley & Bogle, P.C.<br>777 Main Street, Suite 1800<br>Fort Worth, Texas 76102<br>rolandjohnson@hfblaw.com<br>**Attorneys for Energy Corporation of America** | Charles W. Sartain<br>Gray Reed & McGraw<br>1601 Elm Street, Suite 4600<br>Dallas, Texas 75201<br>**Attorneys for Global Oil and Gas Fields** |

/s/ Joseph M. Cox
Joseph M. Cox

2

#5689156

# EXHIBIT D

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | ) | IN THE DISTRICT COURT OF |
| *Plaintiff*, | ) | |
| | ) | |
| ANTERO RESOURCES CORPORATION, | ) | |
| *Intervenor*, | ) | TARRANT COUNTY, TEXAS |
| | ) | |
| vs. | ) | |
| | ) | |
| BRAXTON ENERGY, LLC, et al., | ) | |
| *Defendants*. | ) | 141ST JUDICIAL DISTRICT |

<u>**DEFENDANT BRAXTON MINERALS III, LLC'S**
**SPECIAL EXCEPTIONS AND ORIGINAL ANSWER**</u>

Defendant Braxton Minerals III, LLC ("BMIII") hereby files its Special Exceptions and Original Answer to the Amended Petition in Intervention and Application for Temporary and Permanent Injunction ("Amended Petition in Intervention") of Intervenor Antero Resources Corporation ("Antero"), and would respectfully show the Court as follows:

**I.  SPECIAL EXCEPTIONS**

1.      Antero's Amended Petition in Intervention includes a variety of vague, ambiguous, and generally stated allegations that do not meet these requirements, and wholly lacks any allegations of wrongdoing on the part of BMIII.  Pursuant to Rule 91 of the Texas Rules of Civil Procedure, BMIII specially excepts to Antero's claims for Trade Secret Misappropriation, Conspiracy, and Aiding and Abetting.  Texas follows the "fair notice" standard for pleading, which looks at whether the opposing party can ascertain from the pleadings the nature and basic issues of the controversy and what testimony will be relevant.  *Horizon/ CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000).  If a plaintiff pleads a cause of action in general terms, the defendant may file special exceptions to require the plaintiff to plead specifically.  *See Subia v. Tex. Dept. of Human Servs.*, 750 S.W.2d 827, 829 (Tex. App.—El Paso 1988, no writ).

2. In the Amended Petition in Intervention, Antero has failed to identify any wrongful conduct by BMIII that injured Antero or caused Antero to incur damages. In fact, BMIII is only mentioned in eight (8) paragraphs throughout the Amended Petition in Intervention, related to the following subject matters: (a) Robert Scott Bauer identified certain Antero Title Opinions in his possession or that were obtained from John Bradley Ashburn, and those title opinions related to mineral properties acquired by BMIII; (b) BMIII's membership structure and the current dispute between the members related to management of the company; and (c) EnerQuest Oil and Gas, LLC has advertised BMIII's assets for sale. *See* Amended Petition in Intervention ¶¶ 38, 40, 42–46, 62. Absent from the Amended Petition in Intervention is *any* alleged wrongful conduct by BMIII; instead, Antero has alleged conduct of third parties or information completely irrelevant to the elements of any of Antero's causes of action. As a result of Antero's vague, ambiguous, and general pleading, BMIII cannot ascertain from the Amended Petition in Intervention which causes of action Antero is pursuing against BMIII, or even what conduct of BMIII Antero alleges is wrongful. Accordingly, Antero should be required to re-plead and provide sufficient information to give BMIII "fair notice" of the causes of action asserted.

## II.    GENERAL DENIAL

3. Pursuant to Rule 92 of the Texas Rules of Civil Procedure, BMIII denies each and every allegation in Antero's Amended Petition in Intervention and demands strict proof thereof by a preponderance of the evidence.

## III.    AFFIRMATIVE DEFENSES

4. Antero's claims are barred, in whole or in part, due to the failure to state a claim upon which relief may be granted.

5. Antero's claims are barred, in whole or in part, by virtue of the doctrine of waiver.

6.     Antero's claims are barred, in whole or in part, by virtue of the doctrine of estoppel.

7.     Antero's claims are barred, in whole or in part, by virtue of the statute of limitations doctrine.

## IV.     REQUEST FOR DISCLOSURE

8.     Pursuant to Rule 194 of the Texas Rules of Civil Procedure, BMIII requests that Antero disclose, within thirty (30) days of service of this request, the information or material described in Rule 194.2.

## V.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant BMIII respectfully requests that the Court sustain its special exceptions to Antero's Amended Petition in Intervention. Specifically, BMIII requests that the Court require Antero to re-plead its claims against BMIII. BMIII further requests that Antero take nothing by its claims, and BMIII recover the costs of this proceeding, and such other and further relief to which it may be justly entitled.

Respectfully submitted,

BRACEWELL LLP

By:     /s/ Joseph M. Cox
　　　Joseph M. Cox
　　　State Bar No. 04950200
　　　Joe.Cox@bracewell.com
　　　Andrea D. Broyles
　　　State Bar No. 24082744
　　　Andrea.Broyles@bracewell.com

1445 Ross Avenue, Suite 3800
Dallas, Texas 75202
Telephone: (214) 468-3800
Facsimile: (800) 404-3970

**Attorneys for Defendant Braxton Minerals III, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2018, a true and correct copy of the foregoing document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure.

*/s/ Joseph M. Cox*
Joseph M. Cox

**EXHIBIT E**

CAUSE NO. 141-290089-17

| | | |
|---|---|---|
| PENN INVESTMENT FUNDS, LLC, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| ANTERO RESOURCES | § | |
| CORPORATION, | § | |
| Intervenor, | § | TARRANT COUNTY, TEXAS |
| | § | |
| v. | § | |
| | § | |
| BRAXTON ENERGY, LLC, et al. | § | |
| Defendants. | § | 141ST JUDICIAL DISTRICT |

## ORDER OVERRULING OBJECTION TO JURISDICTION

On May 11, 2018, came on to be heard the special appearance motion of Enerquest Oil & Gas, LLC., a defendant in this cause. All parties to this proceeding, having been duly notified, appeared by counsel. The court, having considered the pleadings, evidence, and arguments of counsel, is of the opinion and finds that the court has jurisdiction over the defendant, and that the special appearance motion should be overruled.

IT IS, ACCORDINGLY, ORDERED by the court that the special appearance motion is overruled. All costs of the motion are taxed against defendant.

SIGNED May 11, 2018.

_____
JUDGE PRESIDING

E-MAILED
5-11-18

**EXHIBIT F**

| | |
|---|---|
| **From:** | Cox, Joe <joe.cox@bracewell.com> |
| **Sent:** | Tuesday, May 22, 2018 3:28 PM |
| **To:** | Jason Grill; Powers, Jason |
| **Cc:** | Broyles, Andrea; Cox, Joe |
| **Subject:** | [EXT]  Special appearance and discovery to EnerQuest |

Dear Jason and Jason:

We are going to appeal the denial of the special appearance for EnerQuest. We were hoping not to have to seek relief from the 2nd Court of Appeals for a motion to stay discovery. Would you all agree to stay the discovery as to only EnerQuest? We intend to answer the discovery for BMIII and continue to participate in the discovery of the case, as well as produce any documents EnerQuest has in relation to BMIII, Bauer and Ashburn through BMIII. Please let us know today if you could agree to this. We would agree to answer the EnerQuest discovery within 30 days of a ruling from the Court of Appeals upholding the denial of the special appearance.

Also, in the hustle and bustle of the deposition's ending, I inadvertently took 4 pages from the two boxes in the other conference room that I intended to mark and question Bauer about. Please let Andrea know where to send the few pages I took.

Thanks for the hospitality.

Best regards.

     Joe

_____

**JOSEPH M. COX**
Partner
joe.cox@bracewell.com
T: +1.214.758.1077 | F: +1.800.404.3970 | M: +1.214.505.7000

**BRACEWELL LLP**
1445 Ross Avenue Suite 3800 | Dallas, TX | 75202-2724
bracewell.com | profile | download v-card

CONFIDENTIALITY STATEMENT
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

**EXHIBIT G**

WARNING!

This rough draft of the proceedings was produced in Realtime and is not certified. The rough draft transcription may not be cited or used in any way or at any time to rebut or contradict the certified transcription of proceedings. There will be discrepancies in this form and the final form, because this Realtime transcription has not been proofread, corrected, finalized, indexed or certified. There will also be a discrepancy in page numbers appearing on the rough draft and the proofread, corrected and certified final.

PROCEEDINGS

VIDEOGRAPHER: We're now on record for the videotaped deposition of Robert Scott Bauer. The date is May 16th, 2018. The time is 9:45 a.m. Will the court reporter please swear in the witness.

(Witness sworn)

ROBERT WILLIAM SCOTT BAUER,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. GRILL:

2

Q.  Good morning, sir.  Please state your full name for the ladies and gentlemen of the jury.

A.  Robert William Scott Bauer.  Robert William is my first name.

Q.  And what names do you go by?

A.  Scott.

Q.  Scott Bauer?

A.  Yeah, Scott Bauer.

Q.  All right.  What about Robert Bauer?

A.  On some official documents, you know.  They're supposed to put a William on there, but it turns out Robert really, so just put Robert.

Q.  Okay.  You understand I represent Antero, correct?

A.  You do.  I do.

Q.  Have you -- you've given your deposition before, correct?

A.  Yes.

Q.  How many times?

A. This will be my third time.

Q. All right. And when was the last one?

A. A couple of weeks ago.

Q. And just in case you've forgotten, let's go over a few ground rules to help the deposition go smoother and quicker, okay?

A. (Moving head up and down)

Q. You understand that the young lady to my right is taking down everything that you and I say?

A. Yes, sir.

Q. And so that means that everything that we say needs to be out loud and verbal, no nods of the head. Uh-huh, huh-uh, those kinds of things don't work, okay?

A. Yes, sir.

Q. If you don't understand a question, please ask me to rephrase it or ask it again. I want to make sure we have a clean record, okay?

A. Yes, sir.

Q. At any point in time you need to take a break, just let me know, we can take a break. We'll try to go about an hour and then take breaks, but if you need a break sooner, just let me know, okay?

A. I do not.

Q. Do you remember sending the electronic version of the Critical Date Report to EnerQuest?

A. Yes, I do.

Q. And when do you believe that occurred, approximately?

A. Late February, maybe.

Q. Of what year?

A. '17.

Q. In relation to EnerQuest, when did you first make contact with EnerQuest?

A. Brad advised me that EnerQuest was going to come -- Greg was coming down to meet us at the Braxton offices off of Vickery to discuss an opportunity to invest.

Q. So that would have been in sometime before November of 2015?

A. I think it was, yeah, maybe late October of 2015.

Q. All right. So Mr. Olsen came to Fort Worth?

A. Yes, sir.

Q. And who --

A. It wasn't Matt that was with him. He had another young guy that ended up moving to another -- he brought -- he had another guy with him.

122

Q. All right. So Mr. Olsen came down to Fort Worth with someone else who was employed by EnerQuest?

A. Yes, yes.

Q. And so this other person, Mr. Olsen and yourself and who else met at the Braxton offices in Fort Worth?

A. Mr. Ashburn and I. And I believe that was it.

Q. And what did you guys discuss?

A. What Braxton had done, a lot of what -- the different deals I had done in the past and different deals that Braxton had done and what we thought we were capable of doing.

Q. Did you guys discuss any -- the possession by any Braxton entity of any Title Opinions issued to Antero?

A. I don't -- I don't recall, sir.

Q. So you don't know one way or the other?

A. Yeah, I don't know. I don't think we talked

much due diligence.

Q. And you guys eventually consummated an agreement, I guess, with EnerQuest; is that correct?

A. That's not -- no, I don't -- no, that's not correct.

Q. All right. And I understand you dispute -- I

123

guess you dispute the formation of Braxton Minerals III; is that correct?

A. And the -- I dispute the LOI being signed. I blew up pictures for to you see the signatures. I know that we were working on something with Enter -- working to achieve a deal with EnerQuest. And then as money was moved, I was cut out of communications. Greg and I had an e-mail probably -- I think it was 12-15 of 2015 and then we didn't have another e-mail until probably November of 2016.

Q. That was you and --

MR. PENNINGTON: Objection, nonresponsive.

Q. -- Brad?

A. No. Mr. Olsen and I.

Q. So you and Mr. Olsen did not communicate between October of 2015 --